**WHITE & CASE**LLP
Francis A. Vasquez, Jr. (FAV-1446)
Maria N. Lerner (Admission Pending)
Claire A. DeLelle (CAD-3527)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL FINANCE CORPORATION,
not in its individual capacity, but solely as the
Trustee for the IFC-Netherlands Carbon Facility
2121 Pennsylvania Avenue, N.W.,
Washington, DC 20433,

               Plaintiff,

v.

KORAT WASTE TO ENERGY CO. LTD.
(a/k/a KHORAT WASTE TO ENERGY CO.)
571/11 Moo 3, Suranaree Industrial Zone,
Tambon NongBausala, Amphur Muang District,
Nakorn Ratchasima, 30000, Thailand,

               Defendant.

07 CIV 5451

Civil Case No.: _____

Judge: _____

**COMPLAINT**

Plaintiff International Finance Corporation ("IFC"), not in its individual capacity, but

solely as the Trustee for the IFC-Netherlands Carbon Facility ("INCaF") and on behalf of the

State of the Netherlands (acting through the Ministry of Housing, Spatial Planning and the

Environment ("VROM")), and by and through its attorneys, White & Case LLP, alleges this

Complaint against Defendant Korat Waste to Energy Co. Ltd. (also known as Khorat Waste to

Energy Co.) ("Korat"), a corporation organized and existing under the laws of Thailand, as

follows:

## NATURE OF THE ACTION

1.     This action arises from Korat's breach of the covenant of good faith and fair dealing implied in the Letter of Intent ("LoI") dated May 17, 2004, entered into between IFC, as Trustee for INCaF, and Korat, and Korat's breach of an agreement on price and quantity reached in June 2005.

2.     The purpose of the LoI was to negotiate the execution of an Emission Reduction Purchase Agreement ("ERPA").   The ERPA would govern the sale of certified emission reductions ("CERs"), commonly called "carbon credits," from Korat to the government of the Netherlands, on whose behalf IFC was negotiating with Korat.   CERs are greenhouse gas ("GHG") emission reductions that are created when a project (such as Korat's) reduces or avoids the emissions of GHGs, such as carbon dioxide or methane, relative to what would have been emitted under a 'business as usual' scenario.   The Kyoto Protocol, an international treaty committing the signatory nations to initiating steps to improve the quality of the earth's environment, permits the trading of CERs created by eligible projects to be used toward meeting national emission reduction targets.   Thus, the emerging, and rapidly growing, carbon credit market will become a key tool in meeting the objectives of the Kyoto Protocol.

3.     Because of IFC's ability to assess and manage long-term project and credit risk in emerging markets, IFC's objectives are to facilitate the development of a commercial carbon market by delivering financial products that achieve the value of carbon assets of developing country clients, and in its role as Trustee of INCaF, to assist the State of the Netherlands in meeting its commitment to mitigate climate change.

4.     Counsel for IFC drafted a proposed ERPA on the basis of a Term Sheet, which addressed all material terms, including price and quantity, upon which IFC and Korat had

reached agreement for the proposed ERPA. IFC sought on numerous occasions to finalize the language of the ERPA with Korat. To demonstrate its good faith in the negotiations, IFC was willing to increase the price Korat had agreed to accept, agree to advance certain of Korat's expenses to facilitate the continued negotiations, and agree to a number of additional concessions.

5.     During IFC's negotiations with Korat pursuant to the LoI, IFC incurred substantial fees and expenses.

6.     Despite having reached agreement as to all material terms of the proposed purchase, Korat delayed until it had secured the Thai government's approval and then purported to terminate the LoI by letter dated March 2, 2007. A true and complete copy of Korat's March 2, 2007, letter is attached as Exhibit A. Further, Korat has admitted that it was conducting negotiations with third-party purchasers prior to its attempted termination of the LoI, despite the LoI's exclusivity of dealings clause. A true and complete copy of an email from Ken Locklin (on behalf of Korat) to Peter Cook (of IFC), dated November 15, 2006, is attached as Exhibit B.

7.     Korat has breached the LoI, breached the covenant of good faith and fair dealing implied in the LoI, and breached its agreement to sell its CERs to INCaF. Accordingly, IFC seeks judgment compelling Korat to pay damages and lost expectancy damages for its breaches. IFC also seeks an order of indemnification of costs associated with the negotiations under the LoI, as well as the instant litigation.

## PARTIES

8.     Plaintiff IFC is an international organization within the meaning of the International Organizations Immunities Act, 22 U.S.C. § 288, *et seq.* ("IOIA"). IFC is headquartered in Washington D.C. and is a legally and financially independent member of the

3

World Bank Group. IFC's membership comprises 179 countries and its goals include the promotion of economic development by encouraging the growth of productive enterprise and efficient capital markets in its member countries. IFC is the largest multilateral source of loan and equity financing for private sector projects in the developing world.

9.    IFC is the Trustee of INCaF, and brings this action solely in that capacity and upon the instructions and consent of the State of the Netherlands, acting through VROM. IFC is the proper party to assert these claims, pursuant to Fed. R. Civ. P. 17(a).

10.    Defendant Korat, also known as Khorat Waste to Energy Co., is a corporation organized and existing under the laws of Thailand. Upon information and belief, Korat maintains a principal place of business at 571/11 Moo 3, Suranaree Industrial Zone, Tambon NongBausala, Amphur Muang District, Nakorn Ratchasima, 30000, Thailand, and maintains, or has maintained in the past, another office at Suite # 2504, 25th Flr., The Millennia Tower, 62 Lang Suan Road, Lumpini, Pathumwan, Bangkok 10330, Thailand.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this action pursuant to the International Finance Corporation Act ("the "IFCA"), 22 U.S.C. 282f; the IOIA, 22 U.S.C. § 288a; and 28 U.S.C. § 1331. The IFCA provides that any action at law or in equity to which IFC is a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of any such action. Additionally, the IOIA provides this Court with subject-matter jurisdiction in that this action is brought by IFC, an international organization within the meaning of 22 U.S.C. § 288, with the capacity to institute legal proceedings in federal court pursuant to 22 U.S.C. § 288a. Thus, federal-question

jurisdiction exists pursuant to 28 U.S.C. § 1331 as this action is deemed to arise under the laws of the United States.

