IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL FINANCE CORPORATION, not in its individual capacity, but solely as the Trustee for the IFC-Netherlands Carbon Facility, )<br><br>Plaintiff, )<br><br>v. )<br><br>KORAT WASTE TO ENERGY CO. LTD. (a/k/a Khorat Waste to Energy Co.), )<br><br>Defendant. ) | **07 Civ. 5451 (SHS)** |

## KWTE'S MOTION TO DISMISS THE COMPLAINT

Defendant Korat Waste to Energy Co. Ltd. ("KWTE") submits this memorandum in support of its motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss plaintiff International Finance Corporation's ("IFC's") Complaint. The claims IFC asserts and the relief it seeks are untenable as a matter of law.

The Complaint alleges that KWTE and plaintiff IFC entered into a non-binding Letter of Intent ("LOI") to negotiate a potential contract for IFC to purchase certified emission reduction credits ("CERs") from KWTE. The LOI, which IFC did not attach to its Complaint, explicitly provides that KWTE could terminate the LOI at any time and for any reason, and decline to enter into a contract, by fifteen-days notice and by paying a stipulated termination fee. Under the LOI, such termination "shall release [KWTE] and [IFC] from all of their respective obligations under [the LOI], including any liabilities arising therefrom" except for the stipulated termination fee.

On March 2, 2007, KWTE exercised its right to terminate the LOI, and offered to make the payment specified by the LOI. IFC has refused to acknowledge that the LOI was terminated under its terms, and instead claims that KWTE had an obligation to continue negotiations with IFC and enter into a final contract.

None of IFC's claims are tenable, and all should be dismissed as a matter of law:

A.      In Count I, IFC asserts that an *implied* covenant of good faith and fair dealing can overcome the *express* contractual term in the LOI allowing KWTE to terminate the LOI. Under New York law, no implied covenant can exist that is inconsistent with the written provisions of the contract. New York courts thus hold that an implied covenant of good faith and fair dealing does not apply when a party has the right to terminate the contract. IFC's proposed implied covenant is directly contradicted by the termination clause of the LOI, and cannot therefore form the basis of a valid claim.

B.      Also in Count I, IFC seeks contract expectation damages for an alleged breach of an implied covenant to negotiate in good faith. That is contrary to the explicit written terms of the LOI, and unsupported by law or logic. It is axiomatic that a party cannot receive expectation damages for failed negotiations that resulted in no contract, particularly where there was no obligation even to continue negotiations, as that would confer the benefit of a bargain that was not reached.

C.      In Count II, IFC claims alternatively that the parties in fact entered into a contract in June 2005, and submits or refers to several e-mails from May-June 2005 and a September 2005 "Term Sheet" prepared by IFC, as memorializing a June 2005 contract. In fact, these documents directly contradict IFC's contract claim. There is no offer and acceptance of common price or quantity terms. Moreover, the September 2005 Term Sheet drafted by IFC – which IFC merely referred to, and, with the LOI, did not attach to its Complaint –states *explicitly* that nothing in the Term Sheet was binding on either party. Each of these documents is properly before the Court on a motion to dismiss, and the law provides that the Court need not and should not accept conclusory complaint allegations that are contradicted by written materials properly before the court.

D.      IFC claims in Count III that it is due the termination payment specified in the LOI. That is true, and that fee is all that is due to IFC. To date, IFC has refused KWTE's

repeated offers to pay the full termination fee, and in fact has refused to accept that fact that the LOI was terminated.  KWTE stands ready at any time to make the required payment to IFC.

      E.      Finally, in Count IV, IFC argues that the LOI's standard indemnification clause, in which KWTE agreed to indemnify IFC against certain third-party claims, is really a *guarantee* by KWTE to reimburse IFC for any losses claimed by IFC from KWTE's termination of the LOI – including, according to IFC, full contract expectation damages to IFC.  New York law does not permit a party to use a third-party indemnification provision as a vehicle to bring first-party claims.

      The grounds for this motion are stated more fully in an accompanying memorandum.  A proposed order is also submitted herewith.

      KWTE respectfully requests oral argument on this motion.

                      Respectfully submitted,

                                _____/s/_____

August 6, 2007               Anthony F. King
                               WALLACE KING DOMIKE & REISKIN, PLLC
                               1050 Thomas Jefferson Street, N.W.
                               Washington, D.C.  20007
                               Telephone:  202.204.1000
                               Facsimile:  202.204.1001

                               Elkan Abramowitz (EA-3987)
                               Thomas M. Keane (TK-6320)
                               MORVILLO, ABRAMOWITZ, GRAND,
                                 IASON, ANELLO & BOHRER, P.C
                               565 Fifth Avenue
                               New York, NY 10017
                               Telephone:  (212) 880-9300
                               Facsimile:  (212) 856-9494

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ........................................................................................................1

      A.     Summary Of The Arguments...................................................................3

      B.     The Court Should Not Accept Complaint Allegations That
            Are Contradicted By Materials Attached To The Complaint
            Or Incorporated By Reference ...............................................................5

STATEMENT OF THE RELEVANT ALLEGATIONS ....................................................6

      A.     Allegations Regarding KWTE's Right To Terminate The LOI .................6

            1.     The LOI Explicitly Allows KWTE To Terminate The
                    LOI At Any Time For Any Reason .................................................7

            2.     The LOI Explicitly States That All Liabilities By Either
                    Party Under Or Arising From The LOI Are Extinguished
                    If KWTE Terminates The LOI .......................................................7

            3.     The LOI Provides For A Specific Termination Fee As
                    IFC's Sole Recovery If KWTE Terminates The LOI.....................8

      B.     Allegations Regarding KWTE's
            Termination Of The LOI..........................................................................9

      C.     Allegations That KWTE And IFC Formed A
            Contract In June 2005 To Sell And Purchase CERs...................................9

            1.     No Offer Was Accepted In The May-June 2005 E-mail
                    Exchange Cited by IFC as Forming a Contract ...........................10

            2.     The September 2005 Term Sheet States Explicitly That
                    There Was No Contract Between The Parties As Of
                    September 2005 .............................................................................12

            3.  IFC Itself Continued To Negotiate And Change The Terms
                  Of Its Offers Long After June 2005....................................................13

ARGUMENT......................................................................................................14

I.      PLAINTIFFS' CLAIM ALLEGING LIABILITY FOR BREACH
        OF COVENANT OF GOOD FAITH AND FAIR DEALING IS
        INVALID AS A MATTER OF LAW ...................................................14

II.    IFC'S CLAIM FOR CONTRACT EXPECTATION DAMAGES
       BASED ON THE ALLEGED BREACH OF AN IMPLIED
       COVENANT IN A NON-BINDING LETTER OF INTENT
       SHOULD BE DISMISSED ...................................................................16

       A.    Expectation Damages Are Not Available For An Alleged
             Breach of the Implied Covenant of Good Faith and Fair
             Dealing...................................................................................17

       B.    IFC Cannot Recover More Than The LOI's Termination
             Fee For Any Claim Based On KWTE's Termination Of
             The LOI...................................................................................19

III.   PLAINTIFF'S BREACH OF CONTRACT CLAIM IS INVALID
       AS A MATTER OF LAW .....................................................................19

IV.    PLAINTIFF HAS REFUSED TO ACCEPT THE LOI
       TERMINATION PAYMENT ...............................................................21

V.     PLAINTIFF'S CLAIM FOR INDEMNIFICATION IS INVALID
       AS A MATTER OF LAW .....................................................................21

CONCLUSION.............................................................................................22

## TABLE OF AUTHORITIES

## <u>CASES</u>

*Alusit, Ltd. v. Aluglas of Pa.*, No. 89 Civ. 3849 (CSH),
    1990 U.S. Dist. LEXIS 16755 (S.D.N.Y. Dec. 4, 1990) ........................................5

*Arcadian Phosphates v Arcadian Corp.*,
    884 F2d 69 (2d Cir. 1989).................................................................................17

*Barry & Sons, Inc. v. Instinct Prods. LLC*,
    5 Misc. 3d 172, 783 N.Y.S.2d 225, (2004),
    *affirmed on relevant grounds*, 15 A.D.3d 62,
    788 N.Y.S.2d 71 (1st Dep't 2005) ........................................................22

*Burdett Radiology Consultants, P.C. v. Samaritan Hosp.*,
    158 A.D.2d 132; 557 N.Y.S.2d 988 (3d Dep't 1990)...........................................15

*Clark Oil Trading Co. v. Amerada Hess Trading Co.*,
    90 Civ. 1856 (PKL), 1993 U.S. Dist.
    LEXIS 10801 (Aug. 4, 1993)...............................................................20

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42
    (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992)..................................6

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989) .....................................................6

*Cyberchron Corp. v. Calldata Sys. Dev.*,
    831 F. Supp. 94 (E.D.N.Y. 1993), *vacated*
    *in part on other grounds*, 47 F.3d 39 (2d Cir. 1995) ...........................20

*Goodstein Constr. Corp. v. N. Y.*,
    80 N.Y.2d 366, 590 N.Y.S.2d 425 (1992) ......................................17, 18

*John's Insulation, Inc. v. Siska Constr. Co.*,
    671 F. Supp. 289, 292 (S.D.N.Y. 1987)............................................20

*Kenford Co. v. County of Erie*, 67 N.Y.2d 257,
    493 N.Y.S.2d 131 (1986) ....................................................................17

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991)................................6

*Madonna v. U.S.*, 878 F.2d 62 (2d Cir. 1989)....................................................6

*Matterhorn Group, Inc. v. SMH (U.S.) Inc.*
   (*In re Matterhorn Group, Inc.*), A.P. No. 97-8273 (SMB),
   2002 Bankr. LEXIS 1275 (Bankr. S.D.N.Y. 2002) ...............................................18

*McKinley Allsopp, Inc. v. Jetborne Int'l, Inc.*,
   1990 U.S. Dist. LEXIS 12405 (S.D.N.Y. 1990) .....................................................17

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
   716 F. Supp. 1504 (S.D.N.Y. 1989) ...............................................................14, 15

*Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293,
   461 N.Y.S.2d 232 (1983) ...............................................................................15, 16

*Paper Corp. of the U.S. v. Schoeller Technical Papers, Inc.*,
   807 F. Supp. 337 (S.D.N.Y. 1992) ........................................................................19

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) ....................................................6

*Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329,
   514 N.Y.S.2d 209 (1987) .........................................................................14, 15, 16

*Tower Int'l, Inc. v. Caledonian Airways, Ltd.*, CV-93-1122,
   1996 U.S. Dist. LEXIS 20311 (E.D.N.Y. Jan. 25, 1996) .....................................20

*Trifiro v. N.Y. Life Ins. Co.*, 845 F.2d 30 (1st Cir. 1988)....................................20

## RULES

Fed R. Civ. P. (12)(b)(6) ........................................................................................1

## MISCELLANEOUS

1 FARNSWORTH, CONTRACTS § 3.26a ........................................................................17

5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE
   AND PROCEDURE (2D ED. 1990), § 1327 .................................................................5

RESTATEMENT (SECOND) OF CONTRACTS § 39(1) ............................................................20

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| INTERNATIONAL FINANCE CORPORATION, not in its individual capacity, but solely as the Trustee for the IFC-Netherlands Carbon Facility,<br><br>Plaintiff,<br><br>v.<br><br><br>KORAT WASTE TO ENERGY CO. LTD. (a/k/a Khorat Waste to Energy Co.),<br><br>Defendant. | )<br>)<br>)<br>)<br>)    **07 Civ. 5451 (SHS)**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM IN SUPPORT OF**
**KWTE'S MOTION TO DISMISS THE COMPLAINT**

Defendant Korat Waste to Energy Co. Ltd. ("KWTE" or "Korat") submits this memorandum in support of its motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss plaintiff International Finance Corporation's ("IFC's") Complaint.

**INTRODUCTION**

KWTE and plaintiff IFC entered into a non-binding Letter of Intent ("LOI") to negotiate a potential contract for IFC to purchase certified emission reduction credits ("CERs") from KWTE. The LOI explicitly provides that KWTE could terminate the LOI at any time and for any reason, and decline to enter into a contract. Specifically, the LOI states that KWTE can terminate the LOI "with or without cause" simply by giving fifteen-days notice and by paying a stipulated termination fee. The LOI also provides that KWTE's termination "shall release [KWTE] and [IFC] from all of their respective obligations under [the LOI], including any liabilities arising therefrom" except for the stipulated termination fee.