12.    Jurisdiction over the person and venue is proper in this district pursuant to the parties' forum selection clause set forth in Paragraph 16 of the LoI.  Pursuant to Paragraph 16, Korat irrevocably agreed that any legal action, suit, or proceeding arising out of or relating to the LoI may be brought in the courts of the United States of America located in the Southern District of New York.

## FACTS COMMON TO ALL COUNTS

13.    Korat's project, located in Khorat, Thailand, involves the construction, ownership, operation, and financing of a methane recovery and waste-to-energy project to treat wastewater and capture biogas for ten years, to be delivered as a substitute for consumption of heavy fuel oil, and to be converted into electricity through combustion (thereby displacing grid-supplied electricity).    The project is expected to generate methane and carbon dioxide emission reductions.

14.    In early 2002, EcoSecurities Group plc. ("EcoSecurities") informed IFC about the Korat project as a potential project for INCaF.    Upon information and belief, at that time EcoSecurities was acting as an advisor/consultant to Korat, and was to be reimbursed a commission upon successful sale of CERs from the Korat project.    IFC, acting solely as the Trustee of INCaF, subsequently began discussions with Korat about the possibility of purchasing the CERs expected to be generated by Korat's project.

15.    IFC and Korat executed the LoI, for the purpose of entering into an ERPA, on May 20, 2004.  The LoI anticipates a sale from Korat to VROM on behalf of the Netherlands of no less than two million, and no more than two and a half million, CERs at a price of EUR 3 per

CER for the period ending December 31, 2012. The LoI contains an exclusivity clause at Paragraph 5, stating in relevant part that Korat "hereby agrees that INCaF's and the Trustee's rights to purchase Emission Reductions up to the Contract Volume and any additional Emission Reductions the Trustee may agree to purchase shall be prior to the rights of any other party to acquire Emission Reductions generated from [Korat's] Project."

16.    To understand Korat's conduct throughout the history of the LoI, two motivating factors must be noted. First, throughout the period of negotiations between Korat and IFC, the market price for CERs, while fluctuating some, has been steadily increasing.[1]  Korat's willingness or unwillingness to proceed with memorializing the agreement it reached with IFC correlates to the robustness of the market for CERs. Indeed, Korat has acknowledged as much, stating in an email from G. Pete Smith (on behalf of Korat) dated May 27, 2005, that Korat's "shareholders are very aware of . . . the extraordinary move in the market prices subsequent to our LoI (according to our sales agents EcoSecurities), and the commercial unacceptability of the resulting situation." A true and complete copy of the email evidencing this discussion is attached as Exhibit C.

17.    Second, Korat's conduct strongly suggests that it used the LoI as a *de facto* put option agreement, allowing it to take advantage of what IFC offered while shopping for another buyer at the same time, for two purposes:  (a) to protect itself against regulatory risks inherent in its project, and (b) to protect itself against the risk of price fluctuations in the market. Throughout the negotiations, there was a risk that the Thai government would not approve

---

[1] *See, e.g.*, State and Trends of the Carbon Market 2006, a report by the World Bank and the International Emissions Trading Association, found at http://carbonfinance.org/docs/StateoftheCarbonMarket2006.pdf; State and Trends of the Carbon Market 2005, a report by the World Bank and the International Emissions Trading Association, found at http://carbonfinance.org/docs/CarbonMarketStudy2005.pdf; State and Trends of the Carbon Market 2004, a report by the World Bank and the International Emissions Trading Association, found at http://carbonfinance.org/docs/CarbonMarketStudy2004.pdf.

Korat's project. Without the Thai government's approval, Korat would be unable to register its credits with the United Nations Framework Convention on Climate Change, and thus be unable to sell them in the carbon market. Korat's LoI with IFC, and the prospect of IFC as the purchaser of Korat's credits, gave Korat additional credibility and leverage with the Thai government – the Thai government, being a member of IFC, would think more favorably of Korat's project, be more likely to approve it, and approve of it more quickly. Korat's use of the LoI as a put option agreement to mitigate against this regulatory risk is evidenced by the fact that it terminated the LoI less than a month after the Thai government ultimately approved of the project. Having received its regulatory approvals, Korat no longer needed IFC to lend it credibility. Additionally, throughout the negotiations, Korat used the LoI as a "fall-back" option, ensuring that it would be able to sell its credits at a certain price if it could not find a more profitable venture with another purchaser. Korat's use of the LoI as a put option agreement to mitigate against the risk of market fluctuations is evidenced by the fact that it approached IFC on several occasions to induce IFC to increase the price it was willing to pay to reflect the market price, yet never moved forward to consummate the transaction after IFC agreed to those increases. Furthermore, Korat has admitted negotiating with other third-party purchasers during the life of the LoI, which violates the exclusivity provisions in the LoI.

18.     On May 26, 2005, Korat proposed certain terms in anticipation of an ERPA, including sale of one and one-half million CERs to IFC for a price of EUR 4.75. Korat also insisted that it would not accept financial liability for failure to deliver CERs in any given year. Korat stated that "[i]f these terms are broadly acceptable to IFC, we are now prepared to move quickly to finalize an updated Term Sheet which reflects them, and proceed with the completion of the balance of the purchase and sale documentation. Look forward to moving ahead

promptly." After further negotiations as to the quantity which would be sold to IFC, on June 10, 2005, IFC agreed with Korat on a price/quantity combination of EUR 4.75 for one and three-quarter million CERs and accepted Korat's other terms. A true and complete copy of the email chain evidencing these discussions and the June agreement is attached as Exhibit D.

19.    On September 21, 2005, the final Term Sheet, which now reflected the new price and quantity combination for CERs that IFC and Korat had agreed to in June, was agreed upon as well. IFC hence proceeded with drafting the ERPA. The parties envisioned that the ERPA would be completed by the end of the year in accordance with the terms reflected in the Term Sheet. On October 13, 2005, IFC sent a draft ERPA to Korat that reflected the new price and quantity combination, as well as all other terms contained in the final Term Sheet.

20.    Despite its June agreement and other representations, Korat began dragging its feet in completing the ERPA. Korat initially provided only very general comments and alleged "policy concerns" on the ERPA (e.g., it was too long, or had too many covenants), without providing specific feedback or language redrafting proposals. In response to IFC's request for additional comments, Korat provided a memorandum of "Guidelines for Redraft of [Korat]/IFC ERPA" ("Guidelines") on November 8, 2005. Korat's Guidelines continue to discuss Korat's "policy concerns," and call for additional terms not agreed to in the final Term Sheet that are above and beyond customary market terms for such agreements. Korat's Guidelines further demonstrate Korat's attempt to force IFC to assume all risks associated with its project, while it continued to keep its options open in the event that a better offer came along.