Pointedly, IFC did not provide a copy of the LOI to the Court with its Complaint. It is attached hereto as Exhibit A.

On March 2, 2007, KWTE exercised its right to terminate the LOI, and offered to make the payment specified by the LOI. That should have been the end of the matter. IFC instead now seeks through this lawsuit to obtain the contract it could not negotiate. IFC asks the Court to rewrite the LOI to say that KWTE had an obligation to continue negotiations and sign a final contract, and had no right to terminate the LOI, in spite of the clear LOI language giving KWTE the right to terminate. IFC asserts various theories in its Complaint, but all are based on the theory that KWTE was obligated to continue negotiations with IFC and enter into a contract. IFC's claims are in defiance of the plain terms of the LOI, and are untenable as a matter of law.

Although this Court need not resolve any contested factual issues in deciding that IFC has not stated any valid claims, it should be noted that IFC's description of the dealings between the parties badly mischaracterizes the facts. The true facts demonstrate that IFC, not KWTE, was intransigent and heavy-handed throughout the negotiations. IFC began with an LOI that was one-sided in assessing a termination fee against KWTE for termination, but which allowed IFC to walk away at no cost. KWTE agreed to that provision, and does not complain of it here. But that imbalance was not enough for IFC. As a major market power backed by the government of the Netherlands, IFC apparently assumed that it had the ability to dictate terms to KWTE, a modestly-sized Thai company. Thus, for example, IFC insisted on price terms that did not come close to recognizing the market value of KWTE's CERs, and refused through the very end to drop its demand that KWTE agree to a commercially irresponsible contract. On numerous other issues, such as penalties to be assessed against KWTE for non-delivery of CERs and KWTE's right to sell additional CERs to third parties, IFC simply refused to negotiate.

Nevertheless, as IFC's own attached documents demonstrate, KWTE continued to actively negotiate potential terms with IFC throughout the life of the LOI. IFC's Complaint confirms that, although IFC did not agree with KWTE's positions (nor KWTE with IFC's), KWTE itself proposed potential terms, responded to IFC's proposed terms, reviewed draft

agreements, provided comments for IFC's consideration, and engaged in regular e-mail and other communications with IFC to try and negotiate an acceptable deal. (See, e.g., Complaint ¶¶ 18-29.) IFC's characterization of this history as a failure to negotiate on KWTE's part is obviously driven by IFC's view that KWTE was obligated to accept IFC's one-sided terms. Happily, because of the termination provision of the LOI, KWTE had no obligation to succumb to IFC's tactics.

Again, the history of the negotiations that were terminated by KWTE (and therefore much of IFC's Complaint) are not relevant to a resolution of this motion. The claims should be dismissed because they are invalid as a matter of law.

### A.     Summary Of The Arguments

*First*, IFC attempts to use an *implied* covenant of good faith and fair dealing to circumvent the *express* language of the LOI that allows KWTE to terminate the LOI at any time for any reason. New York law is clear that an implied covenant must be consistent with the written provisions of the contract, and cannot operate to create new contractual rights. Thus, New York courts hold that an implied covenant of good faith and fair dealing does not apply to a party's express right to terminate a contract. IFC's proposed implied covenant is directly contradicted by the termination clause of the LOI, and would insert a new term into the LOI requiring KWTE both to continue negotiations against its will and to enter into a sales contract with IFC.

*Second*, IFC seeks contract expectation damages for an alleged breach of an implied covenant to negotiate in good faith. IFC essentially argues that, because KWTE exercised its right under the LOI to end negotiations for reasons IFC does not like, IFC is entitled to the full benefits of a non-existent contract that KWTE had no obligation to negotiate or execute, and to which KWTE never agreed. That is nonsensical, contrary to the explicit written terms of the LOI, and unsupported by basic principles of contract law. It is axiomatic that a party cannot

receive expectation damages for failed negotiations that resulted in no contract, as that would confer the benefit of a bargain that was not reached.

*Third,* perhaps in recognition of the fundamental weakness of its implied covenant claim, and in its continuing quest to create a claim for full contract damages, IFC claims alternatively that the parties in fact entered into a contract in June 2005. Based on the Complaint allegations as well as the documents submitted by IFC as part of its Complaint, IFC's claim that the parties entered into a contract is legally unsupportable and should be dismissed now.

IFC submits several e-mails from May-June 2005, and refers to a September 2005 "Term Sheet" prepared by IFC, to support its claim that the parties agreed on specific price and quantity terms in June 2005. In fact, these documents demonstrate on their face that no contract was formed as a matter of law. There is no offer and acceptance of common price or quantity terms; to the contrary, according to IFC's documents, IFC rejected KWTE's proposal and counter-offered different price and quantity terms. In fact, the parties never reached a final agreement on the terms of a contract, but the salient point here is that the documents offered by IFC as forming a contract fail to do so as a matter of law.

Moreover, the September 2005 Term Sheet touted by IFC as setting forth terms agreed to by IFC and KWTE conclusively shows that the parties did not form a contract. As with the LOI, IFC did not attach a copy of the Term Sheet to its Complaint. KWTE does supply the Term Sheet to the Court as Exhibit B hereto. On the first page, at the very top, in bold, capital letters, the Term Sheet states that (1) the Term Sheet did not constitute an offer or commitment by IFC or KWTE; (2) neither party would have any liability under the Term Sheet; (3) the Term Sheet did not purport to set forth final, agreed terms, but rather was "intended to serve only as a basis for discussion of the major terms that would apply" to a completed contract, if any; (4) IFC had no authority to enter into any contract absent approval of its management and the Dutch government; (5) IFC had no authority to enter into any contract until the "the execution of final documentation;" and (6) all "figures, terms and conditions" set forth in the Term Sheet" were "subject to change."

IFC thus made clear in its Term Sheet that there was no contract as of September 2005. Obviously, therefore, there could not have been a binding contract between the parties in June 2005.

That no contract existed between the parties is further confirmed by IFC's Complaint allegations that, for over a year after the May-June 2005 e-mail exchange and the September 2005 Term Sheet, IFC itself repeatedly offered different price and quantity terms, and changed other material terms of its proposal.

*Fourth*, IFC correctly claims that it is due the termination payment specified in the LOI. Indeed, that is all that is due to IFC. To date, IFC has refused KWTE's repeated offers to pay the full termination fee, and in fact has refused to accept that fact that the LOI was terminated. KWTE stands ready at any time to make the required payment to IFC.

*Fifth*, in a final attempt to create a contract where none exists, IFC argues that the LOI's standard indemnification clause, in which KWTE agreed to indemnify IFC against certain third-party claims, is really a *guarantee* by KWTE to reimburse IFC for any losses claimed by IFC from KWTE's termination of the LOI – including, according to IFC, full contract expectation damages to IFC. That is a fundamental mischaracterization of the LOI and of the law of indemnity.

### B.    The Court Should Not Accept Complaint Allegations That Are Contradicted By Materials Attached To The Complaint Or Incorporated By Reference

It is important to note at the outset that, although, for purposes of this motion, the Court is generally constrained to accept the allegations of the Complaint, the Court should not accept allegations that are contradicted by written materials properly before the court. *Alusit, Ltd. v. Aluglas of Pa.*, No. 89 Civ. 3849 (CSH), 1990 U.S. Dist. LEXIS 16755, *32 (S.D.N.Y. Dec. 4, 1990), *citing* 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE (2D ED. 1990), § 1327 at 766-67 ("The court is not bound to accept the pleader's allegations as to the effect of the exhibit, but can independently examine the document and form its own conclusions as to the proper construction and meaning to be given the material. When a disparity exists between the

5

written instruments annexed to the pleadings and the allegations in the pleadings, the written instrument will control"); *see also Madonna v. U.S.*, 878 F.2d 62, 65-66 (2d Cir. 1989). This is an important qualification to the general rule that a court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party. *Id.* at 65. Materials that a court may properly consider on a motion to dismiss include any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit. *Rothman v. Gregor,* 220 F.3d 81, 88-89 (2d Cir. 2000), *citing Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir. 1989); *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir. 1991), *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992) .

The invalidity of IFC's claims is demonstrated by reference to the Complaint allegations, the documents attached by IFC to its Complaint, and by documents referred to by IFC in the Complaint. The Complaint allegations and supporting documents demonstrate as a matter of law that IFC has no valid claim against KWTE. IFC's complaint should be dismissed.

## STATEMENT OF THE RELEVANT ALLEGATIONS

### A.    Allegations Regarding KWTE's Right To Terminate The LOI

The Complaint alleges that KWTE is engaged in a project located in Thailand that "involves the construction, ownership, operation, and financing of a methane recovery and waste-to-energy project to treat wastewater and capture biogas for ten years, to be delivered as a substitute for consumption of heavy fuel oil, and to be converted into electricity through combustion (thereby displacing grid-supplied electricity)." (Complaint ¶ 13.) The Complaint alleges that IFC, acting as trustee for the IFC-Netherlands Carbon Facility ("INCaF"), held discussions with KWTE "about the possibility of purchasing the CERs expected to be generated" by the KWTE project. (Complaint ¶ 14.)

IFC alleges that it and KWTE executed an LOI on May 20, 2004.  (Complaint ¶ 15.)
According to IFC, "the purpose of the LOI was to negotiate the execution of an Emission
Reduction Purchase Agreement ("ERPA") … that "would govern the sale of certified
emission reductions ("CERs"), commonly called 'carbon credits,' from Korat to the
government of the Netherlands…."  (Complaint ¶ 2.)

### 1. The LOI Explicitly Allows KWTE To Terminate The LOI At Any Time For Any Reason

As noted, IFC did not attach the LOI to its Complaint.  That is a glaring omission.  It is
attached hereto as Exhibit A.  The LOI states explicitly that neither party had any obligation to
enter into a sales contract, and that either party could terminate the LOI at will:

> 7. <u>Termination</u>
>
> (a)   Methods of Termination
>
> This Letter Agreement
>
> (i)    may be terminated by the Project Company or the Trustee,
> with or without cause, by giving at least fifteen (15) days'
> prior written notice to the other party; ….

(LOI, Exhibit A at 3.)  Under this provision, KWTE thus had the right to terminate at any time
and for any reason, or no reason at all, simply by giving fifteen-days notice.

### 2. The LOI Explicitly States That All Liabilities By Either Party Under Or Arising From The LOI Are Extinguished If KWTE Terminates The LOI

Moreover, the LOI states that, once a party terminates the LOI, neither party has any
obligation to the other, nor has any liability arising from the LOI, except for a termination fee in
the case of KWTE:

> (b)   <u>Consequences of Termination</u>
>
> Any such termination shall release [KWTE] and [IFC] from all of their
> respective obligations under this Letter Agreement, including any liabilities
> arising therefrom, except as provided in Paragraph 7.

(LOI, Exhibit A, at 3.)

     **3.**      **The LOI Provides For A Specific Termination Fee As**
                        **IFC's Sole Recovery If KWTE Terminates The LOI**

Paragraphs 7(d) and (g) of the LOI specify the payments to be made if KWTE terminates the LOI:

     d.      <u>Termination by Project Company</u>

          Subject to the provisions of Paragraphs 7(f) and (g) below, if the Project Company terminates this Letter Agreement or otherwise fails to fulfill its obligations under this Letter Agreement such as to effectively terminate this Letter Agreement prior to concluding an ERPA with the Trustee then the Project Company agrees to reimburse the Trustee: $25,000 if the termination takes place before the due diligence has started; or up to an amount of $100,000 for Appraisal Expenses incurred (whether or not invoiced) in connection with the Services in addition to an amount of $25,000, if the termination takes place after the Project Concept Note ("PCN") has been approved by VROM as specified in Schedule 1 (b) and after the due diligence by the Trustee has commenced….

     g.      <u>Sale to Third Party</u>

          If (i) (a) the Project Company terminates this Letter Agreement or (b) this Letter Agreement automatically terminates pursuant to Paragraph 7(a)(ii)(y) and (ii) within one year of termination or the effective date of such termination of this Letter Agreement, as the case may be, the Project Company enters into an agreement or agreements with another buyer or buyers to sell Emission Reductions generated from or caused directly and/or indirectly by the Project or any configuration or reconfiguration of the Project, then the Project Company agrees to provide INCaF with a certified, true and complete copy of such agreement or agreements with such other buyer or buyers and to reimburse the Trustee the amount specified in Paragraph 7(d) plus $300,000.