21.    IFC provided comments to Korat on its Guidelines on November 9, 2005 (the very next day), and suggested a meeting to discuss the proposed ERPA. Korat refused to meet, however, and instead sent an email to IFC on November 15, 2005, stating that it "[did] not

believe we have made sufficient progress working around the very material and fundamental difference in our positions . . . to justify further discussions at this time." In subsequent discussions, Korat continued to merely reiterate its general dissatisfaction with the then-existing draft of the ERPA, without providing additional specific feedback. Numerous attempts to follow up with Korat to discuss drafting of the ERPA were ignored.

22.     Tellingly, during this same time (the latter half of 2005), the price of carbon credits had risen, which gave Korat further incentive to avoid completing the ERPA under the agreed upon pricing terms.

23.     On December 13, 2005, IFC sent Korat an email offering to redraft the ERPA. IFC expressed frustration with the difficulty it faced communicating with Korat, and requested open lines of communication. IFC requested a response by December 15, 2005.

24.     On December 15, 2005, Korat requested additional time to respond, and on December 17, 2005, sent an email to IFC stating that any redrafted ERPA should be substantially different from the original. Korat additionally requested that IFC inform them if IFC "know[s] already that the commercial issues [Korat] raised . . . cannot be resolved or eliminated in a redrafted ERPA."

25.     In its efforts to consummate the transaction, IFC retained English counsel at considerable expense to undertake a review of the ERPA. IFC subsequently sent Korat a revised ERPA. Korat never provided comments on this revised draft.

26.     On July 14, 2006, Korat requested that IFC consider a further increase in the price it was willing to pay for the CERs, admitting that despite its prior agreement as to price and quantity and its alleged problems with the ERPA, it was really only interested in renegotiating the price. As Korat stated in an email from that date, its "Board members consider price to be

the central issue . . . If the price issue can be resolved, then we will discuss other details in the ERPA." In response to a query by IFC of what price levels Korat was seeking, Korat stated that it is "currently (in the last week) seeing unsolicited price offers of $15 for PS ["prior to start," or generated before registration] CERs, and $9-10 for 2007+ vintage CERs . . ." A true and complete copy of the emails evidencing this discussion are attached at Exhibits E and F.

27.    On September 23, 2006, Korat informed IFC that it did not wish to incur additional legal expenses in light of the recent coup in Thailand. In response, to demonstrate its good faith in seeking to consummate this transaction, IFC discussed the following revised terms during a meeting with Korat representatives on October 17, 2006: (a) a higher price for the CERs of EUR 7.25; (b) an advance by IFC of certain of Korat's legal expenses, which it would recoup only if the ERPA was executed; (c) an agreement to purchase an additional 250,000 CERs after 2012 at the same price of EUR 7.25 per CER; (d) assistance in obtaining approval from the Thai government; and (e) assistance with the sale of verified emission reductions if Korat's project was not registered in time to qualify for CERs generated prior to registration.

28.    On October 19, 2006, Korat informed IFC that "potential buyers have approached us or our Board members with indications of interest or CER purchase offers from time to time. . . We view these to be attractive offers . . ." In response, IFC send Korat an email on November 10, 2006, expressing a willingness to go forward with a new proposal despite the uncertainty of the political situation in Thailand. IFC further indicated that it believes "that the LoI of May 2004 does not give [Korat] the ability to treat IFC/INCaF as a put option and engage with us intermittently and continue to defer signing the ERPA to gauge how the market plays out." *See* Exhibit B.

29.     Despite repeated requests and deadlines, Korat never provided a substantive response to the enhanced terms described in the November 10, 2006, email. Instead by email dated November 15, 2006, from Ken Locklin (on behalf of Korat) to Peter Cook (of IFC), Korat stated that "at no point has it been our intention to 'play the market' in our discussions with IFC," yet freely admitted that it was negotiating with third parties — in violation of the LoI. *See* Exhibit B ("we also have *received and discussed* offers from third parties during that time . . .") (emphasis added).

30.     On or about February 8, 2007, the Thai government approved Korat's application that would allow it to register its project with the United Nations Framework Convention on Climate Change. Shortly thereafter, on March 2, 2007, Korat sent IFC a notice purportedly terminating the LoI as of March 17, 2007.

31.     Throughout the negotiations, IFC has acted in good faith, making concessions on multiple occasions in order to address Korat's concerns and to move the negotiations along. IFC twice agreed to adjust the price to reflect changes in the market, even though Korat was responsible for the delays in completing the ERPA; IFC agreed to aid Korat in obtaining approval from the Thai government; IFC agreed to advance Korat certain expenses to permit it to continue the negotiations, recognizing that it may not recoup those expenses if an ERPA was never reached; IFC assumed the risks related to possible under-delivery of CERs by Korat; IFC redrafted – at considerable expense – the first draft ERPA (which contained the terms that Korat and IFC had agreed to in principle in the final Term Sheet) at Korat's request, to address Korat's alleged "policy concerns"; and IFC continuously agreed to assume most if not all of the risks associated with Korat's project and the consummation of the proposed ERPA. Despite these

efforts, Korat did nothing but stall, hedge its bets, and attempt to extract additional price concessions from IFC.

32.    IFC responded to Korat's March 2, 2007, termination notice by letter on March 14, 2007, stating that the termination notice was invalid and requesting continued negotiations with Korat to complete the transaction in good faith.

33.    On or about March 29, 2007, Korat requested registration of its project with the Executive Board of the United Nations Framework Convention on Climate Change. The project must undergo a review during the period from April 19, 2007, through June 15, 2007, before being registered. The documents submitted by Korat name Korat and EcoSecurities as a Project Participants. Upon information and belief, EcoSecurities may have become a purchaser of carbon credits from the Korat project, rather than a mere consultant, advisor, or sales agent, and has accumulated a portfolio of carbon credits on its own.

34.    The parties had subsequent communications, but Korat refuses to meet with IFC to discuss this dispute prior to June 18, 2007, i.e., *after* the end of the registration review period. In the meantime, Korat also refuses to name IFC as an additional Project Participant in spite of IFC's request.

35.    As a direct and proximate result of Korat's acts and omissions, including Korat's breach of the LoI, breach of the June 2005 agreement, and breach of the covenant of good faith and fair dealing implied in the LoI, IFC has incurred substantial monetary damages.