(LOI, Exhibit A, at 4, 5.) Thus, under 7(d), if KWTE terminates the LOI, it must "reimburse" IFC either $25,000 or $125,000, including $100,000 constituting IFC's "Appraisal Expenses," depending on the date of termination in relation to certain events. If KWTE then sells CERs from the project to a third party within one year of terminating the LOI, KWTE must "reimburse" IFC an additional $300,000. These reimbursement amounts are due regardless of IFC's actual expenses, and even if IFC provides no invoices supporting its expenses. (LOI, Exhibit A, at 4 ¶ 7(d).) Under Paragraph 7(b), KWTE has no liability to IFC beyond these payments.

**B.     Allegations Regarding KWTE's Termination Of The LOI**

KWTE terminated the LOI by letter dated March 2, 2007.  (May 17, 2007 Letter from

Danish to DeMarco, attached to IFC's Complaint as Exhibit A.)  The termination letter invoked

KWTE's right to terminate under Paragraph 7(a)(i) of the LOI, and offered to make the required

termination payment:

> Under the terms of the LOI, termination is effective in 15 days.  KWTE
> understands that its termination of the LOI pursuant to paragraph 7(a)(i) triggers a
> payment obligation under paragraph 7(d).  KWTE will await your invoice.
> KWTE further understands that, pursuant to paragraph 7(d), certain other
> provisions of the LOI will survive termination and shall remain in full force and
> effect.

(*Id.*)

**C.     Allegations That KWTE And IFC Formed A
        Contract In June 2005 To Sell And Purchase CERs**

The Complaint alleges that an exchange of e-mails in May-June 2005 formed a binding

contract between KWTE and IFC in June 2005 to buy and sell CERs, and that the parties agreed

upon a "final Term Sheet," dated September 21, 2005, setting forth terms agreed to in June 2005.

(Complaint ¶¶ 18-19.)  These allegations are completely contradicted by the documents supplied

by IFC, and are entitled to no deference by this Court.

IFC alleges that, "[o]n May 26, 2005, Korat proposed certain terms in anticipation of an

ERPA, including sale of one and one-half million CERs to IFC for a price of EUR 4.75."  IFC

further alleges that, "on June 10, 2005, IFC agreed with Korat on a price/quantity combination of

EUR 4.75 for one and three-quarter million CERs…."  and accepted Korat's other terms on June

10, 2005."  (Complaint ¶ 18.)  IFC attaches e-mails between KWTE and IFC on May 26 and

June 10, 2005 as Exhibit D to its Complaint, and alleges that these e-mails "evidence[] … these

discussions and the June agreement…."  (May 26 and June 10 E-mails, attached to IFC's

Complaint as Exhibit D.)

IFC's characterization of the May-June e-mails is simply wrong.  KWTE's May 26

proposal was to sell up to $1.5 million tons of CERs at a price of 4.75 euros per ton, but IFC

rejected that proposal. Instead, IFC made a counter-proposal to increase the quantity from 1.5 million to 1.75 million tons, and lower the price from 4.75 to 4.25 euros per ton. KWTE's e-mail in response did not accept the IFC counter-proposal. It merely stated that the counter-proposal would be referred to KWTE's Board. IFC's submissions do not indicate that the parties ever reached a final agreement on the terms of a contract.

Similarly, IFC's allegation that the Term Sheet sets forth terms that were agreed to on June 10, 2005 is contradicted by the Term Sheet itself. The Term Sheet states that it was "intended to serve only as a basis for discussion of the major terms that would apply" to a contract. It explicitly provided that all "figures, terms and conditions" set forth in the Term Sheet" were "subject to change." Perhaps most notably, the Term Sheet states that it "does not constitute an offer or a commitment by IFC or KWTE, and no party shall have any liability hereunder." (Term Sheet, Exhibit B, at 1.)

**1. No Offer Was Accepted In The May-June 2005 E-mail Exchange Cited by IFC as Forming a Contract**

Again, the May-June 2005 e-mails that IFC claims reflect an agreement as to price and quantity terms are at IFC's Exhibit B. They utterly contradict IFC's allegation that the parties agreed on contract terms on June 10, 2005:

a. On May 26, 2005, Korat sent an e-mail to IFC setting forth "general terms" of a KWTE proposal. On the critical terms of price and quantity, Korat proposed to sell up to $1.5 million tons of CERs at a price of 4.75 euros per ton beginning in 2006. (May 26, 2005 E-mail from Locklin to Cook, Complaint Exhibit D at 2.)

b. The next e-mail, dated June 10, 2005, memorializes a conversation between IFC and KWTE regarding KWTE's proposal. ***IFC did not accept the price or quantity terms of the Korat proposal.*** Instead, IFC made a counter-proposal to increase the quantity from 1.5 million

to 1.75 million tons, and lower the price from 4.75 to 4.25 euros per ton.  (June 10, 2005 12:24 p.m. E-mail from Locklin to Cook, Complaint Exhibit D at 1.)

       c.     ***The June 10, 2005 e-mail from KWTE to IFC did not accept IFC's proposal***. To the contrary, the e-mail explicitly states that Locklin will "convey [IFC's proposal] to the rest of the [KWTE] Board on a call we have already scheduled over the weekend, and hopefully revert with a formal response from our side on Monday." (*Id*.)

       d.     The final e-mail, also on June 10, came from IFC to KWTE.  IFC alleges that IFC agreed with Korat on June 10 on a price/quantity combination of EUR 4.75 for one and three-quarter million CERs and accepted Korat's other terms.  (Complaint ¶ 18.)  ***This e-mail never states that the parties had agreed on anything.***  It states merely that IFC would agree to a deal based on *IFC's counter-proposal*, not on KWTE's proposal.

       e.     IFC also explicitly acknowledged in its June 10, 2005 e-mail that going forward based on IFC's terms would be dependent on the approval of the Korat Board.  (See June 10, 2005 2:22 p.m. E-Mail from Cook to Locklin, Complaint Exhibit D at 1 ("Provided the Board agrees, I would like to move forward quickly."))

       Plaintiffs' own complaint and exhibits thus confirm that there was never a meeting of the minds as to any terms of a final agreement, including the threshold issues of price and quantity. More specifically, these submissions cannot support IFC's conclusory allegation that the parties entered into a contract in June 2005.

2.    **The September 2005 Term Sheet States Explicitly That There Was No Contract Between The Parties As Of September 2005**

IFC further alleges that the parties agreed upon a "final Term Sheet" dated September 21, 2005:

> On September 21, 2005, the final Term Sheet, which now reflected the new price and quantity combination for CERs that IFC and Korat had agreed to in June, was agreed upon as well. IFC hence proceeded with drafting the ERPA. The parties envisioned that the ERPA would be completed by the end of the year in accordance with the terms reflected in the Term Sheet. On October 13, 2005, IFC sent a draft ERPA to Korat that reflected the new price and quantity combination, as well as all other terms contained in the final Term Sheet.

(Complaint ¶ 19.)

This is flatly contradicted by the plain language of the Term Sheet itself. It is curious, at a minimum, that IFC did not attach a copy of the Term Sheet to its Complaint. Had it done so, this Court would have immediately seen that, on the first page, at the very top, in bold, capital letters, the Term Sheet expressly states that there is no contract between the parties:

> **IMPORTANT DISCLAIMER: THIS TERM SHEET IS NOT A COMPLETE DESCRIPTION OF A PROPOSED EMISSION REDUCTION PURCHASE AGREEMENT CURRENTLY BEING DISCUSSED BY INTERNATIONAL FINANCE CORPORATION ("IFC") AND KORAT WASTE-TO-ENERGY COMPANY LIMITED ("KWTE") AND DOES NOT CONSTITUTE AN OFFER OR A COMMITMENT BY IFC OR KWTE, AND NO PARTY SHALL HAVE ANY LIABILITY HEREUNDER. IT IS INTENDED TO SERVE ONLY AS A BASIS FOR DISCUSSION OF THE MAJOR TERMS THAT WOULD APPLY TO THE EMISSION REDUCTION PURCHASE AGREEMENT. IFC'S AUTHORITY TO ENTER INTO THE EMISSION REDUCTION PURCHASE AGREEMENT IS CONTINGENT ON THE APPROVAL OF IFC'S MANAGEMENT, THE APPROVAL OF THE NETHERLANDS, ACTING THROUGH ITS MINISTRY OF HOUSING, SPATIAL PLANNING AND THE ENVIRONMENT, AND THE EXECUTION OF FINAL DOCUMENTATION IN FORM AND SUBSTANCE SATISFACTORY TO IFC. THIS TERM SHEET IS NOT TO BE RELEASED TO ANY PARTY OTHER THAN KWTE WITHOUT THE PRIOR WRITTEN CONSENT OF IFC. ALL FIGURES, TERMS AND CONDITIONS STATED BELOW ARE SUBJECT TO CHANGE.**

(Sept. 2005 Term Sheet, Exhibit B, at 1.) The Term Sheet thus confirms that:

12

- The Term Sheet did not constitute an offer or commitment by IFC or KWTE;

- Neither party would have any liability under the Term Sheet;

- The Term Sheet did not purport to set forth final, agreed terms, but rather was "intended to serve only as a basis for discussion of the major terms that would apply" to a completed contract, if any;

- IFC had no authority to enter into any contract absent approval of its management and the Dutch government;

- IFC had no authority to enter into any contract until the "the execution of final documentation;" and

- All "figures, terms and conditions" set forth in the Term Sheet were "subject to change."

The Term Sheet repeats what was made clear by the LOI:  either party could terminate negotiations and walk away.  If there was no contract as of September 2005, as the Term Sheet states, there could not have been a contract as of June 2005.  IFC's decision not to attach the Term Sheet with its Complaint cannot change that.

### 3.    IFC Itself Continued To Negotiate And Change The Terms Of Its Offers Long After June 2005

According to the Complaint, the material terms of price and quantity continued to be negotiated for over a year after the May-June 2006 e-Mail Exchange.  Specifically, the Complaint alleges that IFC offered different price and quantity terms, and changed other material terms of its May 2005 proposal, in October 2006, or over a year after the parties had supposedly agreed to a contract in June 2005:

> IFC discussed the following revised terms during a meeting with Korat representatives on October 17, 2006: (a) a higher price for the CERs of EUR 7.25; (b) an advance by IFC of certain of Korat's legal expenses, which it would recoup only if the ERPA was executed; (c) an agreement to purchase an additional 250,000 CERs after 2012 at the same price of EUR 7.25 per CER; (d) assistance in obtaining approval from the Thai government; and (e) assistance with the sale of verified emission reductions if Korat's project was not registered in time to qualify for CERs generated prior to registration.

(Complaint ¶ 27.)  This allegation of a new offer in October 2006 is inconsistent with the notion that a binding agreement was reached in June 10.  IFC cannot contradict its own document that conclusively states that no agreement existed.

## ARGUMENT

## I.  PLAINTIFF'S CLAIM ALLEGING LIABILITY FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING IS INVALID AS A MATTER OF LAW

Count I of the Complaint alleges that KWTE breached an implied covenant of good faith and fair dealing in its negotiations with KWTE.  (Complaint ¶¶ 38-45.)  IFC does not challenge, or even mention, that the LOI states explicitly that KWTE could terminate the LOI at any time, and that KWTE had no obligation whatsoever to enter into a contract with IFC.  IFC claims instead that KWTE "failed and refused, without legal cause or justification, to negotiate with IFC in good faith to complete the proposed ERPA" and that KWTE "failed to use its best efforts to achieve the goal of the LOI, which was the execution of an ERPA between Korat and IFC."  (Complaint ¶ 42.)

Count I is invalid as a matter of law.  Under New York law, an implied term, including an implied covenant of good faith and fair dealing, must be consistent with the written, explicit provisions of the contract.  The written termination provision of the LOI gives KWTE the right to end negotiations with IFC and terminate the LOI at any time and for any reason.  IFC cannot use an implied covenant to impose a new contractual duty on KWTE to negotiate with IFC.