36.    IFC has duly performed and fulfilled all its obligations under the LoI.

37.    All other conditions precedent to the enforcement of IFC's rights have been satisfied.

## CLAIMS FOR RELIEF

### Count One

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

38.    The allegations contained in paragraphs 1 through 37 above are incorporated herein by reference.

39.    Korat and IFC executed a valid and enforceable LoI on May 20, 2004.

40.    In reliance on the provisions of the LoI, and upon other representations and warranties of Korat, IFC negotiated in good faith with Korat to consummate the transaction contemplated by the LoI.

41.    The LoI required Korat to "provide, at its own cost and in a *timely fashion*, all relevant information and assistance reasonably requested" by IFC. LoI at ¶ 14 (emphasis added). Korat violated this provision of the LoI by repeatedly ignoring numerous attempts by IFC to obtain information, to obtain Korat's position on various proposals, and to move the negotiations along. Upon information and belief, Korat had no intention of executing an ERPA with IFC, and was instead using its negotiations, and purposely delaying and obstructing those negotiations, to obtain leverage in the marketplace. In effect, Korat was using the negotiations as a put option agreement, allowing it to take advantage of what IFC offered while shopping for another buyer at the same time.

42.    Despite having agreed in principle on all material terms in the final Term Sheet of September 21, 2005, Korat failed and refused, without legal cause or justification, to negotiate with IFC in good faith to complete the proposed ERPA. Korat failed to use its best efforts to achieve the goal of the LoI, which was the execution of an ERPA between Korat and IFC.

43.    Korat also violated the exclusivity provision contained in Paragraph 5 of the LoI by conducting negotiations, to which it has admitted, with third party purchasers prior to the termination of the LoI. *See* Exhibit B. Korat was not entitled to negotiate with third parties until it presented additional terms which IFC rejected or failed to accept. Instead of proceeding in this manner, as outlined in the LoI, Korat breached the LoI by beginning negotiations with third party purchasers. LoI at ¶ 5.

44.    In taking these actions, Korat breached the LoI's implied covenant of good faith and fair dealing.

45.    As a direct and proximate result of the foregoing acts and omissions of Korat, IFC has incurred damages.

## Count Two

### (Breach of Contract)

46.    The allegations contained in paragraphs 1 through 45 above are incorporated herein by reference.

47.    Korat offered certain price and quantity terms for the sale of the CERs in May-June 2005. IFC accepted that offer.

48.    Rather than proceeding forward with the execution of the agreement under the terms to which IFC had agreed, Korat improperly delayed execution of the full document and purported to terminate the LoI.

49.    In taking these actions, Korat breached the LoI by refusing to complete the ERPA on the agreed upon terms.

50.    As a direct and proximate result of the foregoing acts and omissions of Korat, IFC has incurred damages.

## Count Three

### (Claim in the Alternative for Termination Payments)

51.     The allegations contained in paragraphs 1 through 50 above are incorporated herein by reference.

52.     Paragraph 7, which survives termination of the LoI pursuant to Paragraph 7(c), of the LoI provides for certain penalties upon termination of the LoI.  In pertinent part, termination with or without cause by Korat triggers the penalties listed in Paragraph 7(d).  Additional penalties are provided under Paragraph 7(g) if Korat terminates the LoI and, within one year of the effective date of termination, enters into an agreement with another buyer to sell the Emission Reductions that were the subject of the LoI.

53.     Korat sent IFC a letter on March 2, 2007, indicating its intent to terminate the LoI on March 17, 2007.

54.     Korat has requested registration of its project with the United Nations Framework Convention on Climate Change, triggering a review period of April 19, 2007, through June 15, 2007, and has identified EcoSecurities as a Project Participant.  Upon information and belief, there is an agreement between Korat and EcoSecurities for the purchase of at least a portion of the CERs generated by the Korat project.

55.     Korat is obligated to pay IFC the penalties indicated in Paragraphs 7(d) and 7(g) of the LoI.

## Count Four

### (Indemnification)

56.     The allegations contained in paragraphs 1 through 55 above are incorporated herein by reference

57.     Paragraph 12 of the LoI, which survives termination of the LoI pursuant to Paragraph 7(c), requires Korat to indemnify IFC for "any losses, claims, damages or liabilities" to which IFC may become subject in connection with IFC's "activities as contemplated under this Letter Agreement." This indemnification clause requires Korat to reimburse IFC for any expenses, including legal expenses, incurred in connection with activities contemplated under the Letter Agreement "or with the investigation or defense thereof."

58.     As a result of Korat's actions, IFC has incurred substantial damages, fees and expenses, including but not limited to damages for Korat's failure to consummate its agreement, and legal expenses.

59.     Korat is obligated to pay the fees and expenses incurred by IFC in connection with the negotiations under the LoI, as well as fees and expenses incurred in this litigation, pursuant to Paragraph 12 of the LoI.

## PRAYER FOR RELIEF

WHEREFORE, International Finance Corporation, acting solely in its capacity as Trustee of the INCaF, respectfully requests that this Court enter judgment in its favor as follows:

### As to Count One

A.     Awarding IFC damages of not less than $360,000, or an amount to be proven at trial, and replacement costs for the CERs of not less than $18.3 million;

### As to Count Two

B.     Awarding IFC damages of not less than $360,000, or an amount to be proven at trial, and replacement costs for the CERs of not less than $18.3 million;

**As to Count Three**

C.     Awarding IFC penalties of not less than $425,000 pursuant to Paragraphs 7(d) and 7(g) of the LoI;

**As to Count Four**

D.     Awarding IFC damages, fees, and expenses of not less than $18.66 million, or an amount to be proven at trial, and all fees, costs, and expenses incurred in the course of this litigation;

**As to All Counts**

E.     Awarding IFC pre-judgment and post-judgment interest on all monetary awards;

F.     Awarding such other and further relief as the Court may deem just and proper.

Dated: June 8, 2007                          Respectfully submitted,

                                             **WHITE & CASE** LLP

                                             Francis A. Vasquez, Jr. (FAV-1446)
                                             Maria N. Lerner (Admission Pending)
                                             Claire A. DeLelle (CAD-3527)
                                             701 Thirteenth Street, N.W.
                                             Washington, D.C. 20005
                                             Telephone: (202) 626-3600
                                             Facsimile: (202) 639-9355

                                             *Attorneys for Plaintiff*
                                             *International Finance Corporation*