Although New York contracts contain an implied covenant of good faith and fair dealing, "such a covenant is implied only where the implied term 'is consistent with other mutually agreed upon terms in the contract.'"  *Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 716 F. Supp. 1504, 1519 (S.D.N.Y. 1989), *quoting Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 335, 514 N.Y.S.2d 209, 212 (1987).  "In other words, the implied covenant will only aid and further the explicit terms of the agreement and will never impose an obligation 'which would be

14

inconsistent with other terms of the contractual relationship.'" *Id.*, *quoting Sabetay*, 69 N.Y.2d at 335, 514 N.Y.S.2d at 212.

Consistent with this rule, New York courts hold that the implied covenant of good faith and fair dealing "does not apply to a party's express right to terminate a contract." *Burdett Radiology Consultants, P.C. v. Samaritan Hosp.*, 158 A.D.2d 132, 13, 557 N.Y.S.2d 988, 991 (3d Dep't 1990), *citing Sabetay*, 69 N.Y.2d at 335-336; *see also Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 304-05, 461 N.Y.S.2d 232, 237-38 (1983).

*Burdett* is instructive. There, plaintiffs entered into a contract with defendants pursuant to which plaintiffs were to provide "all radiological services" for defendant. The contract contained a clause allowing defendants to unilaterally terminate the contract upon 180 days' written notice. Plaintiffs alleged that defendants acted outside the contract in hiring plaintiffs' former employee to provide radiological services to defendants. Defendants subsequently exercised their option to terminate. Plaintiffs then sued, alleging *inter alia* that defendants had breached the covenant of good faith and fair dealing in performing the contract." *Burdett,* 158 A.D.2d at 134-35, 557 N.Y.S.2d at 989. The Court rejected this claim, holding that "[s]uch an implied covenant … does not apply to a party's express right to terminate a contract." 158 A.D.2d at 136, 557 N.Y.S.2d at 991, *citing Sabetay*, 69 N.Y.2d at 335-336.

Other New York courts have applied the principle that no implied covenant of good faith and fair dealing can be implied if the contract can be terminated at will. For example, in *Sabetay v. Sterling Drug, Inc.*, *supra*, the plaintiff asserted he was wrongfully discharged from at-will employment because he refused to participate in unlawful activities and because he had reported the alleged illegalities to his supervisor. Plaintiff claimed that his discharge breached the implied covenant of good faith and fair dealing. *Sabetay*, 69 N.Y.2d at 331-33, 514 N.Y.S.2d at 210-11. The *Sabetay* court held that there was no such covenant because "'[n]o obligation can be implied … which would be inconsistent with other terms of the contractual relationship … in which the law accords the employer an unfettered right to terminate employment at any time.'" 69 N.Y.2d at 335, 514 N.Y.S.2d at 212, *quoting Murphy*, 58 N.Y.2d at 304-05.

*Sabetay* followed the holding of the New York Court of Appeals in *Murphy v. American Home Prods. Corp.*, *supra*, where the plaintiff claimed that termination of his at-will employment contract for alleged whistleblower activity breached the implied duty of good faith and fair dealing. 58 N.Y.2d at 304. The Court of Appeals held that the implied covenant of good faith and fair dealing did not apply because it would be inconsistent with the employer's right to terminate. Absent an express limitation on the right to terminate, no implied covenant could impair that right:

> Thus, in the case now before us, plaintiff's employment was at will, a relationship in which the law accords the employer an unfettered right to terminate the employment at any time. In the context of such an employment it would be incongruous to say that an inference may be drawn that the employer impliedly agreed to a provision which would be destructive of his right of termination. The parties may by express agreement limit or restrict the employer's right of discharge, but to imply such a limitation from the existence of an unrestricted right would be internally inconsistent.

*Murphy,* 58 N.Y.2d at 304-05; *see also Sabetay*, 69 N.Y.2d at 336 ("[d]ispositive in *Murphy* was plaintiff's failure to establish an express limitation on his employer's right of discharge").

The New York rule barring application of an implied covenant of good faith and fair dealing to the termination provision of a contract applies with full force here. Paragraph 7 of the LOI unambiguously allows KWTE to terminate the LOI. KWTE's right to terminate is unlimited, and is subject only to payment of a termination fee. KWTE's express right to terminate the KWTE cannot be defeated or impinged by resort to an implied covenant.

IFC is clearly dissatisfied with KWTE's decision to end negotiations. But KWTE had the express contractual right to do so, and IFC cannot sustain a viable claim to the contrary by resort to an implied covenant. Count I should therefore be dismissed.

## II.    IFC'S CLAIM FOR CONTRACT EXPECTATION DAMAGES BASED ON THE ALLEGED BREACH OF AN IMPLIED COVENANT IN A NON-BINDING LETTER OF INTENT SHOULD BE DISMISSED

Even if IFC could circumvent New York law and rewrite the LOI to include an implied obligation to continue negotiations with IFC, IFC's damages claim is nevertheless invalid as a

matter of law.   IFC alleges that, based solely on KWTE's termination of the LOI and its alleged refusal to further negotiate with IFC, IFC is entitled to "replacement costs for the CERs of not less than $18.3 million." (Complaint at 16.)   IFC's claim is for full contract expectation damages as if the parties had ultimately agreed to a final contract.

New York law does not allow contract expectation damages based on failed negotiations. Instead, such damages are available only if the parties actually enter into a contract and *that* contract is breached.   The only damages even possibly available for failed negotiations are actual, out-of-pocket reliance expenses, but the LOI reduces any such damages to a fixed termination fee and expressly releases all other liability.

### A.  Expectation Damages Are Not Available For An Alleged Breach of the Implied Covenant of Good Faith and Fair Dealing

Under New York law, a party can not recover expectation damages if no contract is reached and the parties had no obligation to enter into a contract.   Expectation damages are intended to put the party aggrieved by a breach of contract in as good a position as it would have been had the contract been fully performed.   *E.g., McKinley Allsopp, Inc. v. Jetborne Int'l, Inc*., 1990 U.S. Dist. LEXIS 12405, *21-23 (S.D.N.Y. 1990), *citing*, *e.g.*, *Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 493 N.Y.S.2d 131, 132 (1986).   "[A]n award based on [the expectation interest] would give the injured party the 'benefit of the bargain' that was not reached.   But if no agreement was reached and … it cannot even be known what agreement would have been reached, there is no way to measure the lost expectation.'"   *Goodstein Constr. Corp. v. N. Y.*, 80 N.Y.2d 366, 373-374, 590 N.Y.S.2d 425, 429 (1992), *quoting* 1 FARNSWORTH, CONTRACTS § 3.26a, at 314.

This principle is routinely applied in the very similar contexts of promissory estoppel claims and claims for lost profits.   There, a party's "alleged failure to bargain in good faith is not a but-for cause of [plaintiff's] lost profits, since even with the best faith on both sides the deal might not have been closed [and] attributing [plaintiff's] lost profits to [defendant's] bad faith may be speculative at best."   *Arcadian Phosphates v Arcadian Corp.*, 884 F.2d 69, 74, n. 2 (2d

Cir. 1989) (promissory estoppel); *see also Matterhorn Group, Inc. v. SMH (U.S.) Inc. (In re Matterhorn Group, Inc.)*, A.P. No. 97-8273 (SMB), 2002 Bankr. LEXIS 1275, *51-52 (Bankr. S.D.N.Y. 2002) (plaintiff cannot recover lost profits for breach of a letter of intent, but only out-of-pocket expenses); *Goodstein*, 80 N.Y.2d at 373-74, 590 N.Y.S.2d at 429 (lost profits).

In *Goodstein*, the City of New York terminated letter agreements that gave plaintiff the exclusive right to negotiate the terms and conditions of a contemplated contract to develop two sites. The City "retain[ed] the right to terminate negotiations at any time" in which case the City could "negotiate with any other applicant or non-applicant," just as it could if it "decided not to extend the negotiation period." 80 N.Y.2d at 368-69, 590 N.Y.S.2d at 426. The City subsequently notified plaintiff that it had been "dedesignated" as exclusive negotiator for the two sites. No development contract was ever concluded. Plaintiffs brought a lawsuit claiming, *inter alia*, breach of the City's obligation to act in good faith under the letter agreements, and sought $800 million in damages, all but $1 million of which represented loss of anticipated profits. 80 N.Y.S.2d at 369-70, 590 N.Y.S.2d at 426-27.

The Court of Appeals held that plaintiffs could not recover lost profit expectation damages even if the City had breached the covenant of good faith and fair dealing:

> Contract damages are ordinarily intended to give the injured party the benefit of the bargain by awarding a sum of money that will, to the extent possible, put that party in as good a position as it would have been in had the contract been performed (*see,* Restatement [Second] of Contracts § 347, comment *a;* § 344). Here, the City's sole obligation under the letters of January 29, February 1, and June 2, 1982 was to negotiate in good faith. The City was neither bound to agree to an LDA nor to continue the negotiating process. To allow the profits that plaintiff might have made under the prospective LDA as the damages for breach of the exclusive negotiating agreements would be basing damages not on the exclusive negotiating agreements but on the prospective terms of a nonexistent contract which the City was fully at liberty to reject. It would, in effect, be transforming an agreement to negotiate for a contract into the contract itself.

80 N.Y.S.2d at 373, 590 N.Y.S.2d at 429.

Here, too, allowing contract expectation damages based on an alleged breach of an implied covenant of good faith and fair dealing would "be transforming an agreement to

negotiate for a contract into the contract itself."  For the reasons set forth above, the claim for an alleged breach of an implied covenant of good faith and fair dealing should be dismissed in any event.  If this claim is allowed to go forward, the claim for expectation damages should be dismissed.

**B.    IFC Cannot Recover More Than The LOI's Termination Fee For Any Claim Based On KWTE's Termination Of The LOI**

Once the claim for expectation damages is stripped away, the only conceivable damages claim is a claim for out-of-pocket reliance damages.  Here, however, the computation of IFC's allowable expenses is expressly set forth in the LOI.  As described above, under 7(d), if KWTE terminates the LOI, IFC receives a reimbursement of either $25,000 or $125,000, including $100,000 constituting IFC's "Appraisal Expenses."  If KWTE then sells CERs from the project to a third party within one year of terminating the LOI, KWTE must pay IFC an additional $300,000.   The LOI further provides that these amounts are the sole liability that can be incurred by KWTE for termination:  "Any such termination shall release [KWTE] and [IFC] from all of their respective obligations under this Letter Agreement, including any liabilities arising therefrom, except as provided in Paragraph 7."  (LOI, Exhibit A, at 3.)

As noted in Section IV below, KWTE has offered to make all payments required by Paragraph 7.  IFC has no claim for any additional sum.

**III.    PLAINTIFF'S BREACH OF CONTRACT CLAIM IS INVALID AS A MATTER OF LAW**

To establish a claim for breach of contract under New York law, a plaintiff must prove: (1) that an agreement existed between it and defendant; (2) what the respective obligations of the parties were; (3) that the plaintiff performed its obligations under the agreement; (4) that the defendant breached the agreement by failing to perform its obligations; and (5) that the plaintiff suffered damages as a result of the breach.  *E.g.*, *Paper Corp. of the U.S. v. Schoeller Technical Papers, Inc.,* 807 F. Supp. 337, 341 (S.D.N.Y. 1992).

19

"Under New York law, no contract exists, nor may one be implied, where parties do not agree to its material terms." *Tower Int'l, Inc. v. Caledonian Airways, Ltd.,* CV-93-1122, 1996 U.S. Dist. LEXIS 20311, at *12 (E.D.N.Y. Jan. 25, 1996), *citing Cyberchron Corp. v. Calldata Sys. Dev.,* 831 F. Supp. 94, 108 (E.D.N.Y. 1993), *vacated in part on other grounds*, 47 F.3d 39 (2d Cir. 1995).

Moreover, if one party makes a counteroffer in response to an offer, the initial offer is thereby rejected and no contract is formed. RESTATEMENT (SECOND) OF CONTRACTS § 39(1); *Clark Oil Trading Co. v. Amerada Hess Trading Co.*, 90 Civ. 1856 (PKL), 1993 U.S. Dist. LEXIS 10801, *14-15 (Aug. 4, 1993); *Trifiro v. N.Y. Life Ins. Co.,* 845 F.2d 30, 32 (1st Cir. 1988); *John's Insulation, Inc. v. Siska Constr. Co.,* 671 F. Supp. 289, 292 (S.D.N.Y. 1987).