# EXHIBIT A



# Korat Waste To Energy Company Limited

571/11 Moo 3, Suranaree Industrial Zone, Tambon NongBuasala, Amphur Muang District
Nakorn Ratchasima, 30000, Thailand • Tel. (662) 651-9900/03, Fax (662) 651-9904
Email: Khoratwte@yahoo.com

Mr. Vikram Widge                                                    March 02, 2007
Program Manager, Carbon Finance
Environmental Finance Group, International Finance Corporation
2121 Pennsylvania Avenue, NW Washington, DC, 20433 USA
Fax 202-974-4404

Re:    Termination of the May 17, 2004 Letter of Intent

Dear Mr. Widge

        Pursuant to the May 17, 2004 "IFC-Netherlands Carbon Facility: Khorat Waste to
Energy Project" Letter of Intent (the "LOI"), the Board of Directors of Korat Waste to
Energy Co., Ltd. have directed me, using this letter, to provide you and the IFC notice of
the KWTE Project Company's intention to exercise its right under paragraph 7(a)(i) of
the LOI to terminate the LOI and discontinue negotiations on preparation of an emissions
reduction purchase agreement ("ERPA") for the KWTE project.

        In the two and a half years since the execution of the LOI, the KWTE Project
Company has engaged in extensive good faith efforts to negotiate with the IFC a
mutually-agreeable ERPA. These efforts have been unsuccessful.  Since the execution of
the LOI, the market for CERs – and CER prices, in particular – have changed
considerably.  Yet, the terms in the current draft ERPA provided by the IFC still fail to
reflect market conditions for this type of transaction.  For these reasons, it has been
concluded that is not worthwhile for the KWTE Project Company to continue to devote
resources to the negotiations.

        Consequently, KWTE hereby terminates the LOI pursuant to paragraph 7(a)(i).
Under the terms of the LOI, termination is effective in 15 days. KWTE understands that
its termination of the LOI pursuant to paragraph 7(a)(i) triggers a payment obligation
under paragraph 7(d).  KWTE will await your invoice.  KWTE further understands that,
pursuant to paragraph 7(d), certain other provisions of the LOI will survive termination
and shall remain in full force and effect.

        We appreciate your understanding.

                                                        Best regards'

                                                        David Donnelly
                                                        General Manager

# EXHIBIT B

"Locklin, Ken" <KLocklin@EIFGroup.com>

11/15/2006 20:34

To "Locklin, Ken" <KLocklin@EIFGroup.com>, "Peter Cook" <pcook@ifc.org>,
<GPeteSmith@cs.com>

CC "Vikram Widge" <Vwidge@ifc.org>

Subject RE: meeting follow-up (updated)

Thanks for the update, Peter, and for IFC's "best and final" terms. It is helpful for us to have the points in your paras 1-5 summarized in writing here.

We will be conveying these new terms to the rest of the KWTE Board members, and plan for further discussions with them to try and reach an accord on the final KWTE posiiton concerning their acceptability.

Please note that any affirmative decision we may make in this regard will continue to be limited by our need to reach agreement on the final detailed terms of an eventual ERPA that would govern the sale of KWTE CER's. As we pointed out when we met, we have not yet engaged counsel to help us work through this exteisive draft document and fully appreicate its terms. We also acknowledge and appreceaite IFC's firm offer to address any commercial or legal concerns which may arise from that eventual legal review.

I believe Pete may have already informed you of his altered schedule. As a result of his shifted plans, he and I will not have the opportunity to meet and talk over these new terms in person until the end of the month. Accordingly, I do not know that we will have completed our discussions with IFC by month's end, as you suggest.

Despite these unavoidable delays, I want to make clear that at no point has it been our intention to 'play the market' in our discussions with IFC. Consistent with the May 2004 LOI, we have been negotiating in good faith with IFC for two and a half years -- through, as you noted, multiple renegotiations. As we said to you in our meeting, we also have received and discussed offers from third parties during that time, arising from the very public nature of the information circulated in the CDM process.

In our view, such discussions are not prohibited by the May 2004 LOI, so I certainly wouldn't characterize our comments to you in this regard as an "admission". Rather, they are a further indication of our frank approach, and our good faith efforts to reach commercially and legally acceptable terms with IFC, pursuant to the LOI.

Pete and I will work diligently to complete our internal review and our discussions with our Board colleagues as prompty as possible. Thanks again for providing us with this additonal specific information.

Best,

Ken

---

**From:** Peter Cook [mailto:pcook@ifc.org]
**Sent:** Friday, November 10, 2006 8:05 AM
**To:** Locklin, Ken; GPeteSmith@cs.com
**Cc:** Vikram Widge
**Subject:** Re: meeting follow-up

Dear Ken and Pete,

Thank you for meeting with us at IFC on October 17 on our continuing efforts to move this CER transaction forward and finalize the agreement between KWTE and IFC per the binding key business terms reflected in our Letter of Intent (LoI) of May 2004, and the subsequent term sheet based on which the draft ERPA was prepared. We appreciate your recognition of our continued goodwill and our attempt to promptly close the deal made by IFC and KWTE, thereby avoiding lengthy and costly legal processes.

As we have expressed in our meeting and throughout our engagement with KWTE for more than 3 years now, we strongly encourage continued negotiations in good faith and to this end we have summarized below IFC's final good faith attempt to deal with your remaining concerns as discussed at our meeting. We understand that you will discuss this with your board and will revert promptly thereafter.

1. Reimbursement of Legal Fees:  Given the current uncertainties surrounding the Thai DNA because of the current political situation, we understand your concern about incurring additional legal expenses in case the Letter of Approval (LoA) is never issued.  On the other hand, we would like to continue and complete the negotiations and sign the ERPA as we have spent a lot of resources on negotiating this deal with you and incurred significant legal and other costs in the process -- including the re-drafting and simplification the ERPA based on your feedback on the first draft.  To facilitate moving forward, we would be willing to pay for KWTE's actual legal costs of up to $100,000 (supported by invoices) incurred in closing this transaction from this point forward.  We would require reimbursement of these monies by KWTE only if the LoA were issued and the project registered, at which time we would deduct this amount from the first payment to be made to KWTE for delivered and accepted CERs. In the event that this project never registers as a CDM project, we would not require reimbursement of these fees.  In addition, we would require that the ERPA be signed no later than February 1, 2007 so the legal fees on both sides can be kept manageable.