Pursuant to these basic contract principles, the e-mail exchange In May-June 2005 cited by IFC does not indicate in any way that the parties reached final agreement as to the material terms of a contract. To the contrary, if KWTE's May 26 proposal is construed as an offer, IFC's June 10 counter-offer terminated KWTE's offer as a matter of law. Moreover, as discussed above, IFC's Complaint further confirms the absence of a June 2005 contract by proposing new price and quantity terms long after June 2005, which likewise would have voided any previous offers. Thus, according to IFC's own submissions, there is no June 2005 contract.

If there were any remaining doubt that the Court should disregard IFC's allegations that the parties entered into a contract on June 10, 2005, that doubt should be fully dispelled by IFC's September 2005 Term Sheet. That document could not be more clear: There was no agreement as to any terms of a contract as of September 2005. IFC said that three months after the date on which IFC now claims the parties supposedly formed a contract.

IFC's Complaint and exhibits establish that there was no binding contract between the parties, and certainly establish that none existed in June 2005. Plaintiffs' allegations to the contrary are contradicted by IFC's own documents, and should be rejected. Count II should be dismissed.

IV.    **PLAINTIFF HAS REFUSED TO ACCEPT**
       **THE LOI TERMINATION PAYMENT**

       Count III of the Complaint alleges that, having terminated the LOI, KWTE "is obligated to pay IFC the penalties indicated in Paragraphs 7(d) and 7(g) of the LOI."  (Complaint ¶ 55.)  As noted, KWTE has acknowledged that it owes IFC a termination fee under the LOI.  IFC has refused to invoice or accept KWTE's payment.  IFC's refusal to accept the termination fee does not state a valid claim against KWTE.  KWTE nevertheless makes clear that it stands ready to make the required payment at any time upon receipt of an invoice from IFC.

V.    **PLAINTIFF'S CLAIM FOR INDEMNIFICATION**
      **IS INVALID AS A MATTER OF LAW**

       Count IV of the Complaint alleges that the indemnification clause at Paragraph 12 of the LOI – which is clearly a standard indemnity against claims by third parties – somehow requires KWTE to pay IFC its "fees and expenses incurred by IFC in connection with the negotiations under the LOI, as well as fees and expenses incurred in this litigation."  (Complaint ¶ 59.)  Remarkably, IFC seeks full contract expectation damages of $18,600,000 under this third-party indemnity clause.  (Complaint at 17.)  There is no support whatsoever for this claim.

       IFC uses selective editing to convert this agreement to indemnify IFC against claims by third parties into a guarantee by KWTE to reimburse IFC for any losses incurred in connection with the LOI.  IFC alleges in its Complaint:  "This indemnification clause requires KWTE to reimburse IFC for any expenses, including legal expenses, incurred in connection with activities contemplated under the [LOI] 'or with the investigation or defense thereof."  The complete indemnity clause, however, clearly applies to claims against IFC, not claims by IFC against KWTE:

     12.    <u>Indemnity</u>

       The Project Company agrees to indemnify and hold IFC, INCaF and the Trustee harmless against any losses, claims, damages or liabilities ***to which the Trustee, IFC, its governors, directors, employees, agents, consultants or legal Counsel (each, an "Indemnified Party") may become subject in connection with any Indemnified Party's activities*** as contemplated under this Letter Agreement,

and to reimburse IFC, INCaF and the Trustee for any expenses, including any legal expenses, incurred by IFC, INCaF or the Trustee in connection therewith or with the investigation or defense thereof; provided however that the Project Company shall not be liable in respect of any such loss, claim, damage, or liability to the extent that such loss, cost, damage or liability resulted from such Indemnified Party's gross negligence or willful misconduct.

(LOI, Exhibit A, at 6; emphasis added.)  Under New York law, such standard third-party indemnification clauses do not provide a basis to assert a first-party claim against a party to an agreement.  *Barry & Sons, Inc. v. Instinct Prods. LLC*, 5 Misc. 3d 172, 180-83, 783 N.Y.S.2d 225, 232-34 (2004), *affirmed on relevant grounds*, 15 A.D.3d 62, 788 N.Y.S.2d 71 (1st Dep't 2005).

## CONCLUSION

For all the foregoing reasons, plaintiff's Complaint should be dismissed and plaintiff's demand for damages should be stricken.

Respectfully submitted,

_____/s/_____

August 6, 2007

Anthony F. King
WALLACE KING DOMIKE & REISKIN, PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C.  20007
Telephone:  202.204.1000
Facsimile:  202.204.1001

Elkan Abramowitz (EA-3987)
Thomas M. Keane (TK-6320)
MORVILLO, ABRAMOWITZ, GRAND,
  IASON, ANELLO & BOHRER, P.C
565 Fifth Avenue
New York, NY 10017
Telephone:  (212) 880-9300
Facsimile:   (212) 856-9494

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 6th day of August 2007, 2001, true and copies of KWTE's Motion to Dismiss the Complaint, the Memorandum in support thereof, and proposed Order were served via LexisNexis File & Serve on all counsel of record.

_____/s/_____
Anthony F. King

# EXHIBIT A



2121 PENNSYLVANIA AVE NW
WASHINGTON, DC  20433 USA
TELEPHONE: (202) 473-6684• FACSIMILE: (202) 974-4389

**Letter of Intent**

Confidential

May 17, 2004

Khorat Waste to Energy Company
Suite # 2504, 25th Flr., The Millennia Tower
62 Lang Suan Road
Lumpini, Pathumwan
Bangkok 10330, Thailand

Attention: David Donnelly, General Manager, KWTE Co

Ladies & Gentlemen:

### IFC-Netherlands Carbon Facility: Khorat Waste to Energy Project

In response to your expression of interest in selling Emission Reductions (as defined below) to International Finance Corporation ("IFC") in its capacity as the Trustee of the IFC-Netherlands Carbon Facility (the "Trustee") in connection with the Khorat Waste to Energy project we are pleased to enter into this letter agreement (the "Letter Agreement") which expresses both parties' intent to enter into an Emission Reduction Purchase Agreement ("ERPA"). This Letter Agreement is intended to set forth the basis on which the IFC-Netherlands Carbon Facility ("INCaF") and the Trustee will work with the Project Company (as defined below) in preparing and executing the purchase of Emission Reductions (as defined below) generated by the Project (as defined below).

1.    **The Project**

We understand that the project, located in Khorat, Thailand, involves the construction, ownership, operation and financing of a methane recovery and waste to energy project to treat Sanguan Wongse Industries' (SWI's) wastewater and capture a minimum of 70,000 cubic meters of biogas daily for 10 years: (i) to be delivered to SWI as a substitute for its consumption of heavy fuel oil (HFO); and (ii) to be converted into electricity through combustion in biogas fueled electricity generator units which would generate approximately 19,100,000 kWh of electricity annually thereby displacing electricity currently purchased from the grid in Khorat, Thailand (the "Project"). It is envisaged that the owners of Khorat Waste to Energy Company (the "Project Company") will agree to sell and the Trustee will agree to purchase eligible greenhouse gas emission reductions as defined under the Kyoto Protocol including methane and carbon dioxide emission reductions ("Emission Reductions") to be generated or caused directly and/or indirectly by the operation of the Project per Paragraph 2 below unless otherwise agreed to in the ERPA.

2.    **INCaF Commitment**

Nothing contained in this Letter Agreement will commit the Trustee to purchase Emission Reductions from the Project Company unless and until the Project Company and the Trustee have executed an ERPA and the terms and conditions of such ERPA are satisfied. Without prejudice to the

INTERNATIONAL FINANCE CORPORATION
A Member of the World Bank Group

- 2 -

foregoing, at this preliminary stage and based upon the information made available to INCaF as of the date hereof and assuming (among other assumptions) the accuracy thereof, INCaF has the preliminary expectation to: (i) pay €3.00 per metric tonne of Emission Reductions; (ii) purchase not less than 2.0 million and not more than 7.75 million metric tonnes of Emission Reductions confirmed by validation for the period ending December 31, 2012 (the "Contract Volume") net of Emission Reductions payable as fees for adaptation and/or administration under the Clean Development Mechanism of the Kyoto Protocol ("CDM"); and (iii) purchase the Contract Volume based on an annual delivery schedule to be agreed.

3.     **Project Requirements**

The Project Company acknowledges that it has received information on INCaF's project processing cycle and understands both INCaF and Kyoto Protocol processing requirements (see Appendix A). In particular, the Project Company acknowledges that the Project will be required to comply with:

(i) UNFCCC, Kyoto Protocol and any national requirements for CDM projects (Article 12 of the Kyoto Protocol);

(ii) Project requirements of the State of the Netherlands, acting through the Ministry of Housing, Spatial Planning and the Environment ("VROM") which require that projects comply with certain sections of the OECD Guidelines for Multinational Enterprises (see Appendix B);

(iii) IFC's Environmental and Social Policies and Guidelines applicable to the Project (see http://www.ifc.org/enviro/EnvSoc/index.html); and

(iv) both IFC's and the Kyoto Protocol CDM disclosure requirements and public consultation requirements.

4.     **Scope of INCaF and Trustee's Work**

INCaF and/or the Trustee may take any or all of the actions set forth in Schedule 1 and any other actions that they determine to be necessary for the specific purpose of concluding an ERPA with the Project Company (the "Services"). The Services to be performed by INCaF will be carried out by INCaF staff in the Environmental Finance Group of IFC's Environment and Social Development Department solely in their capacity as INCaF staff and/or by consultants commissioned by INCaF. IFC, in its capacity as Trustee for INCaF, will sign this Letter Agreement and the ERPA, if successfully negotiated. The Project Company will cooperate fully as necessary with INCaF and the Trustee in carrying out the Services and taking the other steps described in Schedule 1. INCaF and/or the Trustee will be authorized to take the steps described in Schedule 1(e) only after the approval in writing has been received by INCaF from the Project Company.

5.     **INCaF's Preferential Status**

The Project Company hereby agrees that INCaF's and the Trustee's rights to purchase Emission Reductions up to the Contract Volume and any additional Emission Reductions the Trustee may agree to purchase shall be prior to the rights of any other party to acquire Emission Reductions generated from the Project. Subject to the provisions of Paragraph 7 below, the Project Company may only enter into negotiations with third-party purchasers that are interested in buying Emission Reductions generated or caused directly and/or indirectly by the operation of the Project if the Emission Reductions have been offered to the Trustee and INCaF or the Trustee have not accepted the offer within 30 days or otherwise indicated that they are not interested in purchasing the additional Emission Reductions.

- 3 -

6.    **Expenses**

(a)    **Project Company Expenses**

As per Schedule 1 the Project Company will pay all expenses and fees related to the Baseline Study, the Monitoring Plan, and the validation of the Project as per Schedule 1, and all expenses and fees related to the registration with the Executive Board.  The Project Company will pay any taxes, fees or other charges applied by the Government of Thailand to process CDM projects and/or to payments for Emission Reductions generated in the country and/or to transfers of Emission Reductions to foreign buyers.

(b)    **Trustee Expenses**

The Trustee will cover the expenses for INCaF's appraisal and due diligence and IFC's Environment and Social Review as per Schedule 1(c) and for INCaF's legal counsel (collectively, "Appraisal Expenses").

Subject to Paragraphs 7(d) and 7(e) below, the Trustee expects to recover all costs incurred by INCaF pursuant to this Paragraph 6 by amortizing them in the unit price paid for the Emission Reductions under the ERPA.  The price paid is expected to be as provided in Paragraph 2.

7.    **Termination**

(a) Methods of Termination

This Letter Agreement

(i)  may be terminated by the Project Company or the Trustee, with or without cause, by giving at least fifteen (15) days' prior written notice to the other party; and

(ii) shall automatically terminate on the earlier of:
(x) the execution of the ERPA, and
(y) the date that is nine months after the Project is registered by the Executive Board in the event that the ERPA has not been executed by such date.

If this Letter Agreement is terminated pursuant to Paragraph 7(a)(ii)(y) above, the parties acknowledge and agree that the Project Company shall have the obligation to reimburse the Trustee as provided in Paragraph 7(d) below.

(b)    **Consequences of Termination**

Any such termination shall release the Project Company and INCaF and the Trustee from all of their respective obligations under this Letter Agreement, including any liabilities arising therefrom, except as provided in Paragraph 7.