2. Engagement with Thai DNA:  Once we have signed an ERPA, as a counterparty and prospective project participant, IFC would support KWTE in its discussion with the Thai DNA in seeking a speedy issuance of the LoA for this project.

3. Assistance with placement of ERs in the voluntary market:  Once the ERPA is signed, we would reasonably endeavor to assist you in placing emission reductions from this project (that were not eligible as CERs because of delays in the registration process) as voluntary ERs to corporate buyers.

4. Price:  Starting with an agreement between KWTE and IFC/INCaF in the Letter of Intent dated May 28, 2004 to pay €3.00/CER for 2.0 - 2.25 million CERs, we have already re-negotiated those terms and agreed with you in May 2005 to raise the price to €4.75/CER and decrease the volume to 1.75 million CERs as proposed by you.  As we mentioned in the meeting, we are now willing to agree to an even higher price to show our continued engagement in good faith.  We would be willing to pay €7.25/CER, which is an increase of more than 50% over the re-negotiated price and an increase of nearly 150% over the price agreed in the 2004 LoI.

5. Contract Volume:  We would require that contract volume be maintained at the reduced level of 1.75 million CERs through to 2012.  However, to provide even more value to KWTE, we would be willing to agree to buy an additional 250,000 of vintage 2013 at the same price if 1.75 million CERs are delivered through to 2012.  This would mean an ERPA value of €14.5 million for 1.75 million CERs through to 2012 or a price of nearly

$10.50/CER if no value is placed on CERs after 2012.

We have continued to negotiate in good faith and hence continued to incur significant costs in negotiations with KWTE that have included multiple renegotiations on price and volume; such costs are both in terms of our staff time, expenses and external legal costs as well as the opportunity cost of our continuous engagement. As of September 2006, we have already incurred staff and direct costs amounting to $234,795 on this project without accounting for the opportunity cost of engagement and as such, we would like to close this deal as quickly and expediently as possible. We also note with interest your frank admissions indicating that you have been discussing prices and terms for the KWTE CERs that are the subject of the binding commercial terms in the IFC-KWTE LoI. We believe that the LoI of May 2004 does not give KWTE the ability to treat IFC/INCaF as a put option and engage with us intermittently and continue to defer signing the ERPA to gauge how the market plays out. We would stand by these terms even if the market drops considerably as it has earlier this year and has shown signs of not being so firm in the recent past.   The terms outlined here and our willingness to stand by them going forward, however, is subject to putting in place an amended and restated LoI that includes the terms outlined in this email, but also sets forth your firm commitment to engage seriously and solely with us based on these improved terms and to promptly move towards an execution of the ERPA by February 1, 2007.

We appreciate the constructive discussion we had at our recent meeting and look forward to moving forward in that spirit. We believe the terms discussed in our meeting and outlined in this email are reasonable and competitive, especially given the history to date. We appreciate the need for you to consult with your other board members and would ask if you could do so and revert to us by November 30, 2006 about KWTE's acceptance of these terms.

Best regards,

Peter & Vikram

"Locklin, Ken" <KLocklin@EIFGroup.com>

10/19/2006 03:10 AM

To Vikram Widge <Vwidge@ifc.org>, pcook@ifc.org

cc GPeteSmith@cs.com

Subject meeting follow-up

Dear Vikram and Peter:

Thanks for taking the time to update us on IFC's views concerning the status of the KWTE CER purchase negotiations on Monday. We appreciate your continued interest in our project, your open attitude to moving the discussion forward, and the several new options you have introduced for consideration in our discussions. We will be passing those ideas along to the rest of our Board at our next meeting later this month, and look to reverting to you with some specific reactions ASAP.

In the final analysis, the acceptability of IFC's CER purchase offer will be based on the totality of the commercial elements of the deal. That will obviously include the offered price and commercial tonnage involved. We are pleased that you noted that you are prepared to continue our discussions on these points.

In order to assist you in developing the most competitive possible offer price for KWTE CERs to help bring these

discussions to a successful conclusion, and in response to your specific request to gain a clear sense of our view of the market for our CERs, we can provide the following information.

As we have discussed, potential buyers have approached us or our Board members with indications of interest or CER purchase offers from time to time.  The prices quoted have clustered in the range of $11/CER.  The earliest offer was the lowest, at just under $10/CER, and the latest (quite recent) was the highest, at approximately $11.50, suggesting that the market is generally firm at this price level.  We view these to be attractive offers, and they are directly comparable from a structural point of view – in that they have been based on commercial terms and conditions generally similar to those proposed by IFC.  These prices have been received from leading private carbon funds, and from several AA and AAA-rated public and private institutions.

It is important to note, however, that the acceptability of the final transaction will not be based solely on the offered price levels or delivery tonnages.  It will also be impacted by the specifics of the ERPA documentation.  While we have not commissioned a full legal review of the current IFC draft ERPA, it remains a relatively daunting document.

It is literally 2-3X longer than other ERPAs that members of our group have already executed or now have under review on similar deals. While document length is not necessarily correlated with onerous legal conditions, and we appreciate your openness to address unintended potential problems that we identify in the text, we remain concerned about how the final detailed ERPA terms might impact KWTE's future commercial operations.  These concerns can only be addressed through detailed (i.e., costly) legal review and negotiations, of course, but we make this point to note that price alone is not the final determinant in the acceptability of this transaction for KWTE.

We also found your frankness about your views concerning the 2004 LoI for this potential commercial relationship informative.  That you no longer see some terms of the LoI as binding on our negotiations is interesting.  We would like to better understand your reasoning.  Going forward, it will be important for us to know how the IFC views the role of the 2004 LoI in the IFC-KWTE negotiations.

In closing, we should note that we certainly do not believe that KWTE has been "dragging its feet", as has been earlier asserted by Peter.  It is true that we have struggled to deal with the complex multi-responsibility work obligations of our Board members, while we interpret the shifting commercial realities of the CER marketplace in Thailand.  And it is also true that IFC has had to deal with volunteer KWTE Board members on these issues, rather than full time commercial managers.  This has sometimes slowed progress on negotiations, just as the IFC's internal processes did when it required some months after our initial impasse on the draft ERPA to develop revised documentation.  Indeed, it is important to keep in mind that KWTE has had to react to two very different IFC ERPAs in the course of our negotiations.

Nevertheless, we continue to appreciate IFC's interest in the KWTE project.  We look forward to your thoughts on relevant CER price issues, and will comment ASAP on the other new elements you have suggested in our most recent discussions.