(c)    **Survival of Provisions**

In the event this Letter Agreement is terminated for any reason, the following provisions are hereby expressly agreed to survive termination and shall remain in full force and effect:  Paragraph 7 (Termination), Paragraph 8 (Amounts Payable), Paragraph 9 (Sharing of Information), Paragraph 10 (INCaF's No Warranty), Paragraph 11 (Potential Conflict of Interest), Paragraph 12 (Indemnity), Paragraph 13 (INCaF Reports), and Paragraph 16 (Governing Law and Submission to Jurisdiction).

- 4 -

**(d)    Termination by Project Company**

Subject to the provisions of Paragraphs 7(f) and (g) below, if the Project Company terminates this Letter Agreement or otherwise fails to fulfill its obligations under this Letter Agreement such as to effectively terminate this Letter Agreement prior to concluding an ERPA with the Trustee then the Project Company agrees to reimburse the Trustee: $25,000 if the termination takes place before the due diligence has started; or up to an amount of $100,000 for Appraisal Expenses incurred (whether or not invoiced) in connection with the Services in addition to an amount of $25,000, if the termination takes place after the Project Concept Note ("PCN") has been approved by VROM as specified in Schedule 1 (b) and after the due diligence by the Trustee has commenced. The Trustee will commence due diligence at any time after the Project Company has requested in writing to the Trustee that the Trustee should commence such due diligence, which written request for commencement of due diligence shall be substantially in the form attached as Annex I.

**(e)    Termination by Trustee**

If the Trustee terminates this Letter Agreement prior to the conclusion of an ERPA with the Project Company:

   (i)     If at any time it is determined that the Contract Volume is less than 1.2 million metric tonnes, or if the Project differs in a significant or material way from the Project proposed in the Project Concept Note (see Schedule 1 (b)), or as a result of the Project Company's failure to take any action or obtain any approval required pursuant to the terms of this Letter Agreement within a reasonable period of time, the termination will have the same consequences as a termination by the Project Company in 7(d) except for as provided in Paragraph 7(f)(iii) below; or

   (ii)    for all reasons other than those described in Paragraph 7(e)(i), the Project Company will have no liability.

**(f)    Special Termination Events**

   (i)     In the event VROM does not grant its approval of the PCN within 60 days from the date INCaF transmits to VROM the PCN prepared by the Project Company as specified in Schedule 1(b), the Project Company has the right to terminate this Letter Agreement with no further obligation to the other party; *provided, however,* that if VROM has requested additional information in order to give its approval, such 60-day period shall be extended, but only by an additional 30 days unless the Project Company agrees in writing to a longer extension, in order to provide the parties and VROM reasonable time to obtain the approval.

   (ii)    In the event that VROM's PCN approval offers a price and range in volume which are lower than the price or range in volume, as applicable, in the price or volume range in Paragraph 2, then the Project Company may terminate this Letter Agreement within fifteen (15) days following receipt of the PCN approval and neither party shall have any further obligation to the other party.

   (iii)   If it is determined that the Government of Thailand has not been expediently issuing Letters of Approval ("LoAs") for projects and for this reason the Project does not receive its LoA by December 31, 2004, then the Trustee has the right

5 .

to terminate this Letter Agreement and INCaF will pay (and the reimbursement obligation of the Project Company set forth in Paragraph 7(d) shall not arise) for any and all of INCaF's expenses incurred in connection with INCaF's appraisal and due diligence and IFC's Environment and Social Review, as the case may be.  If the LoA is subsequently issued, then if so requested by the Trustee, the Project Company agrees to enter into a replacement letter agreement on the same terms and conditions as this Letter Agreement, except that the Contract Volume and/or the definition of the Project shall be modified to reflect the attributes of the Project at the time the LoA is received.  If the Project Company fails to enter into such replacement letter agreement with the Trustee, then it shall pay the Trustee the amount specified in Paragraph 7(d) plus $300,000.

(g)     Sale to Third Party

If (i) (a) the Project Company terminates this Letter Agreement or (b) this Letter Agreement automatically terminates pursuant to Paragraph 7(a)(ii)(y) and (ii) within one year of termination or the effective date of such termination of this Letter Agreement, as the case may be, the Project Company enters into an agreement or agreements with another buyer or buyers to sell Emission Reductions generated from or caused directly and/or indirectly by the Project or any configuration or reconfiguration of the Project, then the Project Company agrees to provide INCaF with a certified, true and complete copy of such agreement or agreements with such other buyer or buyers and to reimburse the Trustee the amount specified in Paragraph 7(d) plus $300,000.

8.     Amounts Payable

Any amounts payable to the Trustee pursuant to this Letter Agreement shall be due and payable net of any taxes, withholdings or deductions whatsoever in U.S. Dollars in immediately available funds at such bank or banks, in such place or places as the Trustee or the payee may from time to time designate, to the Trustee within thirty (30) days of receipt by the Project Company of an invoice.

9.     Sharing of Information

The Project Company acknowledges that IFC and the Trustee have signed a confidentiality agreement with VROM whereby VROM has agreed to treat confidential information provided to it by INCaF or the Trustee with the same care as VROM normally exercises for its own information of a like character and to limit circulation of such information to persons within VROM who have a need to know such information. VROM has further agreed not to disclose any confidential information except to the extent necessary to meet requirements under applicable Dutch or European Union law and the requirements of the Kyoto Protocol. The Project Company agrees that IFC's, the Trustee's and INCaF's obligation to VROM is limited to obtaining its written agreement to these terms.

10     INCaF's No Warranty

Neither INCaF nor the Trustee makes any representation or warranty as to the outcome of, or as to the accuracy or completeness of, any reports, documents, or analyses prepared, or caused to be prepared, by it in connection with the subject matter of this Letter Agreement. Neither INCaF nor the Trustee will be liable for any loss, cost, damage or liability that the Project Company or any other party might suffer or incur in connection with this Letter Agreement, the Services performed by INCaF or the Trustee hereunder, any transaction contemplated hereby or INCaF's or the Trustee's role in

- 6 -

connection therewith, except to the extent that such loss, cost, damage or liability resulted from INCaF's or the Trustee's gross negligence or willful misconduct. Any such claim will be limited to reasonably foreseeable losses arising directly from performance of such Services and will not include lost profits or consequential or punitive damages.

11.    Potential for Conflict of Interest

In the event that the Project Company enters into a mandate letter with an IFC investment department with the aim to obtain debt and/or equity financing for the Project, the Project Company will be expected to sign a letter acknowledging that the Project Company will be working with two separate teams within IFC (the investment department team representing IFC to process the debt and/or equity financing and the INCaF team to process this Emission Reduction purchase), and authorizing INCaF to obtain any necessary confidential information on the Project from the Project Company, from any department within the IFC and/or from other financial institutions or other entities that are involved in preparing or financing the Project and to share any confidential information developed or obtained by INCaF.

12.    Indemnity

The Project Company agrees to indemnify and hold IFC, INCaF and the Trustee harmless against any losses, claims, damages or liabilities to which the Trustee, IFC, its governors, directors, employees, agents, consultants or legal Counsel (each, an "Indemnified Party") may become subject in connection with any Indemnified Party's activities as contemplated under this Letter Agreement, and to reimburse IFC, INCaF and the Trustee for any expenses, including any legal expenses, incurred by IFC, INCaF or the Trustee in connection therewith or with the investigation or defense thereof; provided however that the Project Company shall not be liable in respect of any such loss, claim, damage or liability to the extent that such loss, cost, damage or liability resulted from such Indemnified Party's gross negligence or willful misconduct.

13.    INCaF Reports

All written material prepared by INCaF or the Trustee or in which INCaF or the Trustee assists in the preparation in connection with the Project, including, without limitation, this Letter Agreement and any ERPA whether or not they have been cleared and ratified by the Project Company, will be and will remain the property of INCaF or the Trustee. In all cases, the written material shall not be provided to any third party without INCaF's, the Trustee's and the Project Company's written consent, and then only if they include such disclaimers as INCaF and the Trustee shall specify with the exception of the PDD, which the Trustee acknowledges must be made public pursuant to Kyoto Protocol requirements. None of INCaF's, IFC's or the Trustee's names nor opinions shall be used in any advertisements, promotional material, or other written materials or in presentations or other oral representations to other potential lenders or investors or other written materials without the Trustee's prior written consent which will not be unreasonably withheld.

14.    Provision of Information

The Project Company shall provide, at its own cost and in a timely fashion, all relevant information and assistance reasonably requested by the Trustee, INCaF, its staff, consultants or legal counsel to carry out INCaF's and the Trustee's duties hereunder and shall grant access to INCaF, the Trustee and, upon request, VROM for such purpose, to all pertinent documents, facilities, premises, sites and personnel.



- 7 -

15.   <u>Trustee's Right to Assign</u>

The Trustee may assign, without the prior consent of the Project Company, all of its rights and obligations under this Letter Agreement to any IFC facility (other than INCaF) that agrees to enter into an ERPA with the Project Company as contemplated herein.

16.   <u>Governing Law and Submission to Jurisdiction</u>

The terms of this Letter Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, United States of America. The Company irrevocably submits to the non-exclusive jurisdiction of the courts of the United States of America located in the Southern District of New York and irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Letter Agreement may be brought by INCaF or the Trustee in such court. The Company irrevocably waives, to the fullest extent permitted by law, any objection it may now or hereafter have to the laying of venue of any such legal action, suit or proceeding and any claim that such legal action, suit or proceeding has been brought in an inconvenient forum and agrees that a final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding upon it and may be enforced in any other courts in the jurisdiction of which it is or may be subject, by suit upon such judgment.

Please confirm your agreement with the above terms and conditions by executing and returning to us two of the enclosed copies of this Letter Agreement. This Letter Agreement will enter into force on the date of countersigning by the Project Company. In any event if this Letter Agreement is not executed and returned to INCaF before the close of business on May 21, 2004, then this Letter Agreement will not become effective and neither the Trustee nor INCaF will be bound by any of the terms and conditions stated herein.

Sincerely,

INTERNATIONAL FINANCE CORPORATION, in its
capacity as Trustee for the IFC-Netherlands
Carbon Facility

Date:   MAY 18, 2004

By:

Authorized Signature

Name:   LOUIS C. BOORTIN

We acknowledge receipt of this Letter Agreement and accept and agree to be bound by the terms set forth herein:

Khorat Waste to Energy Company.

Date:   May 20, 2004

By:

Authorized Signature

Name:   GRANVILLE SMITH

- 8 -

Appendices (provided as attachments):

A    Project Cycle
B    OECD Guidelines (VROM Requirements)
C    PCN Template
D    VROM's Baseline Guidance
F    Letter of Approval Template

- 9 -

## SCOPE OF SERVICES AND PROJECT CYCLE

(a)  **Preparation of Baseline Study**

The Project Company will commission and pay for a baseline study, which will be conducted in accordance with Kyoto Protocol requirements and interim guidance provided by VROM (see Appendix D) by an expert reasonably satisfactory to INCaF (the "Baseline Study"). The Project Company will also commission and pay for the development of an appropriate Methodology for the review and approval of the executive board of the CDM (the "Executive Board").

(b)  **Preparation of the Project Concept Note**

The Project Company must prepare, at its own expense, a Project Concept Note ("PCN"), the template for which is attached in Appendix C. The PCN must contain or be supported by a preliminary baseline analysis to determine the 'without project' scenario, an estimate of the expected volume of Emission Reductions resulting from and/or caused directly and/or indirectly by the operation of the Project. INCaF and the Trustee will review the PCN and thereafter will transmit the PCN along with its observations and recommendations to VROM for its review and approval. VROM's approval of the PCN would constitute a conditional approval to purchase Emission Reductions from the Project subject to certain conditions being satisfied (such as, for example, the Project being validated and registered as a CDM project activity). The PCN approval will confirm certain preliminary material indicative terms which the parties expect at such time to be included in the Term Sheet including details on price, duration and volume and, if applicable, any options relating to the purchase of Emission Reductions beyond the maximum stated duration.

(c)  **Preparation of Monitoring Plan**

If the baseline study indicates that Emission Reductions are likely to be eligible under the CDM and will be of a reasonable or significant amount, the Project Company will commission a monitoring plan for the Project to be prepared by consultants or experts reasonably satisfactory to both parties (the "Monitoring Plan").