Best,

Ken

# EXHIBIT C

Vikram Widge/HQ/IFC

06/01/2005 19:41

To  GPeteSmith@cs.com

cc  KLocklin@EIFGroup.com (Ken R. Locklin), Peter Cook/HQ/IFC

Subject  Re: Terms for CER sales Link

Pete:

It's not as simple as you giving us an ultimatum and IFC complying.  Let me clarify a few things and make a few observations:

1. The LoI between KWTE and IFC is a binding agreement that was signed by KWTE only a year ago with full recognition of all the uncertainties and risk -- as well as the value that associating with IFC would potentially bring to the project throughout the Kyoto process.

2. Clearly the price and volume at the time of signing the LoI was considered by KWTE and its shareholders to provide sufficient value, not only financially for the credits we agreed to purchase, but also the credibility IFC that brought to the project with the Thai Government, the EB and the potential purchasers of the remaining credits.  Neither the changes in the total volume of credits to be generated by the project nor "market" prices have any bearing on KWTE's commitment under the LoI.  Nevertheless, we have consistently indicated that we will work with KWTE in the spirit of fairness -- and try in good faith to ensure that the shareholders get fair value relative to their expectations when they agreed to the terms of the LoI in May 2004.  This means that we were — and still are -- willing to consider a price-volume combination that provides for some capture of the developments in the market and at the EB/MP.

3. According to you there is an unfair "windfall" accruing to IFC.  Had KWTE not considered the possibility of the prices rising as much as they had considered the possibility of the prices going down if the KP had not entered into force — a risk that IFC has borne?   The current market conditions have no bearing on KWTE's obligations that it agreed to in May 2004, and as importantly, this "windfall" is not a monetary windfall as the credits will be retired by the Dutch Govt to meet their obligations under Kyoto.  In fact there is a huge opportunity cost for IFC and the Dutch in that IFC had entered into an LoI with KWTE and worked for more than a year with the intention of signing an ERPA consistent with the terms agreed to by KWTE.  In fact, to demonstrate our willingness to work with KWTE, we had started working with your consultants on the PDD long before the LoI was even signed.

4. Ken's original e-mail last week, and yours now, come as an unpleasant surprise as none of this was ever mentioned before.  At the meeting we had at the Starbucks on March 10, you and Ken — representing the majority of the KWTE shareholding — had been very clear that while the prices had increased since the signing of the LoI, you intended to honor your obligations.  In good faith we offered to consider an increase in price and even agreed to waive the need for a due diligence letter from you and the financial consequences associated with it, so as to accelerate the process of concluding the deal this year -- expressly because you reiterated your intention to honor the LoI.  This sentiment was further reiterated by you in the meeting we had during appraisal in Bangkok on April 22, at which time you were quite pleased with our intervention with the Thai DNA and the proposed 25% increase in price from that agreed in the LoI.  The follow-up meeting we had with you and Ken in DC on May 9 to discuss the draft term sheet also

focused on the issues of structuring the ERPA consistent with market practice given the price-volume combination in play. Given your and Ken's e-mails implying that you intend to walk away from your obligations and find a new buyer for the credits unless IFC agrees to your new terms, I have to wonder if there was ever any intention to honor the obligations under the LoI.

5. We enter into agreements on the basis of good faith and have continued to act on that basis all along in this project -- as is demonstrated by our proposal to increase the price, by waiving the due diligence letter (and the financial consequences associated with it) so that we could go to appraisal without further delay, and by our support to the project in the Kyoto process (both at the EB level and in Thailand). In return we expect that your commitment would also be honored.

6. Having assumed all along -- with no indication to the contrary until now -- that KWTE would honor its obligations, we (and the Dutch Govt) have continued to lend our credibility to the project in the Kyoto process -- facilitating with the EB, as well as the Thai DNA. It remains unclear how keen the Thai DNA would be to approve a project and issue an LoA for it if it is mired in a controversy over business terms. It certainly does not make for a showcase candidate that they want for their early approvals.

In conclusion, I would like to remind you that while things at the commercial level may not have gone the way KWTE's shareholders may like, they have an obligation which they signed up to. It seems to me that the obligations in the LoI can be met even with the reduced volumes that the MP may be imposing. However, we remain willing to continue to work in good faith with you to agree on a package that is fair vis-a-vis the LoI and potentially works better for all concerned.

Vikram

**Vikram Widge**, Program Manager, Carbon Finance, Environmental Finance Group, International Finance Corporation
☎ +1 202 473 1368   📠 +1 202 974 4404   ✉ vwidge@ifc.org   🌐 www.ifc.org/carbonfinance

GPeteSmith@cs.com

05/27/2005 16:02

To  pcook@ifc.org, Vwidge@ifc.org

cc  KLocklin@EIFGroup.com (Ken R. Locklin)

Subject  Terms for CER sales

Dear Peter,

I don't like the prospect of reneging on the LOI, which KWTE did sign in good faith. However, I have a responsibility to the shareholders of KWTE and, as they have clearly stated, it would be financially irresponsible to accept the terms in the LOI.

The shareholders are very aware of the reduced CER KWTE level estimates, the extraordinary move in the market prices subsequent to our LOI (according to our sales agents EcoSecurities), and the commercial unacceptability of the resulting situation. The changes in available quantity and price imposed a special burden on KWTE via the clearly "out of market" price windfall benefit that would accrue to IFC as a result of price, plus reduced production with its resulting smaller capacity to balance the lower than market IFC sales with higher priced commercial ones.

According to the terms of the LOI, IFC would have bought KWTE's past CER production and

achieve an immediate 100%+ market profit at KWTE's expense. This windfall for IFC is not equitable, and neither you nor Vikram did (or could) act to materially close this unacceptable gap.

Nevertheless, KWTE made its best effort to be responsive to the spirit of the LOI by offering IFC an opportunity to work with us in an arrangement that is in accord with current market conditions for all amounts, and by reserving and offering first call on the expected majority of our future production at a price that, while higher than that proposed in the LOI, remains materially discounted from current market. Moreover, if the IFC cannot match real world prices on the past amounts because of their own limitations, we understand, and rather than tearing up the whole deal, we are offering to just set aside those totally out of market amounts and give IFC the chance to buy the majority of their originally anticipated future production amounts at a price that we hope will be within its purchase band and at a more reasonable (but still material 10-25%) discount to market.