(d)  **Project Design Document, Validation and Request for Registration**

The Project Company, in consultation with INCaF, will hire an Operational Entity ("OE") to validate the Emission Reduction component of the Project. INCaF will work with the Project Company to prepare and submit to the OE a Project Design Document ("PDD") (including a "Letter of Approval" from the Government of Thailand (see Appendix E) and a summary of how comments from stakeholders were solicited and taken into account) to be evaluated and validated by the OE against the requirements of the CDM.

Following validation by the OE, INCaF will assist the Project Company with its request that the OE submit to the Executive Board a request for registration of the Project in the form of a validation report including such supporting documents as the Executive Board may require or may otherwise be necessary or advisable. The Project Company shall be responsible for obtaining the registration with the Executive Board. In the event that the Executive Board is unable to accept the Project for timely registration, VROM may make a determination to proceed before formal registration of the Project by the Executive Board.

- 10 -

(e)    **Appraisal and Due Diligence**

Promptly after the Project is registered by the Executive Board and written approval to proceed is received from the Project Company and no later than December 31, 2004, INCaF will carry out or commission an appraisal and due diligence at a level determined by INCaF. The scope and extent of the Environmental and Social Review and the appraisal and due diligence will depend on the information provided to INCaF by the Project Company and any other institutions participating in the financing of the Project that have carried out their own due diligence and are willing to share the information. For the appraisal, INCaF will also evaluate the technical, commercial, financial and legal soundness of the Project to ensure that INCaF is comfortable that the Project will perform as proposed or indicated by the Project Company. The appraisal should convince INCaF that, based on the information available, the Project is expected to perform and generate Emission Reductions as indicated in the PCN. In addition, INCaF will carry out and/or commission all or part of an Environmental and Social Review of the Project, including a field appraisal as necessary and desk review of the Project, as well as consultations with the Project Company, relevant governments, technical experts and stakeholders to ensure the Project complies with IFC's Environmental and Social Policies and Guidelines.

(f)    **Emission Reduction Purchase Agreement Terms**

Once the Project has been validated and registered as per paragraph (d) above, INCaF will negotiate the terms of the ERPA, including price per metric tonne of Emission Reductions and duration of the agreement, with the Project Company and the parties will agree to a final term sheet (the "Term Sheet").

Once the Term Sheet is finally negotiated, INCaF will instruct its lawyers to prepare the ERPA. The ERPA will provide for the termination of this Letter Agreement and will govern the purchase of eligible Emission Reductions by the Trustee. The ERPA will require that the Project Company pay for services for verification and certification of the Emission Reductions to be purchased.

(g)    **Verification and Certification**

The costs incurred relating to the initial verification (if applicable), verification, re-verification (if needed), certification, registration and issuance of Emission Reductions, renewal of the Baseline Study and monitoring of the Project, in each case, in accordance with the requirements of the Kyoto Protocol, will be paid directly by the Project Company.

- 11 -

**Annex 1**

Form of Request For Commencement of Due Diligence

IFC-Netherlands Carbon Facility
2121 Pennsylvania Ave NW
Washington, DC    20433 USA

Facsimile: (202) 974-4349
[Date]

Attention:  Mr. Vikram Widge

Subject:  Request for Commencement of Due Diligence

Dear Mr. Widge,

Reference is hereby made to the Letter Agreement (the "Letter Agreement") dated [xxx] between Khorat Waste to Energy Company (the "Project Company") and International Finance Corporation in its capacity as the Trustee of the IFC-Netherlands Carbon Facility (the "Trustee"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Letter Agreement.

Pursuant to Paragraph 7(d) of the Letter Agreement, the Project Company hereby formally requests the Trustee to commence due diligence of the Project. The Project Company acknowledges and agrees that this request will bind it to the provisions and potential liabilities applicable to a termination of the Letter Agreement after due diligence has commenced as set forth in Paragraph 7(d) of the Letter Agreement.

Sincerely,

Khorat Waste to Energy Company.

Date:    _____

By:    _____
         Authorized Signature

Name:    _____

Title:    _____

**EXHIBIT B**

CONFIDENTIAL DRAFT
SUBJECT TO EXTERNAL AND
LOCAL COUNSEL REVIEW
September 21, 2005

**IMPORTANT DISCLAIMER: THIS TERM SHEET IS NOT A COMPLETE DESCRIPTION OF A PROPOSED EMISSION REDUCTION PURCHASE AGREEMENT CURRENTLY BEING DISCUSSED BY INTERNATIONAL FINANCE CORPORATION ("IFC") AND KORAT WASTE-TO-ENERGY COMPANY LIMITED ("KWTE") AND DOES NOT CONSTITUTE AN OFFER OR A COMMITMENT BY IFC OR KWTE, AND NO PARTY SHALL HAVE ANY LIABILITY HEREUNDER.   IT IS INTENDED TO SERVE ONLY AS A BASIS FOR DISCUSSION OF THE MAJOR TERMS THAT WOULD APPLY TO THE EMISSION REDUCTION PURCHASE AGREEMENT.   IFC'S AUTHORITY TO ENTER INTO THE EMISSION REDUCTION PURCHASE AGREEMENT IS CONTINGENT ON THE APPROVAL OF IFC'S MANAGEMENT, THE APPROVAL OF THE NETHERLANDS, ACTING THROUGH ITS MINISTRY OF HOUSING, SPATIAL PLANNING AND THE ENVIRONMENT, AND THE EXECUTION OF FINAL DOCUMENTATION IN FORM AND SUBSTANCE SATISFACTORY TO IFC. THIS TERM SHEET IS NOT TO BE RELEASED TO ANY PARTY OTHER THAN KWTE WITHOUT THE PRIOR WRITTEN CONSENT OF IFC. ALL FIGURES, TERMS AND CONDITIONS STATED BELOW ARE SUBJECT TO CHANGE.**

## DRAFT TERM SHEET FOR EMISSION REDUCTIONS PURCHASE

**Overview of Transaction**

THIS DRAFT TERM SHEET SUMMARIZES THE PRELIMINARY PRINCIPAL TERMS OF AN EMISSION REDUCTION PURCHASE AGREEMENT (THE "ERPA") BETWEEN (I) IFC, IN ITS CAPACITY AS THE TRUSTEE OF THE IFC-NETHERLANDS CARBON FACILITY, ON BEHALF OF AND FOR THE BENEFIT OF THE NETHERLANDS, AND (II) KWTE, (THE "SELLER" OR THE "PROJECT COMPANY").

The Trustee intends to purchase from the Seller certified emission reductions developed pursuant to the Clean Development Mechanism of the Kyoto Protocol to the United Nations Framework Convention on Climate Change (the "Kyoto Protocol"). All such certified emission reductions that are developed under and are certified and in compliance with the Kyoto Protocol are referred to herein as "CERs".

**Principal Terms**

1.  Parties:                      The Seller and IFC, an international organization established by Articles of Agreement among its member countries including Thailand in its capacity as the trustee of the IFC-Netherlands Carbon Facility ("INCaF"), on behalf of and for the benefit of The Netherlands (hereinafter, the "Buyer," or "Trustee"), each of which may be referred to in this Term Sheet (as hereinafter defined) individually as the "Party" or collectively as the "Parties."

| | | |
|---|---|---|
| 2. | Scope: | This term sheet (this "Term Sheet") sets forth certain understandings, basic principles and commercial terms on which the Seller and the Trustee are willing to enter into the ERPA, under which the Seller will sell to the Buyer 1,750,000 tonnes (the Total Contract Volume, as defined in Paragraph 7) of CERs confirmed by validation and generated from the Project (as hereinafter defined) or, in certain specified circumstances, from other sources. |
| 3. | Project: | The Seller owns and operates an anaerobic baffled reactor ("ABR") on the premises of Sanguan Wongse Industries ("SWI") in Korat, Thailand. The "Project" consists of: (a) delivery of wastewater by SWI to KWTE; (b) the processing by KWTE of such wastewater by the ABR to generate biogas; (c) the sale by KWTE of a portion of the biogas to SWI for combustion as boiler fuel, which prevents the emission of methane gas and displaces the use of fuel oil in SWI's boiler; (d) the use by KWTE of a portion of the biogas to generate electricity for sale to SWI, which also prevents the emission of methane gas and displaces SWI's use of the same amount of electricity from the Thai grid; and, (e) if necessary, the flaring by KWTE of any remaining biogas. The Project has a total power generation capacity of 3.1 MW. KWTE has three agreements with SWI which govern all aspects of the Project (x): the Facility Hosting Agreement; (y) the Build, Own, Operate and Transfer Agreement; and, (z) the Energy Supply and Purchase Agreement (collectively, the "Project Agreements"). |
| 4. | Transaction Documents: | The "Transaction Documents" shall include, without limitation, the ERPA, a distribution agreement to establish INCaF's seniority over any and all other possible purchasers of CERs generated by the Project and any other agreement or document reasonably necessary or desirable for the Project, or to give effect to the transactions provided for in the ERPA such as supply contracts entered into or to be entered into between the Seller and any affiliate of the Seller or any third party (each a "Counterparty") providing for the transfer, release and/or waiver in favor of the Seller of any such Counterparty's rights to the CERs being sold to the Trustee under the ERPA (including any CERs generated by the Project or otherwise acquired by the Seller from any other source). |
| 5. | Term: | The term of the ERPA (the "Term") will commence as of the date of execution of the ERPA and will continue until the later of (i) the Executive Board established pursuant to the Kyoto Protocol (the "Executive Board") having issued into the National Registry of The Netherlands (and/or any interim or substitute registry or agency designated in accordance with the terms of the ERPA) 1,750,000 CERs or the maximum permitted by the total amount generated from the Project beginning in 2006 and ending in 2012 if less than 1,750,000 CERs and (ii) both the Buyer and the Seller having satisfied their respective obligations under the |

ERPA in accordance with the terms thereof (subject to any prior termination of the ERPA in accordance with its terms).

6.  Price:  €4.75 (four Euros seventy-five cents) per CER.

7.  Total Contract Volume:  1,750,000 CERs (the "Total Contract Volume").

8.  Delivery and Transfer of Title:  "Delivery" of any CERs shall be deemed to have occurred at the time the Executive Board issues such CERs in accordance with Paragraph 5 above. Transfer of title for CERs between the Seller and the Buyer will take place pursuant to the procedures set forth in the Kyoto Protocol applicable to CERs and to applicable procedures established by any Governmental Authority (as hereinafter defined) if such procedures exist, or as otherwise provided for in the ERPA.

9.  Delivery Date and Subsequent Delivery Dates:  "Date of First Delivery" of CERs will be a date specified by the Seller's written notice to the Buyer at least 30 days prior to Delivery but not later than May 2007. Delivery of all CERs for vintage-years specified in Table 1 which are required to be Delivered to Buyer pursuant to Paragraph 10 shall occur on or before June 30 of the year following such particular vintage-year (each such date a "Delivery Date").

10.  Seller Delivery Obligation:  Beginning with the vintage year 2006, the Seller shall be required to sell to the Buyer on an annual basis 250,000 CERs generated by the Project ("Annual Contract Volume" as is listed in Table 1 below), net of any CERs required to be transferred as fees, charges or share of proceeds under the Kyoto Protocol until the Total Contract Volume has been delivered as per Paragraph 7 (the "Delivery Obligation"). The Seller must Deliver to the Buyer, for each vintage year starting in 2006, CERs up to the Annual Contract Volume if such CERs are generated by the Project. The Seller must Deliver available CERs from the Project up to the Cumulative Contract Volume, as defined in Table 1 below, for the given vintage-year, even if the Seller has Delivered the Annual Contract Volume for the most recent vintage-year. Any Delivered CERs over the Annual Contract Volume in any given year shall not reduce the Annual Contract Volume in subsequent years but shall count towards meeting the Cumulative Contract Volume, unless the Cumulative Contract Volume has already been met.