I hope that you understand that giving up such a huge windfall profit to IFC would open up the KWTE leadership to charges of unacceptable performance from the other investors in the firm.

The question is whether IFC would like to develop something along the lines of KWTE's proposed terms. If so, then we should arrange to meet again to discuss a new agreement. If not, then KWTE will proceed to find a new buyer.

Best regards,

Pete

# EXHIBIT D

Peter Cook/HQ/IFC

06/10/2005 14:22

To "Locklin, Ken" <KLocklin@EIFGroup.com>

cc "'GPeteSmith@cs.com'" <GPeteSmith@cs.com>, "Locklin, Ken"
   <KLocklin@EIFGroup.com>

Subject RE: KWTE TS comments Link

Ken,

Yes, I can confirm IFC would agree to a deal on those terms.   I look forward to hearing back from you so we can
finalize the terms.

Provided the Board agrees, I would like to move forward quickly.  I will turn around a revised term sheet to you by
early next week.  To complete my due diligence, please also forward the documents we have spoken about.

Thanks,

Peter


"Locklin, Ken" <KLocklin@EIFGroup.com>

06/10/2005 12:24 PM

To "Locklin, Ken" <KLocklin@EIFGroup.com>, 'Peter Cook' <pcook@ifc.org>

cc "'GPeteSmith@cs.com'" <GPeteSmith@cs.com>

Subject RE: KWTE TS comments


Peter, I understand from Marc that, following his last talk with you, he felt IFC would have an interest in an
arrangement to purchase 1.75M tonnes of KWTE CER's at a price of Euro 4.25/tonne from the 2006 vintage
onward, on terms otherwise in keeping with our last proposal below.

Of course, this is both a higher purchase amount and a lower proposed purchase price than we have previously
offered.  However, if you are in a position to confirm IFC's interest in such an arrangement (subject to
documentation, etc.), I will be happy to convey this to the rest of the Board on a call we have already scheduled
over this weekend, and hopefully revert with a formal response from our side on MOnday.

Look forward to your thoughts...

Best,

Ken
-----Original Message-----
**From:** Locklin, Ken
**Sent:** Thursday, May 26, 2005 7:52 AM
**To:** 'Peter Cook'
**Cc:** GPeteSmith@cs.com
**Subject:** RE: KWTE TS comments

Peter, sorry to be a bit late in getting back to you, and to not having your colleagues e-m addresses handy to include them in this message. As we discussed during our meeting on May 9, 2005, it was important and necessary for us to discuss IFC's proposed term sheet in detail with EcoSecurities, in as much as they are working in this domain everyday, and are our representatives for this sale before the Meth Panel and Executive Board as well as to the broader market of potential buyers of KWTE CERs.

We have had a long consultation with EcoSecurities, followed by discussions with the KWTE shareholders, and believe that we now have a clear understanding of the current market. In that context, Pete and I provide below for your consideration the general terms under which KWTE is prepared to sell its CERs to the IFC in its capacity as the Trustee of the IFC-Netherlands Carbon Facility.

1.        Existing tonnes of Certified Emission Reductions (CERs), which KWTE has accumulated from its commercial operating date until the end of year 2005, will be offered at €8.00 per tonne. IFC has first right of refusal to buy all of these CERs. Any amounts not purchased by IFC will be sold into the market.
2.        KWTE agrees to sell up to 1.5 million tonnes of CERs generated from its activities subsequent to the above referenced period to the IFC at a price of €4.75 per tonne.
3.        IFC will have priority rights to 250,000 tonnes of CERs per year beginning in year 2006; KWTE will have the right to put this amount to IFC in each year.
4.        KWTE will accept no financial liability for failure to deliver the tonnes requested by IFC in any given year. If KWTE fails to deliver sufficient tonnes in a given year, then IFC will have priority rights to the shortfall plus the requested tonnes in the subsequent year.
5.        KWTE will accept reasonable liquidated damages if it sells CERs to a third party without first meeting it CER sale obligation to the IFC.
6.        Termination will be extended beyond 2011 in the case that KWTE has not fulfilled its delivery of 1.5 million tonnes to IFC.

These terms reflect conservatively the existing market, as well as KWTE's current lower assessment of the CERs annually available for sale from its project in Khorat as a result of the latest decisions of the Meth Panel. If these terms are broadly acceptable to IFC, we are now prepared to move quickly to finalize an updated Term Sheet which reflects them, and proceed with the completion of the balance of the purchase and sale documentation.

Look forward to moving ahead promptly. Please address any comments on this e-m to Pete and me jointly, as I will be out of the traveling for a couple of days, and only intermittently on my e-m.

Best,

Ken

# EXHIBIT E

Peter Cook/HQ/IFC

07/18/2006 14:44

To  GPeteSmith@cs.com
cc
Subject  Re: KWTE LOI Link

Pete,

Thanks for your email.  I would like to discuss with you the price level that KWTE is seeking.  Could you please call me when you get a chance?

Thanks,

Peter

GPeteSmith@cs.com

07/14/2006 01:30 AM

To  pcook@ifc.org
cc  Vwidge@ifc.org, KLocklin@EIFGroup.com (Ken R. Locklin)
Subject  KWTE LOI

Dear Peter,

I have exchanged emails with Ken and discussed via phone with other KWTE Board members our conversation regarding further steps on the ERPA.

Because the Board members consider price to be the central issue, we would like to request from you what price or price range IFC can now consider.

I have restated your point to the effect that IFC's price may not be as high as current commercial prices; and there is willingness to consider a lower price based on the financial strength of the IFC relative to other potential buyers.

If the price issue can be resolved, then we will discuss other details in the ERPA.

Best regards,

Pete

# EXHIBIT F

"Locklin, Ken" <KLocklin@EIFGroup.com>

07/26/2006 08:40

To "Peter Cook (E-mail)" <pcook@ifc.org>

CC "Pete Smith (E-mail)" <GPeteSmith@cs.com>

Subject CER prices

Sorry to miss your call, Peter.

Further to your query, we're currently (in the last week) seeing unsolicited price offers of $15 for PS CERs, and $9-10 for 2007+ vintage CERs, all assuming successful registration, validation, etc.  A to AA rated corporate buyers.

FYI, Pete is off line for a week on vacation, and I'm out next Tuesday for the same.  I expect to hear from him late next week.  Then he is back to BKK, where we are HOPEFUL of some progress on the HNA front - still a challenge there.

Best,

Ken.