11.  Buyer's Purchase Obligation:  Commencing on the Date of First Delivery, the Buyer (i) shall buy any CERs Delivered by the Seller to the Buyer pursuant to the ERPA up to the Cumulative Contract Volume for a given vintage-year, and (ii) may, but does not have the obligation to, purchase CERs in excess of the Cumulative Contract Volume if the Seller offers them for sale to the Buyer. Buyer shall pay Seller for all CERs Delivered within 45 days from the date that such CERs have been Delivered and accepted by Buyer and upon confirmation that Seller is in compliance with its

- 3 -

obligations under the ERPA. The Buyer will notify the Seller of its decision to accept or reject the CERs Delivered to it by the Seller within 30 days of the date the CERs are Delivered. If the Buyer rejects the CERs, the CERs shall be returned to the Seller pursuant to the procedures set forth in the Kyoto Protocol applicable to CERs and to applicable procedures established by any Governmental Authority (as hereinafter defined) if such procedures exist, or as otherwise provided for in the ERPA.

Table 1: KWTE Expected Generation and Contract Volume

|  | Annual Project Generation | Cumulative Project Generation | Annual Contract Volume | Cumulative Contract Volume |
|---|---|---|---|---|
| 2006 | 400 | 400 | 250 | 250 |
| 2007 | 400 | 800 | 250 | 500 |
| 2008 | 400 | 1,200 | 250 | 750 |
| 2009 | 400 | 1,600 | 250 | 1,000 |
| 2010 | 400 | 2,000 | 250 | 1,250 |
| 2011 | 400 | 2,400 | 250 | 1,500 |
| 2012 | 400 | 2,800 | 250 | 1,750 |
| Total | 2,800 | 2,800 | 1,750 | 1,750 |

12.    Seniority of Buyer:    The Seller agrees that it shall not enter into any transactions or take any actions to sell, transfer, or dispose of CERs generated by the Project that are inconsistent with the ERPA or that may otherwise impair the Seller's ability to perform its obligations under the ERPA. The Seller agrees that the Buyer has a senior claim against the CERs generated by the Project beginning in 2006 and ending 2012 up to the Annual Contract Volume and the Cumulative Contract Volume for the given vintage-year. The Seller may sell CERs from a vintage-year to another party only if the Buyer has received the Annual Contract Volume for that vintage-year and the Cumulative Contract Volume for the same vintage-year.

13.    Remedies for Failure
       to Deliver:    If by the Delivery Date in any year the Seller has not Delivered to the Buyer the Cumulative Contract Volume for a given vintage-year (an "Event of Under Delivery"), the Seller shall be obligated to Deliver to the Buyer sufficient CERs to satisfy the Cumulative Contract Volume within 12 months of the relevant Delivery Date (such 12-month period, the "Cure Period"), but not later than June 30, 2013 for CERs generated prior to December 31, 2012. If the Seller fails to Deliver the Annual Contract Volume on two consecutive Delivery Dates or has not satisfied the Cumulative Contract Volume for the given vintage-year on two consecutive Delivery Dates, the Buyer may terminate the ERPA. The Parties acknowledge and agree that after a termination of the ERPA pursuant to this Paragraph 13,

- 4 -

the Buyer shall be entitled to exercise any and all remedies available to it at law or in equity.

| | | |
|---|---|---|
| 14. | Remedies for Unauthorized Sales to Third Parties: | If the Seller violates the "Delivery Obligation" and sells CERs from the Project to other parties, the Seller shall pay to Buyer liquidated damages equal to the greater of (a) €15 (Fifteen Euros) per CER sold, transferred or otherwise disposed of in violation of the Delivery Obligation, or (b) two times the highest reasonably documented price for which it sells CERs to a third party for each CER needed to meet the Total Contract Volume. |
| 15. | Termination: | The ERPA shall terminate at the expiry of the Term as set forth in Paragraph 5 above and may also be terminated by a Party in accordance with its rights to do so pursuant to Paragraphs 13, 24 and/or 25 or as otherwise specified in the ERPA; provided, however, that the provisions of the ERPA corresponding to the provisions of Paragraphs 15 (Termination), 16 (Taxes and Fees), 26 (Buyers' Limitation of Liability), 27 (Indemnity), 28 (Confidentiality), 30 (Applicable Law) and 31 (Dispute Resolution) hereof shall survive the termination of the ERPA. |
| 16. | Taxes and Fees: | The Seller shall be responsible for the taxes, costs and fees set forth in Schedule 1 of the Letter of Intent, dated May 17, 2004, signed by Buyer and Seller, as well as payment of all additional taxes, costs and fees imposed or required pursuant to the Kyoto Protocol associated with the creation, registration and sale of CERs, including without limitation any taxes, costs and fees levied by the CDM Executive Board or any government or governmental division, agency or authority in Thailand (a "Governmental Authority") on the transfer and / or issuance of CERs. Buyer shall not withhold any portion of the amount payable to Seller under the ERPA unless it is required to do so by an order of a Governmental Authority or a court of competent jurisdiction. Buyer shall be responsible for all applicable taxes, costs and fees that may be levied by any governmental authorities in the Netherlands. |
| 17. | Conditions Precedent to Execution of the ERPA: | The execution of the ERPA shall be subject to certain conditions precedent customary for a transaction of this type including, without limitation, the approval of the ERPA by the Ministry of Housing, Spatial Planning and the Environment of The Netherlands ("VROM") where the proposed ERPA contains any material change from the terms of this Term Sheet. |
| 18. | Conditions Precedent to Effectiveness of ERPA: | The effectiveness of the ERPA shall be subject to certain conditions precedent customary for a transaction of this type including, without limitation, the following: |

- 5 -

a.  the completion by the Project Company of the baseline study, the monitoring plan, the validation of the Project, and the registration with the Executive Board of a Project Design Document with a 10-year Baseline for the Project;

b.  the issuance of the Letter of Approval by the Thai Ministry of Natural Resources and Environment or other entity designated by Thai law as having authority to issue the Project Letter of Approval; and,

c.  the signing of a distribution agreement between the Parties

19.  Conditions Precedent to All Payments:

All payments to be made by the Buyer under the ERPA shall be subject to certain conditions precedent customary for a transaction of this type.

20.  Representations and Warranties:

The ERPA will include representations and warranties customary for transactions of this type, including, without limitation, the following representations and warranties:

a.  The Seller has received and reviewed the information on the Trustee's project processing cycle and understands both the Trustee's and the Kyoto Protocol's processing requirements.

b.  The Seller is not in violation of the IFC/World Bank Environmental and Social Policies and Guidelines (see http://www.ifc.org/enviro/EnvSoc/index.html) applicable to the Project;

c.  The Seller (i) is the sole and absolute beneficial owner of CERs generated by the Project or purchased from other sources for Delivery to the Buyer under the ERPA, free and clear of any and all liens and encumbrances and any and all other rights and claims of any kind, and (ii) has delivered to the Buyer copies of all necessary inter-company and other documentation in connection with such sole and absolute beneficial ownership;

d.  The Seller has the legal power and authority to enter into the ERPA and perform its obligations under it;

e.  The Seller has delivered to the Buyer requested documents, including copies of the Project Agreements, the Seller and SWI are each in compliance with their respective obligations under such agreements, all of agreements remain in full force and effect;

- 6 -

f.    The Trustee has the legal power and authority to enter into the ERPA and perform its obligations under the agreement.

21.    Covenants:

The ERPA will include affirmative and negative covenants customary for transactions of this type, including, among others that the Seller shall:

a.    Execute the Project;

b.    Develop, own, operate, maintain and monitor the Project and associated activities in accordance with:

    (1)    The Kyoto Protocol including, without limitation, Article 12 of the Kyoto Protocol, and any other national requirements for Kyoto Protocol projects developed in accordance with the Kyoto Protocol;

    (2)    Project requirements of The Netherlands, acting through the VROM, which require that projects comply with certain sections of the OECD Guidelines for Multinational Enterprises (see Appendix B) in effect on the date of execution of the ERPA;

    (3)    The IFC/World Bank Environmental and Social Policies and Guidelines applicable to the Project;

    (4)    The IFC's disclosure requirements and public consultation requirements;

    (5)    The Kyoto Protocol's disclosure requirements and public consultation requirements;

    (6)    Applicable environmental, natural habitats, pest management, involuntary resettlement, cultural property protection, occupational health and safety requirements, and any child labor and forced labor laws, rules and regulations (including any international treaty obligations, if any) of any Governmental Authority; and,

    (7)    The Project Agreements.

c.    Within 30 days after (a) the Date of First Delivery and (b) each subsequent Delivery Date, provide to the Trustee a report of the actual annual transaction costs of verification and certification of CERs;

- 7 -

d.    Within 90 days after each Delivery Date, provide to the Trustee an annual monitoring report in a form to be agreed by the Parties, confirming compliance with the requirements listed in clause (b) above; and

e.    Continue to be the sole and absolute beneficial owner of CERs generated by the Project or purchased from other sources for Delivery to the Buyer under the ERPA.

f.    Provide the Buyer with the audited financial statements of the Seller 120 days after the end of each fiscal year, a report on the number of CERs generated 60 days after the end of the 2nd and 4th quarters of each fiscal year and other reasonable reporting requirements.

22.    Events of Default:    The ERPA will include customary events of default and relevant cure periods for transactions of this type (each an "Event of Default"), including, without limitation:

a.    Failure by the Seller to maintain the absolute beneficial ownership of CERs generated by the Project or purchased from other sources for Delivery to the Buyer under the ERPA, free and clear of all rights and claims of others of any kind;

b.    The Buyer's failure to receive and pay for Delivered CERs; and,

c.    A material breach under any of the Project Agreements that continues beyond any applicable cure period; or a termination, revocation or repudiation of any of the Project Agreements.

23.    Kyoto Uncertainty:    This Term Sheet has been negotiated at a time when the Kyoto Protocol has just entered into force and the legal regime governing the registration, issuance and use of CERs is uncertain and subject to change. Further, as at the date this Term Sheet has been finalized, the CDM Registry, through which the transfer of CERs is to be affected, is not in operation. The ERPA shall contain an agreement by the Parties to use commercially reasonable efforts to mitigate the effect of any changes in the status or effect of the Kyoto Protocol and the CDM Registry in order to permit the Trustee to pay for, and the Netherlands to acquire and use, the CERs as contemplated herein.

24.    Buyer's Remedies for Default:    If any Event of Default has occurred and is continuing, the Buyer may at any time: (i) suspend or terminate the ERPA, and (ii) exercise any and all rights and remedies available to the Buyer at law or in equity.

25.    Seller's Remedies for Default:    If the Buyer has failed to make payment on a timely basis after notice of such failure, the Seller may at any time: (i) suspend or

- 8 -

terminate the ERPA, and (ii) subject to the limitation on liability in Paragraph 26, exercise any and all rights and remedies available to Seller at law or in equity.

26.  Buyer's Limitation of Liability: The total liability of the Buyer to the Seller for claims arising under the ERPA shall in no event exceed €8,312,500.[1]

27.  Indemnity:  The Seller shall indemnify and hold the Trustee harmless against any losses, claims, damages or liabilities to which the Trustee, its governors, directors, employees, agents, consultants or legal counsel (each, an "Indemnified Party") may become subject in connection with any Indemnified Party's activities as contemplated under the ERPA (the "Covered Loss"). However, the Seller will not be liable under this indemnity to the extent that the Covered Loss results from an Indemnified Party's gross negligence or willful misconduct.

28.  Confidentiality:  The Seller shall maintain all written material prepared by INCaF or the Trustee or in which INCaF or the Trustee assist in the preparation in connection with the Project, including, without limitation, this Term Sheet and the ERPA as confidential and shall not disclose the terms of this Term Sheet or the ERPA or other written material to any third party without the prior written consent of the Trustee, and then only if it includes such disclaimers as the Trustee shall specify, with the exception of the Project Design Document, which the Parties acknowledge must be made public pursuant to Kyoto Protocol requirements.

29.  Assignment:  The Seller may not assign the ERPA without the Trustee's consent. Subject to terms and conditions to be mutually agreed by the Parties, either Party may create security interests in the ERPA as security for financing.

30.  Applicable Law:  The ERPA shall be governed by, and all disputes arising under or in connection with it shall be resolved in accordance with, the laws of England, to the exclusion of its conflict of laws rules.

31.  Dispute Resolution:  Any dispute that cannot be settled amicably shall be referred to final and binding arbitration under the Optional Rules for Arbitration of Disputes Relating to Natural Resources and/or the Environment of the Permanent Court of Arbitration. The place of arbitration shall be London, England

---

[1] This figure is based on the agreed price as indicated above €4.75 for 1,750,000 tonnes and is subject to revision if the Cumulative Contract Volume is adjusted pursuant to Validation and final agreement on price

- 9 -