IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL FINANCE CORPORATION, not in its individual capacity, but solely as the Trustee for the IFC-Netherlands Carbon Facility,<br><br>Plaintiff,<br><br>v.<br><br>KORAT WASTE TO ENERGY CO. LTD. (a/k/a Khorat Waste to Energy Co.),<br><br>Defendant. | 07 Civ. 5451 (SHS) |

## KWTE'S NOTICE OF MOTION FOR SUMMARY JUDGMENT AS TO THE QUANTUM OF RELIANCE DAMAGES RECOVERABLE UNDER COUNT I OF PLAINTIFF'S COMPLAINT

PLEASE TAKE NOTICE that Defendant Korat Waste to Energy Co. Ltd. ("KWTE"), by and through its attorneys, Wallace King Domike & Reiskin, PLLC, and Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., will move this Court on a date and time to be determined at the Courthouse located at 500 Pearl Street, New York, New York 10007, for an order pursuant to Rule 56 of the Federal Rules of Civil Procedure granting summary judgment in favor of KWTE as to the quantum of reliance damages potentially recoverable under Count I of Plaintiff International Finance Corporation's ("IFC's") Complaint.

Respectfully submitted,

April 10, 2008

_____/s/_____
Anthony F. King
Amanda Gilbert
WALLACE KING DOMIKE & REISKIN, PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007
Telephone: (202) 204-1000

Facsimile:  (202) 204-1001

Elkan Abramowitz (EA-3987)
Thomas M. Keane (TK-6320)
MORVILLO, ABRAMOWITZ, GRAND,
 IASON, ANELLO & BOHRER, P.C
565 Fifth Avenue
New York, NY 10017
Telephone:  (212) 880-9300
Facsimile:  (212) 856-9494

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL FINANCE CORPORATION,<br>not in its individual capacity, but solely as the<br>Trustee for the IFC-Netherlands Carbon Facility,<br><br>Plaintiff,<br><br>v.<br><br>KORAT WASTE TO ENERGY CO. LTD.<br>(a/k/a Khorat Waste to Energy Co.),<br><br>Defendant. | 07 Civ. 5451 (SHS) |

## KWTE'S RULE 56.1 STATEMENT IN SUPPORT
## OF ITS MOTION FOR SUMMARY JUDGMENT
## AS TO THE QUANTUM OF RELIANCE DAMAGES
## RECOVERABLE UNDER COUNT I OF PLAINTIFF'S COMPLAINT

Pursuant to Local Rule 56.1, Defendant Korat Waste to Energy Co. Ltd. ("KWTE") submits this statement of material facts as to which there is no genuine issue to be tried in support of its motion for summary judgment as to the quantum of reliance damages potentially recoverable under Count I of Plaintiff International Finance Corporation's ("IFC's") Complaint alleging that KWTE breached an implied covenant of good faith and fair dealing in its negotiations with KWTE pursuant to a May 17, 2004 Letter of Intent ("LOI") between IFC and KWTE:

1.     IFC and KWTE executed a LOI on May 17, 2004 to negotiate a possible contract for the sale of certified emission reductions from KWTE to the government of the Netherlands. (Complaint ¶¶ 2, 15.)

2.      Paragraph 7(a)(i) of the LOI states that either party could terminate the LOI at will. (LOI ¶ 7(a)(1), Exhibit 1 to Smith Declaration (attached hereto as Exhibit A) at 3.)

3.      Paragraph 7(b) of the LOI states that, once a party terminates the LOI, both parties are released from any obligations to the other under the LOI, and neither KWTE nor IFC has any liability arising from the LOI, except for a termination fee in the case of KWTE under Paragraph 7 of the LOI:

> (b)      Consequences of Termination
>
> Any such termination shall release [KWTE] and [IFC] from all of their respective obligations under this Letter Agreement, including any liabilities arising therefrom, except as provided in Paragraph 7.

(LOI ¶ 7(b), Smith Dec. Ex. 1 at 3.)

4.      IFC's claim in Count I of the Complaint for breach of the LOI's implied good faith covenant claim seeks reliance damages for liabilities allegedly arising from the LOI. (Mar. 27, 2008 Tr. at 20:13-20:23, Exhibit 1 to King Declaration (attached hereto as Exhibit B)); Complaint ¶¶ 41-43; IFC's Sept. 7, 2007 "Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Complaint at 10 ("IFC's cause of action for breach of the covenant of good faith and fair dealing is premised on the LOI")).

5.      If KWTE terminates the LOI, paragraphs 7(d) and (g) of the LOI specify the amount and limits of any recoverable damages, including reliance damages, from KWTE for any claimed liability arising from the LOI. (LOI ¶¶ 7(d) and (g), Smith Dec. Ex. 1 at 4, 5.)

6.      KWTE terminated the LOI by letter dated March 2, 2007. (March 2, 2007 Letter from Donnelly to Widge, attached to IFC's Complaint as Exhibit A.)

Respectfully submitted,

_____ /s/ _____

April 10, 2008

Anthony F. King
Amanda Gilbert
WALLACE KING DOMIKE & REISKIN, PLLC
1050 Thomas Jefferson Street, N.W.
Washington, D.C.  20007
Telephone:  (202) 204-1000
Facsimile:  (202) 204-1001

Elkan Abramowitz (EA-3987)
Thomas M. Keane (TK-6320)
MORVILLO, ABRAMOWITZ, GRAND,
  IASON, ANELLO & BOHRER, P.C
565 Fifth Avenue
New York, NY 10017
Telephone:  (212) 880-9300
Facsimile:  (212) 856-9494

3

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

INTERNATIONAL FINANCE CORPORATION,  )
not in its individual capacity, but solely as the  )
Trustee for the IFC-Netherlands Carbon Facility,  )
                                                 )      **07 Civ. 5451 (SHS)**
             Plaintiff,  )
                            )
     v.  )
                            )
                            )
KORAT WASTE TO ENERGY CO. LTD.  )
(a/k/a Khorat Waste to Energy Co.),  )
                            )
           Defendant.  )

---

## DECLARATION OF GRANVILLE SMITH

I, GRANVILLE SMITH, declare as follows:

1.     I was the Chairman of the Board of Directors of Korat Waste to Energy Co., Ltd. ("KWTE") during May 2004.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the May 17, 2004 Letter of Intent executed by International Finance Corporation and KWTE.

I declare under penalty of perjury that the foregoing is true and correct. Executed on _____ *April 9* _____, 2008.

_Granville Smith_

Granville Smith

# EXHIBIT 1

 **IFC**

2121 Pennsylvania Ave NW
WASHINGTON, D.C.  20433 USA
TELEPHONE: (202) 473-6684• FACSIMILE: (202) 974-4389

Letter of Intent

Confidential

May 17, 2004

Khorat Waste to Energy Company
Suite # 2504, 25th Flr., The Millennia Tower
62 Lang Suan Road
Lumpini, Pathumwan
Bangkok 10330, Thailand

Attention: David Donnelly, General Manager, KWTE Co

Ladies & Gentlemen:

### IFC-Netherlands Carbon Facility: Khorat Waste to Energy Project

In response to your expression of interest in selling Emission Reductions (as defined below) to International Finance Corporation ("IFC") in its capacity as the Trustee of the IFC-Netherlands Carbon Facility (the "Trustee") in connection with the Khorat Waste to Energy project we are pleased to enter into this letter agreement (the "Letter Agreement") which expresses both parties' intent to enter into an Emission Reduction Purchase Agreement ("ERPA"). This Letter Agreement is intended to set forth the basis on which the IFC-Netherlands Carbon Facility ("INCaF") and the Trustee will work with the Project Company (as defined below) in preparing and executing the purchase of Emission Reductions (as defined below) generated by the Project (as defined below).

1.    The Project

We understand that the project, located in Khorat, Thailand, involves the construction, ownership, operation and financing of a methane recovery and waste to energy project to treat Sanguan Wongse Industries' (SWI's) wastewater and capture a minimum of 70,000 cubic meters of biogas daily for 10 years: (i) to be delivered to SWI as a substitute for its consumption of heavy fuel oil (HFO); and (ii) to be converted into electricity through combustion in biogas fueled electricity generator units which would generate approximately 19,100,000 kWh of electricity annually thereby displacing electricity currently purchased from the grid in Khorat, Thailand (the "Project"). It is envisaged that the owners of Khorat Waste to Energy Company (the "Project Company") will agree to sell and the Trustee will agree to purchase eligible greenhouse gas emission reductions as defined under the Kyoto Protocol including methane and carbon dioxide emission reductions ("Emission Reductions") to be generated or caused directly and/or indirectly by the operation of the Project per Paragraph 2 below unless otherwise agreed to in the ERPA.

2.    INCaF Commitment

Nothing contained in this Letter Agreement will commit the Trustee to purchase Emission Reductions from the Project Company unless and until the Project Company and the Trustee have executed an ERPA and the terms and conditions of such ERPA are satisfied. Without prejudice to the

INTERNATIONAL FINANCE CORPORATION
A Member of the World Bank Group

- 2 -

foregoing, at this preliminary stage and based upon the information made available to INCaF as of the date hereof and assuming (among other assumptions) the accuracy thereof, INCaF has the preliminary expectation to: (i) pay €3.00 per metric tonne of Emission Reductions; (ii) purchase not less than 2.0 million and not more than 7.25 million metric tonnes of Emission Reductions confirmed by validation for the period ending December 31, 2012 (the "Contract Volume") net of Emission Reductions payable as fees for adaptation and/or administration under the Clean Development Mechanism of the Kyoto Protocol ("CDM"); and (iii) purchase the Contract Volume based on an annual delivery schedule to be agreed.

3.    **Project Requirements**

The Project Company acknowledges that it has received information on INCaF's project processing cycle and understands both INCaF and Kyoto Protocol processing requirements (see Appendix A).   In particular, the Project Company acknowledges that the Project will be required to comply with:

(i) UNFCCC, Kyoto Protocol and any national requirements for CDM projects (Article 12 of the Kyoto Protocol);

(ii) Project requirements of the State of the Netherlands, acting through the Ministry of Housing, Spatial Planning and the Environment ("VROM") which require that projects comply with certain sections of the OECD Guidelines for Multinational Enterprises (see Appendix D);

(iii) IFC's Environmental and Social Policies and Guidelines applicable to the Project (see http://www.ifc.org/enviro/EnvSoc/index.html); and

(iv) both IFC's and the Kyoto Protocol CDM disclosure requirements and public consultation requirements.

4.    **Scope of INCaF and Trustee's Work**

INCaF and/or the Trustee may take any or all of the actions set forth in Schedule 1 and any other actions that they determine to be necessary for the specific purpose of concluding an ERPA with the Project Company (the "Services").  The Services to be performed by INCaF will be carried out by INCaF staff in the Environmental Finance Group of IFC's Environment and Social Development Department solely in their capacity as INCaF staff and/or by consultants commissioned by INCaF. IFC, in its capacity as Trustee for INCaF, will sign this Letter Agreement and the ERPA, if successfully negotiated.  The Project Company will cooperate fully as necessary with INCaF and the Trustee in carrying out the Services and taking the other steps described in Schedule 1.  INCaF and/or the Trustee will be authorized to take the steps described in Schedule 1(e) only after the approval in writing has been received by INCaF from the Project Company.

5.    **INCaF's Preferential Status**

The Project Company hereby agrees that INCaF's and the Trustee's rights to purchase Emission Reductions up to the Contract Volume and any additional Emission Reductions the Trustee may agree to purchase shall be prior to the rights of any other party to acquire Emission Reductions generated from the Project.  Subject to the provisions of Paragraph 7 below, the Project Company may only enter into negotiations with third-party purchasers that are interested in buying Emission Reductions generated or caused directly and/or indirectly by the operation of the Project if the Emission Reductions have been offered to the Trustee and INCaF or the Trustee have not accepted the offer within 30 days or otherwise indicated that they are not interested in purchasing the additional Emission Reductions.

- 3 -

6.    **Expenses**

(a)    **Project Company Expenses**

As per Schedule 1 the Project Company will pay all expenses and fees related to the Baseline Study, the Monitoring Plan, and the validation of the Project as per Schedule 1, and all expenses and fees related to the registration with the Executive Board. The Project Company will pay any taxes, fees or other charges applied by the Government of Thailand to process CDM projects and/or to payments for Emission Reductions generated in the country and/or to transfers of Emission Reductions to foreign buyers.

(b)    **Trustee Expenses**

The Trustee will cover the expenses for INCaF's appraisal and due diligence and IFC's Environment and Social Review as per Schedule 1(c) and for INCaF's legal counsel (collectively, "Appraisal Expenses").

Subject to Paragraphs 7(d) and 7(e) below, the Trustee expects to recover all costs incurred by INCaF pursuant to this Paragraph 6 by amortizing them in the unit price paid for the Emission Reductions under the ERPA. The price paid is expected to be as provided in Paragraph 2.

7.    **Termination**

(a) Methods of Termination

This Letter Agreement

(i)    may be terminated by the Project Company or the Trustee, with or without cause, by giving at least fifteen (15) days' prior written notice to the other party; and

(ii)    shall automatically terminate on the earlier of:
(x) the execution of the ERPA, and
(y) the date that is nine months after the Project is registered by the Executive Board in the event that the ERPA has not been executed by such date.

If this Letter Agreement is terminated pursuant to Paragraph 7(a)(ii)(y) above, the parties acknowledge and agree that the Project Company shall have the obligation to reimburse the Trustee as provided in Paragraph 7(d) below.

(b)    **Consequences of Termination**

Any such termination shall release the Project Company and INCaF and the Trustee from all of their respective obligations under this Letter Agreement, including any liabilities arising therefrom, except as provided in Paragraph 7.

(c)    **Survival of Provisions**

In the event this Letter Agreement is terminated for any reason, the following provisions are hereby expressly agreed to survive termination and shall remain in full force and effect: Paragraph 7 (Termination), Paragraph 8 (Amounts Payable), Paragraph 9 (Sharing of Information), Paragraph 10 (INCaF's No Warranty), Paragraph 11 (Potential Conflict of Interest), Paragraph 12 (Indemnity), Paragraph 13 (INCaF Reports), and Paragraph 16 (Governing Law and Submission to Jurisdiction).

- 4 -

(d)    **Termination by Project Company**

Subject to the provisions of Paragraphs 7(f) and (g) below, if the Project Company terminates this Letter Agreement or otherwise fails to fulfill its obligations under this Letter Agreement such as to effectively terminate this Letter Agreement prior to concluding an ERPA with the Trustee then the Project Company agrees to reimburse the Trustee: $25,000 if the termination takes place before the due diligence has started; or up to an amount of $100,000 for Appraisal Expenses incurred (whether or not invoiced) in connection with the Services in addition to an amount of $25,000, if the termination takes place after the Project Concept Note ("PCN") has been approved by VROM as specified in Schedule 1 (b) and after the due diligence by the Trustee has commenced. The Trustee will commence due diligence at any time after the Project Company has requested in writing to the Trustee that the Trustee should commence such due diligence, which written request for commencement of due diligence shall be substantially in the form attached as Annex I.

(e)    **Termination by Trustee**

If the Trustee terminates this Letter Agreement prior to the conclusion of an ERPA with the Project Company:

(i)    If at any time it is determined that the Contract Volume is less than 1.2 million metric tonnes, or if the Project differs in a significant or material way from the Project proposed in the Project Concept Note (see Schedule 1 (b)), or as a result of the Project Company's failure to take any action or obtain any approval required pursuant to the terms of this Letter Agreement within a reasonable period of time, the termination will have the same consequences as a termination by the Project Company in 7(d) except for as provided in Paragraph 7(f)(iii) below; or

(ii)    for all reasons other than those described in Paragraph 7(e)(i), the Project Company will have no liability.

(f)    **Special Termination Events**

(i)    In the event VROM does not grant its approval of the PCN within 60 days from the date INCaF transmits to VROM the PCN prepared by the Project Company as specified in Schedule 1(b), the Project Company has the right to terminate this Letter Agreement with no further obligation to the other party; _provided, however_, that if VROM has requested additional information in order to give its approval, such 60-day period shall be extended, but only by an additional 30 days unless the Project Company agrees in writing to a longer extension, in order to provide the parties and VROM reasonable time to obtain the approval.

(ii)    In the event that VROM's PCN approval offers a price and range in volume which are lower than the price or range in volume, as applicable, in the price or volume range in Paragraph 2, then the Project Company may terminate this Letter Agreement within fifteen (15) days following receipt of the PCN approval and neither party shall have any further obligation to the other party.

(iii)    If it is determined that the Government of Thailand has not been expediently issuing Letters of Approval ("LoAs") for projects and for this reason the Project does not receive its LoA by December 31, 2004, then the Trustee has the right

5 ·

to terminate this Letter Agreement and INCaF will pay (and the reimbursement obligation of the Project Company set forth in Paragraph 7(d) shall not arise) for any and all of INCaF's expenses incurred in connection with INCaF's appraisal and due diligence and IFC's Environment and Social Review, as the case may be. If the LoA is subsequently issued, then if so requested by the Trustee, the Project Company agrees to enter into a replacement letter agreement on the same terms and conditions as this Letter Agreement, except that the Contract Volume and/or the definition of the Project shall be modified to reflect the attributes of the Project at the time the LoA is received. If the Project Company fails to enter into such replacement letter agreement with the Trustee, then it shall pay the Trustee the amount specified in Paragraph 7(d) plus $300,000.

(g)    Sale to Third Party

If (i) (a) the Project Company terminates this Letter Agreement or (b) this Letter Agreement automatically terminates pursuant to Paragraph 7(a)(ii)(y) and (ii) within one year of termination or the effective date of such termination of this Letter Agreement, as the case may be, the Project Company enters into an agreement or agreements with another buyer or buyers to sell Emission Reductions generated from or caused directly and/or indirectly by the Project or any configuration or reconfiguration of the Project, then the Project Company agrees to provide INCaF with a certified, true and complete copy of such agreement or agreements with such other buyer or buyers and to reimburse the Trustee the amount specified in Paragraph 7(d) plus $300,000.

8.    Amounts Payable

Any amounts payable to the Trustee pursuant to this Letter Agreement shall be due and payable net of any taxes, withholdings or deductions whatsoever in U.S. Dollars in immediately available funds at such bank or banks, in such place or places as the Trustee or the payee may from time to time designate, to the Trustee within thirty (30) days of receipt by the Project Company of an invoice.

9.    Sharing of Information

The Project Company acknowledges that IFC and the Trustee have signed a confidentiality agreement with VROM whereby VROM has agreed to treat confidential information provided to it by INCaF or the Trustee with the same care as VROM normally exercises for its own information of a like character and to limit circulation of such information to persons within VROM who have a need to know such information. VROM has further agreed not to disclose any confidential information except to the extent necessary to meet requirements under applicable Dutch or European Union law and the requirements of the Kyoto Protocol. The Project Company agrees that IFC's, the Trustee's and INCaF's obligation to VROM is limited to obtaining its written agreement to these terms.

10    INCaF's No Warranty

Neither INCaF nor the Trustee makes any representation or warranty as to the outcome of, or as to the accuracy or completeness of, any reports, documents, or analyses prepared, or caused to be prepared, by it in connection with the subject matter of this Letter Agreement. Neither INCaF nor the Trustee will be liable for any loss, cost, damage or liability that the Project Company or any other party might suffer or incur in connection with this Letter Agreement, the Services performed by INCaF or the Trustee hereunder, any transaction contemplated hereby or INCaF's or the Trustee's role in

- 6 -

connection therewith, except to the extent that such loss, cost, damage or liability resulted from INCaF's or the Trustee's gross negligence or willful misconduct. Any such claim will be limited to reasonably foreseeable losses arising directly from performance of such Services and will not include lost profits or consequential or punitive damages.

11.     Potential for Conflict of Interest

In the event that the Project Company enters into a mandate letter with an IFC Investment department with the aim to obtain debt and/or equity financing for the Project, the Project Company will be expected to sign a letter acknowledging that the Project Company will be working with two separate teams within IFC (the investment department team representing IFC to process the debt and/or equity financing and the INCaF team to process the Emission Reduction purchase), and authorizing INCaF to obtain any necessary confidential information on the Project from the Project Company, from any department within the IFC and/or from other financial institutions or other entities that are involved in preparing or financing the Project and to share any confidential information developed or obtained by INCaF.

12.     Indemnity

The Project Company agrees to indemnify and hold IFC, INCaF and the Trustee harmless against any losses, claims, damages or liabilities to which the Trustee, IFC, its governors, directors, employees, agents, consultants or legal counsel (each, an "Indemnified Party") may become subject in connection with any Indemnified Party's activities as contemplated under this Letter Agreement, and to reimburse IFC, INCaF and the Trustee for any legal expenses, including any legal expenses, incurred by IFC, INCaF or the Trustee in connection therewith or with the investigation or defense thereof; provided however that the Project Company shall not be liable in respect of any such loss, claim, damage or liability to the extent that such loss, cost, damage or liability resulted from such Indemnified Party's gross negligence or willful misconduct.

13.     INCaF Reports

All written material prepared by INCaF or the Trustee or in which INCaF or the Trustee assists in the preparation in connection with the Project, including, without limitation, this Letter Agreement and any ERPA whether or not they have been cleared and ratified by the Project Company, will be and will remain the property of INCaF or the Trustee. In all cases, the written material shall not be provided to any third party without INCaF's, the Trustee's and the Project Company's written consent, and then only if they include such disclaimers as INCaF and the Trustee shall specify with the exception of the PDD, which the Trustee acknowledges must be made public pursuant to Kyoto Protocol requirements. None of INCaF's, IFC's or the Trustee's names nor opinions shall be used in any advertisements, promotional material, or other written materials or in presentations or other oral representations to other potential lenders or investors or other written materials without the Trustee's prior written consent which will not be unreasonably withhold.

14.     Provision of Information

The Project Company shall provide, at its own cost and in a timely fashion, all relevant information and assistance reasonably requested by the Trustee, INCaF, its staff, consultants or legal counsel to carry out INCaF's and the Trustee's duties hereunder and shall grant access to INCaF, the Trustee and, upon request, VROM for such purpose, to all pertinent documents, facilities, premises, sites and personnel.

- 7 -

15.    Trustee's Right to Assign

The Trustee may assign, without the prior consent of the Project Company, all of its rights and obligations under this Letter Agreement to any IFC facility (other than INCaF) that agrees to enter into an ERPA with the Project Company as contemplated herein.

16.    Governing Law and Submission to Jurisdiction

The terms of this Letter Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, United States of America. The Company irrevocably submits to the non-exclusive jurisdiction of the courts of the United States of America located in the Southern District of New York and irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Letter Agreement may be brought by INCaF or the Trustee in such court. The Company irrevocably waives, to the fullest extent permitted by law, any objection it may now or hereafter have to the laying of venue of any such legal action, suit or proceeding and any claim that such legal action, suit or proceeding has been brought in an inconvenient forum and agrees that a final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding upon it and may be enforced in any other courts in the jurisdiction of which it is or may be subject, by suit upon such judgment.

Please confirm your agreement with the above terms and conditions by executing and returning to us two of the enclosed copies of this Letter Agreement. This Letter Agreement will enter into force on the date of countersigning by the Project Company. In any event if this Letter Agreement is not executed and returned to INCaF before the close of business on May 21, 2004, then this Letter Agreement will not become effective and neither the Trustee nor INCaF will be bound by any of the terms and conditions stated herein.

Sincerely,

INTERNATIONAL FINANCE CORPORATION, in its capacity as Trustee for the IFC-Netherlands Carbon Facility

Date:    MAY 18, 2004

By:

Authorized Signature

Name:    LOUIS C. BOOFETN

We acknowledge receipt of this Letter Agreement and accept and agree to be bound by the terms set forth herein:

Khorat Waste to Energy Company,

Date:    May 20, 2004

By:

Authorized Signature

Name:    GRANVILLE SMITH

- 8 -

Appendices (provided as attachments):

A     Project Cycle
B     OECD Guidelines (VROM Requirements)
C     PCN Template
D     VROM's Baseline Guidance
F     Letter of Approval Template

- 9 -

## SCOPE OF SERVICES AND PROJECT CYCLE

(a)    **Preparation of Baseline Study**

The Project Company will commission and pay for a baseline study, which will be conducted in accordance with Kyoto Protocol requirements and interim guidance provided by VROM (see Appendix D) by an expert reasonably satisfactory to INCaF (the "Baseline Study"). The Project Company will also commission and pay for the development of an appropriate Methodology for the review and approval of the executive board of the CDM (the "Executive Board").

(b)    **Preparation of the Project Concept Note**

The Project Company must prepare, at its own expense, a Project Concept Note ("PCN"), the template for which is attached in Appendix C. The PCN must contain or be supported by a preliminary baseline analysis to determine the 'without project' scenario, an estimate of the expected volume of Emission Reductions resulting from and/or caused directly and/or indirectly by the operation of the Project. INCaF and the Trustee will review the PCN and thereafter will transmit the PCN along with its observations and recommendations to VROM for its review and approval. VROM's approval of the PCN would constitute a conditional approval to purchase Emission Reductions from the Project subject to certain conditions being satisfied (such as, for example, the Project being validated and registered as a CDM project activity). The PCN approval will confirm certain preliminary material indicative terms which the parties expect at such time to be included in the Term Sheet including details on price, duration and volume and, if applicable, any options relating to the purchase of Emission Reductions beyond the maximum stated duration.

(c)    **Preparation of Monitoring Plan**

If the baseline study indicates that Emission Reductions are likely to be eligible under the CDM and will be of a reasonable or significant amount, the Project Company will commission a monitoring plan for the Project to be prepared by consultants or experts reasonably satisfactory to both parties (the "Monitoring Plan").

(d)    **Project Design Document, Validation and Request for Registration**

The Project Company, in consultation with INCaF, will hire an Operational Entity ("OE") to validate the Emission Reduction component of the Project. INCaF will work with the Project Company to prepare and submit to the OE a Project Design Document ("PDD") (including a "Letter of Approval" from the Government of Thailand (see Appendix E) and a summary of how comments from stakeholders were solicited and taken into account) to be evaluated and validated by the OE against the requirements of the CDM.

Following validation by the OE, INCaF will assist the Project Company with its request that the OE submit to the Executive Board a request for registration of the Project in the form of a validation report including such supporting documents as the Executive Board may require or may otherwise be necessary or advisable. The Project Company shall be responsible for obtaining the registration with the Executive Board. In the event that the Executive Board is unable to accept the Project for timely registration, VROM may make a determination to proceed before formal registration of the Project by the Executive Board.

- 10 -

(e)    **Appraisal and Due Diligence**

Promptly after the Project is registered by the Executive Board and written approval to proceed is received from the Project Company and no later than December 31, 2004, INCaF will carry out or commission an appraisal and due diligence at a level determined by INCaF. The scope and extent of the Environmental and Social Review and the appraisal and due diligence will depend on the information provided to INCaF by the Project Company and any other institutions participating in the financing of the Project that have carried out their own due diligence and are willing to share the information. For the appraisal, INCaF will also evaluate the technical, commercial, financial and legal soundness of the Project to ensure that INCaF is comfortable that the Project will perform as proposed or indicated by the Project Company. The appraisal should convince INCaF that, based on the information available, the Project is expected to perform and generate Emission Reductions as indicated in the PCN. In addition, INCaF will carry out and/or commission all or part of an Environmental and Social Review of the Project, including a field appraisal as necessary and desk review of the Project, as well as consultations with the Project Company, relevant governments, technical experts and stakeholders to ensure the Project complies with IFC's Environmental and Social Policies and Guidelines.

(f)    **Emission Reduction Purchase Agreement Terms**

Once the Project has been validated and registered as per paragraph (d) above, INCaF will negotiate the terms of the ERPA, including price per metric tonne of Emission Reductions and duration of the agreement, with the Project Company and the parties will agree to a final term sheet (the "Term Sheet").

Once the Term Sheet is finally negotiated, INCaF will instruct its lawyers to prepare the ERPA. The ERPA will provide for the termination of this Letter Agreement and will govern the purchase of eligible Emission Reductions by the Trustee. The ERPA will require that the Project Company pay for services for verification and certification of the Emission Reductions to be purchased.

(g)    **Verification and Certification**

The costs incurred relating to the initial verification (if applicable), verification, re-verification (if needed), certification, registration and issuance of Emission Reductions, renewal of the Baseline Study and monitoring of the Project, in each case, in accordance with the requirements of the Kyoto Protocol, will be paid directly by the Project Company.

- 11 -

Annex 1

Form of Request For Commencement of Due Diligence

IFC-Netherlands Carbon Facility
2121 Pennsylvania Ave NW
Washington, DC   20433 USA

Facsimile: (202) 974-4349
[Date]

Attention:  Mr. Vikram Widge

Subject:  Request for Commencement of Due Diligence

Dear Mr. Widge,

Reference is hereby made to the Letter Agreement (the "Letter Agreement") dated [xxx] between Khorat Waste to Energy Company (the "Project Company") and International Finance Corporation in its capacity as the Trustee of the IFC-Netherlands Carbon Facility (the "Trustee"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Letter Agreement.

Pursuant to Paragrah 7(d) of the Letter Agreement, the Project Company hereby formally requests the Trustee to commence due diligence of the Project. The Project Company acknowledges and agrees that this request will bind it to the provisions and potential liabilities applicable to a termination of the Letter Agreement after due diligence has commenced as set forth in Paragraph 7(d) of the Letter Agreement.

                                Sincerely,


Khorat Waste to Energy Company,

        Date:        _____

        By:          _____
                     Authorized Signature

        Name:        _____

        Title:       _____

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL FINANCE CORPORATION, not in its individual capacity, but solely as the Trustee for the IFC-Netherlands Carbon Facility,<br><br>            Plaintiff,<br><br>      v.<br><br><br>KORAT WASTE TO ENERGY CO. LTD. (a/k/a Khorat Waste to Energy Co.),<br><br>            Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

07 Civ. 5451 (SHS)

## DECLARATION OF ANTHONY F. KING

I, ANTHONY F. KING, declare as follows:

1.      I am an attorney with the law firm Wallace King Domike & Reiskin in Washington, DC.  I represent Defendant Korat Waste to Energy Co., Ltd. ("KWTE") in the above-captioned matter.

2.      Attached hereto as Exhibit 1 is a true and correct copy of a transcript ordered by my office from the official court reporter following the March 27, 2008 hearing in this matter.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 10, 2008.

Anthony F. King

# EXHIBIT 1

83R5IFCD                    decision

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   INTERNATIONAL FINANCE
    CORPORATION,
4
                 Plaintiff,
5
          v.                        07 Civ. 5451 (SHS)
6
    KORAT WASTE TO ENERGY CO.,
7   LTD.,
8
                 Defendant.

9   ------------------------------x

10                                  March 27, 2008
                                    12:10 p.m.
11  Before:

12                 HON. SIDNEY H. STEIN,

13                                  District Judge

14                      APPEARANCES

15  WHITE & CASE, L.L.P.
         Attorneys for Plaintiff
16  BY:  FRANK A. VASQUEZ, JR.

17  WALLACE KING DOMIKE & REISKIN, P.L.L.C.
         Attorneys for Defendant
18  BY:  ANTHONY FRAZIER KING
         -and-
19  MORVILLO, ABRAMOWITZ, GRAND, IASON, ANELLO & BOHRER, P.C.
         Attorneys for Defendant
20  BY:  THOMAS M. KEANE

21

22

23

24

25

2

83R5IFCD                    decision

1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your names

3    for the record.

4              MR. VASQUEZ:  Frank Vasquez of White & Case.  I'm here

5    for plaintiff IFC.

6              THE COURT:  Good morning, sir.

7              MR. VASQUEZ:  Good morning.

8              MR. KING:  Anthony King of Wallace, King for

9    defendant, Korat Waste Energy.

10             MR. KEANE:  And Thomas Keane of Morvillo, Abramowitz

11   also for Korat Waste Energy.

12             THE COURT:  Good morning.  Won't all of you please be

13   seated?

14             What I wanted to do this morning is three-fold:

15   First, to read into the record a decision granting in part and

16   denying in part Korat's motion to dismiss, and I will then

17   enter a minute order that simply says for the reasons set forth

18   on the record, the motion to dismiss is granted in part and

19   denied in part.  Then I wanted to see how I can assist the

20   parties and partially debrief a discovery dispute.  And, third,

21   I want to see if we can set up a track for attempting to

22   resolve it.

23             My decision is as follows:

24             Plaintiff IFC is an international organization

25   headquartered in Washington, D.C. and brings this action in its

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

83R5IFCD                    decision

1    capacity as trustee of the IFC Netherlands carbon facility,

2    which I will refer to as INCaF.

3         The action is brought against defendant Korat Waste

4    Energy Company limited, which I will refer to as Korat, that's

5    a corporation organized under the laws of Thailand.  On May 17,

6    2004, IFC and Korat executed a letter of intent which I will

7    also refer to as the LOI, documenting their intention to

8    negotiate Korat's sale of certified emission reductions, which

9    I will refer to either as CERs or by their common name, carbon

10   credits, to IFC.  In other words, the sale of the carbon

11   credits was going to be from Korat to IFC.  The parties never

12   finalized their negotiations and on March 2, 2007, Korat

13   exercised its option to terminate the letter of intent.  IFC

14   then commenced this action for breach of the implied covenant

15   of good faith and fair dealing, breach of contract, termination

16   payment due under the terms of the letter of intent and

17   reimbursement of various expenses incurred during negotiations

18   and in this litigation.

19        Korat has now moved, pursuant to Rule 12(b)(6), to

20   dismiss each of the four claims asserted in the complaint

21   except as to the claim for a termination payment as to which it

22   concedes liability.

23        As I will explain in this opinion, the allegations in

24   the complaint and the documents attached to the complaint as

25   exhibits do not support IFC's contention that the parties

83R5IFCD                    decision

1    reached agreement on all material terms for sale of the carbon

2    credits.  IFC has thus failed to state a claim for breach of

3    contract but it has sufficiently stated a claim for breach of

4    covenant of good faith and fair dealing implicit in the letter

5    of intent by alleging that Korat negotiated for sale of the

6    carbon credits in bad faith.

7         Finally, IFC's claim for negotiation expenses and

8    attorney's fees fails as a matter of law because the language

9    of the letter of intent's indemnification clause does not

10   contain an intention to permit recovery of those expenses.

11        In deciding a motion to dismiss, pursuant to Rule

12   12(b)(6) I am to consider the allegations in the complaint and

13   documents that are attached to the complaint as exhibits or are

14   incorporated in the complaint by reference and any document

15   upon which the complaint "solely relies and which is integral

16   to it." Roth v. Jennings, 489 F.3d 499, 509, (2d Cir. 2007).

17   I accept the factual allegations, as I must, that are set forth

18   in the complaint, as true, and I must draw the inferences from

19   those allegations in the light most favorable to plaintiff.

20   However, if the complaint contains assertions regarding the

21   contents of the document that are contradicted by the document

22   itself, the document controls.  Roth v. Jennings, at 510 to

23   511.

24        Here the complaint has six exhibits, all of which I am

25   considering in deciding the motion to dismiss and, in addition,

83R5IFCD                    decision

1    IFC concedes that the letter of intent which Korat attaches to

2    the motion to dismiss is integral to the complaint and

3    appropriate to consider.   That concession, as I think is

4    appropriate, is in IFC's memorandum in opposition to the motion

5    at page 8.   Therefore, I will consider on this motion the

6    complaint, the six exhibits attached to the complaint and, on

7    consent, the letter of intent.

8         On the other hand, the complaint makes only fleeting

9    references to the document that's entitled "Draft Term Sheet"

10   that Korat also attaches to its motion to dismiss.   Fleeting

11   references are in paragraph 19 of the complaint.   Because they

12   do characterize them as just tangential references, the "Draft

13   Term Sheet" is not integral to the complaint and I'm not

14   considering it on this 12(b)(6) motion.   You will see even were

15   I to consider it, the outcome would still be the same.

16        The following facts were taken from the complaint and

17   the exhibits to the complaint and the letter of intent:

18        IFC is an independent member of the World Bank Group

19   with a membership of 179 countries and its goals include the

20   promotion of economic development by encouraging the growth of

21   productive enterprises and efficient capital markets in its

22   member countries.   And, it also serves as a trustee of INCaF.

23   Complaint, paragraphs 8 and 9.

24        Korat intends to build and operate a methane recovery

25   and waste energy facility in Khorat, Thailand.   For a period of

83R5IFCD                        decision

1   10 years, this facility will treat wastewater and capture bio

2   gas which will be used in place of heavy fuel oil to generate

3   electricity.   The project is expected to generate carbon

4   credits which are credits created when a facility reduces the

5   amount of greenhouse gas emissions that otherwise would have

6   been produced.   Under the terms of the Kyoto protocol, an

7   international and environmental treaty, signatory nations may

8   trade carbon credits in order to meet national targets for

9   greenhouse gas emissions.   That's in the complaint at

10  paragraphs 2 and 13.

11          In early 2002, EcoSecurities Group PLC suggested

12  Korat's project to IFC as a source of carbon credits that the

13  Netherlands could use to meet its emissions targets.   At that

14  time, EcoSecurities was an advisor and consultant to Korat.

15  IFC subsequently entered into the negotiations with Korat in

16  its capacity as a trustee of INCaF and, on May 20th, 2004, IFC

17  and Korat executed the Letter of Intent in which they expressed

18  their intention to negotiate an Emission Reduction Purchase

19  Agreement -- I will also call that the ERPA -- governing the

20  sale of carbon credits.   That is the complaint at paragraphs 14

21  and 15 and the Letter of Intent dated May 17, 2004 at page 1.

22          The purpose of the Letter of Intent was to "set forth

23  the basis on which IFC will work with Korat in preparing and

24  executing purchase of" the carbon credits generated by Korat's

25  project.   The Letter of Intent stated INCaF's "preliminary

83R5IFCD                    decision

1    expectation" to pay three Euros per metric ton of carbon

2    credits and to purchase between 2 and 2.25 million metric tons

3    of carbon credits during the period ending December 31, 2012.

4    The Letter of Intent expressly stated, however, that IFC would

5    not be bound to purchase any carbon credits unless and until

6    IFC and Korat had executed an ERPA and the terms of that ERPA

7    had been satisfied.   All of those facts are taken from the

8    Letter of Intent in the complaint at paragraph 15.

9           The Letter of Intent contains the following relevant

10    provisions.   Paragraph 4 confers "preferential status" on IFC

11    by permitting Korat to enter into agreements with third-parties

12    for the sale of carbon credits only after it had first offered

13    them to IFC.   Paragraph 7(a)(i) permitted either party to

14    terminate the agreement on 15 days' notice, and paragraph 7(d)

15    provided that in the event that Korat was the party elected to

16    terminate, it would be required to pay IFC $25,000 for expenses

17    incurred before due diligence and an additional amount up to

18    $100,000 for IFC's appraisal, due diligence, and environmental

19    assessment and legal expenses.   Paragraph 7(g) provides that

20    Korat would be liable for an additional $300,000 payment if it

21    were to enter into an agreement for the sale of carbon credits

22    with a third-party within one year of electing to terminate the

23    agreement.   That's all from the Letter of Intent in the

24    complaint at paragraph 15.

25           Finally, paragraph 12 of the Letter of Intent labeled

83R5IFCD                    decision

1    "Indemnity" provided that Korat would hold IFC "harmless

2    against any losses, claims, damages or liabilities to which it

3    or its governors, directors, employees, agents, consultants or

4    legal counsel might become subject in connection with any of

5    their activities as contemplated under" the Letter of Intent,

6    and that Korat would reimburse IFC "for any expenses including

7    legal expenses" IFC incurred "in connection therewith or with

8    the investigation or in defense thereof" except in the case of

9    gross negligence or willful misconduct.

10            In a May 26, 2005 e-mail to IFC's Peter Cook, which is

11   approximately one year after the Letter of Intent was entered

12   into, Korat's Ken Lochlin proposed to sell IFC 1.5 million tons

13   of carbon credits at a price of 4.75 Euros per ton, subject to

14   a number of conditions regarding such issues as IFC's priority

15   right to purchase additional carbon credits; Korat's liability

16   for failure to deliver the full amount of carbon credits

17   requested or for selling IFC's carbon credits to third-parties;

18   and an extension of termination date in the event that Korat

19   failed to deliver all of the carbon credits promised.

20            Lochlin stated "if these terms are broadly acceptable

21   to IFC, we are now prepared to move quickly to finalize an

22   updated term sheet which reflects them and proceed with the

23   completion of the balancing of the purchase and sale

24   documentation."   That is the complaint, paragraph 18, and the

25   e-mail from Lochlin to Cook dated May 26, 2005 which is Exhibit

9

83R5IFCD                    decision

1    D in the complaint.

2            On June 10, 2005, Lochlin again e-mailed IFC's Cook

3    and stated that he understood from communications between the

4    parties that "IFC would have an interest in an agreement to

5    purchase 1.75 million tons of Korat carbon credits at a price

6    of 4.25 Euros per ton from the 2006 vintage onward, on terms

7    otherwise in keeping with Korat's last proposal."  Lochlin

8    stated that "of course this is both a higher purchase price and

9    a lower proposed purchase price than we have previously

10   offered.  However, if you are in a position to confirm IFC's

11   interest in such an arrangement, subject to documentation,

12   etc., I will be happy to convey this to the rest of the board

13   on a call we have already scheduled over this weekend, and

14   hopefully revert to a formal response from our side on Monday."

15   That's the June 10, 2005 e-mail from Lochlin to Cook also part

16   of Exhibit D.

17           That same day, June 10, 2005, IFC's Cook responded in

18   an e-mail by stating, "I can confirm that IFC would agree to a

19   deal on those terms.  I look forward to hearing back from you

20   so we can finalize the terms."  Cook added that, "provided

21   Korat's board agrees, I would like to move forward quickly."

22   That's the June 10, 2005 Cook to Lochlin e-mail, also part of

23   Exhibit D.

24           Three and a half months later, on September 21, 2005,

25   according to the complaint, IFC and Korat agreed on a "Final

83R5IFCD                    decision

1    Term Sheet" reflecting the price and quantity combination

2    discussed in the May through June 2005 e-mail exchange.   IFC

3    then began drafting an ERPA which the parties envisioned would

4    be completed by the end of 2005.

5          October 13, 2005 IFC forwarded a draft ERPA to Korat

6    and, in response, Korat expressed what it referred to as

7    "policy concerns" including that the draft was too long and

8    contained too many covenants.   On November 8, 2005, after IFC

9    asked Korat to elaborate on these concerns, Korat provided a

10   memorandum entitled "guidelines for redraft of Korat IFC ERPA."

11   In this memorandum, Korat reiterated its concerns and requested

12   additional terms not in that term sheet.   All of this is from

13   the complaint at paragraphs 19 and 20.

14         IFC provided comments on Korat's memorandum the

15   following day, November 9, 2005 and Korat responded on November

16   15th informing IFC that it did not believe "sufficient

17   progress" had been made in resolving the parties' "very

18   material and fundamental differences and their positions."

19   Korat thereafter ignored IFC's attempts to discuss revising the

20   ERPA.   On December 13, 2005, IFC sent Korat an e-mail offering

21   to redraft the ERPA, and four days later Korat responded that

22   the new ERPA would have to be substantially different from the

23   original.   IFC thereafter retained English counsel, at what it

24   alleges was considerable expense, to undertake a review of the

25   ERPA.   It then sent Korat a revised version.   Korat never

83R5IFCD                    decision

1    responded to that draft.  Complaint, paragraphs 121, 23, 25.

2            In a July 14, 2006 e-mail, Korat's G. Pete Smith asked

3    IFC's Cook to consider paying a higher price for the carbon

4    credits explaining that "because Korat's board members consider

5    price to be the central issue, we would like to request from

6    you what price or price range IFC can now consider."  Smith

7    told Cook that although "IFC's might not be as high as current

8    commercial prices, there is willingness to consider a lower

9    price based on the financial strength by IFC relative to other

10   potential buyers."  Smith stated that "if the price issue can

11   be resolved, then we will discuss other details in the ERPA."

12           At an October 17, 2006 meeting, IFC proposed to pay

13   7.25 Euros per carbon credit to purchase an additional 250,000

14   carbon credits after 2012 at that same price.  It also offered

15   to help Korat obtain the Thai government's approval for the

16   project and to advance Korat's legal expenses which it would

17   recoup only if the ERPA were executed.  Complaint paragraphs 26

18   and 27 and e-mail from Smith to Cook dated July 14, 2006 which

19   is Exhibit E to the complaint.

20           In an e-mail to IFC dated October 19th, 2006, two days

21   after this meeting, Korat's Lochlin took issue with IFC's

22   statement that Korat was "dragging its feet" in the

23   negotiations.  Lochlin stated that although other parties had

24   offered to pay Korat between $10 and $11.50 per carbon credit

25   which Korat described as "attractive" offers, "the

83R5IFCD                    decision

1    acceptability of the final determination will not be based

2    solely on the offered price levels or delivery tonnages but

3    will also be impacted by the specifics of the ERPA

4    documentation."  Lochlin explained that IFC's draft ERPA was

5    two or three times longer than the other ERPAs that IFC had

6    previously executed and that while he appreciated IFC's

7    willingness to address unintended potential problems, Korat

8    identified in the draft he remained concerned about how the

9    ERPA's terms "might impact Korat's future commercial

10   operations."  This is from the October 19th, 2006 e-mail from

11   Lochlin to Widge and Cook, Exhibit B to the complaint.

12           In an e-mail to Korat's Lochlin and Smith on November

13   10, 2006, Cook set forth what he described as "IFC's final good

14   faith attempt to deal with Korat's remaining concerns" which he

15   understood Korat would "discuss with its board and revert

16   promptly thereafter."  That's Exhibit B, it is the Cook to

17   Lochlin and Smith e-mail dated November 10, 2006.  Cook also

18   stated that "we note with interest your frank admissions

19   indicating that you have been discussing prices and terms for

20   the Korat carbon credits that are the subject of the binding

21   commercial terms in the IFC/Korat Letter of Intent.  We believe

22   that the Letter of Intent of May 2004 does not give Korat the

23   ability to treat IFC and INCaF as a put option and engage with

24   us intermittently and continue to defer signing the ERPA to

25   gauge how the market plays out."  Cook asked Korat to respond

83R5IFCD                          decision

1    to its terms by November 30, 2006.  That's all from the

2    November 10, 2006 e-mail.

3            In response, on November 15, 2006, Lochlin responded

4    to Cook's e-mail and stated, "at no point has it been our

5    intention to play the market in our discussions with IFC

6    consistent with the May 2004 LOI.  We have been negotiating in

7    good faith with IFC for two and a half years through multiple

8    negotiations."  Lochlin also noted that Korat's statements

9    regarding the offers it had received from third-parties was "a

10   further indication of our frank approach and our good faith

11   efforts to reach commercially and legally acceptable terms with

12   IFC pursuant to the LOI."  He promised that Korat would

13   complete its internal review of discussions with board members

14   promptly.  All of that is from the November 15, 2006 e-mail

15   which is Exhibit B.

16           On February 8, 2007, the Thai government approved

17   Korat's application to register its project with the United

18   Nations Framework Convention on Climate Change.  Without this

19   approval, Korat would have been unable to sell its carbon

20   credits on the carbon market.  That's complaint paragraph 17

21   and 30.

22           A month later, March 2nd, 2007, Korat sent IFC notice

23   that it was invoking its right to terminate the Letter of

24   Intent as of March 17, 2007, and in that notice Korat stated

25   that since the execution of the Letter of Intent, "the market

83R5IFCD                    decision

1   for CER and CER prices in particular have changed considerably.

2   Yet, the terms in the current draft ERPA provided by IFC still

3   fail to reflect market conditions for this type of transaction.

4   For these reasons, it has been concluded that it is not

5   worthwhile for Korat to continue to devote resources to the

6   negotiations."  That's Exhibit A to the complaint.  Korat

7   acknowledged that its decision to terminate the agreement

8   triggered its obligation to make a termination payment pursuant

9   to paragraph 7(d) of the Letter of Intent and it requests that

10  an invoice of IFC's services.

11         On March 29, 2007, Korat registered its project with

12  the executive board of the U.N. Framework Convention on Climate

13  Change.  Complaint paragraph 33 and its supporting documents.

14         Korat identified both itself and EcoSecurities as

15  "project participants."  IFC alleges that EcoSecurities, which

16  had simply been Korat's advisor, had "accumulated a portfolio

17  of carbon credits on its own" and speculates that EcoSecurities

18  had purchased some of those credits from the Korat project.

19  Complaint, paragraph 33.

20         IFC asserts four causes of action in the complaint.

21  First, IFC alleges that Korat breached the covenant of good

22  faith and fair dealing, instinct in the May 20, 2004 Letter of

23  Intent by failing to negotiate good faith toward a final ERPA.

24  IFC alleges that Korat had no intention of executing a final

25  agreement and used the Letter of Intent as a "put option

83R5IFCD                    decision

1   agreement" or fallback to obtain leverage in the marketplace

2   while shopping for other buyers.   IFC also alleges that Korat

3   entered into the Letter of Intent because the credibility it

4   gained from a relationship of IFC would help persuade the Thai

5   government to approve the project.   Complaint, paragraph 16 and

6   41 and 42.

7         IFC also alleges that in the May through June 2005

8   e-mail exchange, IFC and Korat reached a binding agreement as

9   to all the material terms of its sale of the carbon credits.

10   Its second cause of action asserts that Korat's failure to

11   negotiate toward final ERPA constitutes a breach of the

12   contract which IFC finds in the May through June 2005 e-mails.

13   All right?

14         So, cause one is breach of the covenant of good faith

15   and fair dealing and cause of action two is breach of the

16   contract which is the May through June '05 e-mails.

17         The third cause of action is a claim that Korat is

18   liable for termination payment pursuant both to paragraph 7(d)

19   of the Letter of Intent because of its election to terminate

20   the agreement and, again, that's conceded by Korat, but it also

21   claims it is entitled to a payment pursuant to 7(g) because

22   Korat entered into an agreement with a third-party for the sale

23   of the carbon credits within one year of termination.

24   Complaint, paragraphs 52 to 54.

25         In the fourth cause of action, IFC seeks to recover

83R5IFCD                    decision

1    the fees and expenses it incurred in its negotiation with Korat

2    as well as attorneys' fees and costs incurred in the present

3    litigation pursuant to the Letter of Intent's indemnification

4    clause.  Complaint, 57 to 59.

5          This Court has federal subject matter jurisdiction

6    pursuant to 28 U.S.C. 1331.  Any action in which the IFC is a

7    party is deemed to arise under the laws of the United States

8    and there is original jurisdiction over such actions.  22

9    U.S.C. Section 282f.  This Court has personal jurisdiction over

10   Korat and venue here is proper pursuant to the Letter of

11   Intent's forum selection clause.

12         Dismissal is appropriate pursuant to Rule 12(b)(6)

13   only if the plaintiff has not pled "enough facts to state a

14   claim to reliefs that is plausible on its face."  Bell Atlantic

15   Corp. v. Twombly, 127 S. Ct. 1955 (2007).  A plaintiff's

16   factual allegations must be enough to raise a right to relief

17   above the speculative level."  Twombly at 1965.  As noted, when

18   reviewing motion to dismiss, the Court assumes the truth of all

19   facts asserted in the complaint and draws all reasonable

20   inferences from those facts in favor of the plaintiff.  See

21   Cleveland v. Caplaw Enterprises, 448 F.3d 518, 512, (2d Cir.

22   2006).

23         The Letter of Intent specifies that New York Law

24   governs the interpretation of its terms.

25         All right, let's turn to the first claim for relief.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

83R5IFCD                    decision

1    The first claim for relief is the breach of the implied

2    covenant of good faith and fair dealing.  I am finding that IFC

3    has stated a claim for breach of the applied covenant of good

4    faith and fair dealing.

5          Under New York Law, a covenant of good faith and fair

6    dealing in the course of contract performance is implicit in

7    all contracts.  Dalton v. Educational Testing Service, 87,

8    N.Y.2d 384,  389 (1995).  "Encompassed within the implied

9    obligation of each promisor are any promises which a reasonable

10   person in the position of the promisee would be justified in

11   understanding were included."  Among those implied obligations

12   is a pledge not to do anything that "will have the effect of

13   destroying or injuring the right of the other party to receive

14   the fruits of the contract."  No obligation may be implied,

15   however, that "would be inconsistent with other terms of the

16   contractual relationship."  Those are all quotes from Dalton v.

17   Educational Testing Service at 389.

18         Korat contends that IFC has failed to state a claim

19   for breach of this implied covenant because paragraph 7 of the

20   Letter of Intent permitted it to terminate their agreement on

21   15 days' notice.  In its view, an implied obligation to

22   continue negotiation would be inconsistent with this express

23   provision of the contract.

24         Korat's argument, however, mistakes the nature of

25   IFC's claim.  The complaint alleges that Korat breached the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

83R5IFCD                    decision

1   implied covenant of good faith and fair dealing with its

2   conduct during the negotiation of the ERPA.  The complaint 16

3   to 17 and 41 to 42.  It does not allege that Korat breached the

4   implied covenant of good faith and fair dealing by terminating

5   the LOI.  The issue before this Court is whether IFC has stated

6   a claim that Korat breached the implied covenant of good faith

7   and fair dealing by failing to negotiate in good faith.

8          Based on the allegations in the complaint and the

9   other documents I have said I am taking into account, that is

10  the exhibits and the LOI, I find that IFC has stated plausible

11  claim of breach of duty to negotiate good faith.  For example,

12  IFC alleges that between November and December of 2005 Korat

13  ignored IFC's attempts to discuss revisions to the Emission

14  Reduction Purchase Agreement and then responded only

15  reluctantly and not helpfully to IFC's December 13, 2005 offer

16  to redraft that document.  IFC also alleges that Korat totally

17  failed to respond to the revised draft ERPA it sent later that

18  month.  Complaint, paragraphs 23 and 25.

19         More significantly, IFC alleges that Korat kept IFC as

20  a fallback or "put option" while entertaining other offers.

21  This allegation is plausible which, again, is the Supreme Court

22  standard on 12(b)(6) motions for at least two reasons:  First,

23  Korat acknowledged it had received other offers it viewed as

24  "attractive," that's the October 19th, 2006 e-mail; and second,

25  IFC alleges that the market price of carbon credits had

83R5IFCD                      decision

1   increased significantly during the period of the parties'
2   negotiations which, if true, certainly provided Korat with an
3   incentive to hold out as long as possible in the negotiations.
4   Complaint paragraph 16.
5           IFC also alleges that Korat maintained negotiations
6   with IFC in order to use that relationship to help secure the
7   Thai government's approval for the project.  This claim is also
8   plausible.  IFC alleges that Korat terminated the agreement
9   after nearly three years of negotiations less than one month
10  after receiving the Thai government approval.  Complaint,
11  paragraph 30.
12          Finally, IFC alleges that EcoSecurities became a
13  purchaser of Korat's carbon credits rather than solely a
14  consultant.  According to the complaint, Korat disclosed
15  EcoSecurities' role as a "project participant" as opposed to an
16  advisor in its filing with the executive board of the U.N.
17  Framework Convention on Climate Change on March 29, 2007, less
18  than one month after Korat notified IFC that it was invoking
19  its right to terminate the Letter of Intent.  Complaint,
20  paragraphs 30 and 33.
21          Given how much time the parties spent attempting to
22  reach agreement on the sale of the CERs, it is unlikely
23  although certainly not inconceivable that Korat and ecosystems
24  could have reached agreement in less than one month.  Thus, it
25  is possible or at least plausible that Korat had been

83R5IFCD                         decision

1    negotiating with EcoSecurities while still bound by its

2    commitment under the terms of the Letter of Intent to negotiate

3    exclusively with IFC.  That, if true, would violate the Letter

4    of Intent's exclusivity clause and represent a breach of

5    Korat's duty to negotiate in good faith.

6                Therefore, I'm finding on Count One that IFC has

7    stated a plausible claim for breach of covenant of good faith

8    and fair dealing implicit in the Letter of Intent.  Count One,

9    therefore, remains, and I am denying the motion to the extent

10   it seeks dismissal of Count One.

11               Now Count One remains, as I say, so the question then

12   is what type of damages may IFC seek under Count One?  And I am

13   finding that it can recover reliance damages on that claim but

14   it can't recover lost profits, that is, the cost of the carbon

15   credits.

16               IFC seeks to recover expectation damages on its claim

17   for breach of the implied covenant of good faith and fair

18   dealing.  It seeks "replacement costs for the CERs of not less

19   than $18.3 million."  That's the complaint at paragraph 16.

20   Under New York Law, however, a party that prevails on the claim

21   for breach of the implied covenant of good faith and fair

22   dealing is limited to reliance damages and it does not obtain

23   benefit of the contract that ultimately was not entered into.

24   In other words, on the breach of a covenant of good faith and

25   fair dealing, you don't receive the benefit of the contract

83R5IFCD                     decision

1   that was not entered into, that is, you don't receive what you

2   would have received under the ERPA.  The ERPA was never entered

3   into.  See Goodstein Construction Corp. v. City of New York, 80

4   N.Y.2d 366, 604 N.E.2d 1356, 590 N.Y.S.2d 425 (1992).

5           In that case, parties had entered into two

6   "designation agreements" as part of which they agreed to

7   cooperate in preparing a land disposition agreement called an

8   LDA which governed the plaintiff's purchase and development of

9   certain city-owned properties.  After plaintiff had incurred

10  substantial expenses negotiating with New York City and

11  preparing the land disposition agreement, the city

12  "de-designated" the plaintiff as the negotiator.  Plaintiff

13  sued for breach of contract based on the defendant's failure to

14  negotiate in good faith and sought not only its out-of-pocket

15  expenses but also the profits it expected to have received if

16  they had successfully negotiated the land disposition

17  agreement.  The New York Court of Appeals held that "both the

18  law and logic preclude such a recovery."

19          And the following, these quotes are all from 368, 369,

20  371 of Goodstein and this quote is from 373,

21          "Contract damages are ordinarily intended to give the

22  injured party the benefit of the bargain by awarding the sum of

23  money that will, to the extent possible, put that party in as

24  good a position as it would have been had the contract been

25  performed.  Here, the defendant's sole obligation under the

1    designation agreements was to negotiate in good faith.  The

2    defendant is neither bound to agree to an LDA nor to continue

3    the negotiating process.  To allow the profits that plaintiff

4    might have made under the prospective LDA as the damages for

5    breach of the exclusive negotiating agreement would be basing

6    damages not on the exclusive negotiating agreements but on the

7    prospective terms of a nonexistent contract which the defendant

8    was fully at liberty to reject.  It would, in effect, be

9    transforming an agreement to negotiate for a contract into a

10   contract itself."

11           Here, the Letter of Intent bound Korat to negotiate in

12   good faith toward an Emission Reduction Purchase Agreement.

13   IFC is in exactly the position of Goodstein and, just as in

14   that case, is attempting to "transform an agreement to

15   negotiate for a contract into a contract itself."

16           Thus, IFC's recovery on Count One -- which I repeat I

17   am allowing -- is going to be its reliance damages and not lost

18   profits.

19           Now let's turn to Count Two, that is, the claim for

20   breach of contract arising out of the May through June e-mail

21   exchange.

22           I'm finding that IFC has not alleged a formation of a

23   binding agreement and therefore I am granting the motion

24   dismissing Count Two.

25           IFC alleges that the parties reached agreement on all

83R5IFCD                    decision

1    material terms in the course of the May to June 2005 e-mail

2    exchange.  IFC calls that the June agreement.  Complaint,

3    paragraph 18.  Its argument is although that agreement was not

4    the formal ERPA that was contemplated in the Letter of Intent,

5    it was nonetheless a binding agreement since it involved a

6    meeting of the minds on all material terms save only the

7    subsequent execution of the more formal agreement embodying all

8    the terms that have been agreed on.

9         However, that e-mail exchange which, as I have said on

10   several occasions I am considering on this motion, it is

11   evident that the parties did not reach a meeting of the minds

12   on the two most crucial items, that is, price of the carbon

13   credits and quantity of the carbon credits.

14        E-mails disclose that on May 5, 2006, Lochlin of Korat

15   wrote to Cook of IFC with a proposal regarding a variety of

16   terms for the carbon credit sale including the price of 4.75

17   Euros and a quantity of 1.5 million tons.  On June 10, Lochlin

18   again e-mailed Cook stating that IFC would be willing to

19   purchase 1.75 million tons of carbon credits at a price of 4.25

20   Euros.  Lochlin, noting that these terms were different than

21   those he had earlier proposed, indicated "he would be happy to

22   convey IFC's offer to the rest of the Korat board."  In an

23   e-mail the same day, Cook confirmed IFC's willingness to agree

24   to a deal on those terms and stated that he "looked forward to

25   hearing back" from Lochlin in order for them to "finalize the

83R5IFCD                        decision

1  | terms."

2  |     It is abundantly clear from this exchange that the

3  | parties never agreed to a price and quantity combination.  What

4  | is apparent is that Korat made an offer that contained price

5  | terms and quantity terms, IFC counter-offered with different

6  | price and quantity terms which Korat agreed to take under

7  | advisement, and at no point in this exchange did Korat agree to

8  | the counter-offer.  There was no meeting of the minds on price

9  | and quantity and therefore the June agreement was not a binding

10 | contract as a matter of law.  See Tractebel Energy Marketing v.

11 | AEP Power Marketing, Inc., 487 F.3d 89, 95 (2d Cir. 2007).

12 |     IFC argues that the standard of review on a motion to

13 | dismiss requires that the Court assume that the e-mail exchange

14 | is only part of the correspondence between the parties.

15 | Therefore, I must deny the motion to dismiss on Count Two.  I

16 | do draw all permissible inferences from the allegations in the

17 | light most favorable to plaintiff but the complaint is clear

18 | that the e-mails attached as exhibits are the sole evidence of

19 | the June agreement.

20 |     Paragraph 18 states that Korat proposed terms in the

21 | May 26 e-mail and that "after further negotiations as to the

22 | quantity which would be sold to IFC, on June 10, 2005, IFC

23 | agreed with Korat on price quantity combination and accepted

24 | Korat's other terms.  A true and complete copy of the e-mail

25 | chain evidencing these discussions and the June agreement is

83R5IFCD                    decision

1   attached as Exhibit D."  That's Complaint paragraph 18.

2           So, the plaintiff itself is saying that the alleged

3   contract is contained solely within the e-mail exchanges that

4   make up Exhibit D.  It can't now allege in its motion papers

5   that there is more documents that constitute the contract.

6           Paragraph 19 of the complaint alleges the parties

7   subsequently executed a term sheet containing the price and

8   quantity terms agreed to in the June agreement.  IFC, however,

9   makes clear in its motion papers that the term sheet merely

10  reflected the agreement that it contends the parties reached in

11  the May to June 2005 e-mail exchange and is not itself the

12  contract IFC is seeking to enforce in this action.

13          Plaintiff's memorandum of law in opposition to

14  defendant's motion to dismiss at 18.  As previously noted, the

15  term sheet is not before the Court.  Given that the May to June

16  e-mail exchange does not evidence the formation of the binding

17  of a contract and that paragraph 18 of the complaint alleges

18  that the e-mails annexed as Exhibit D alone evidence the June

19  agreement, it is not permissible for the Court to infer from

20  paragraph 19 that the term sheet, regardless of what it

21  contained, recorded the parties' binding agreement on price and

22  quantity.  Moreover, such a reading is not plausible because

23  the allegations are that the parties continue to negotiate

24  regarding the price of the carbon credits as late as October

25  2006.  This belies IFC's contention that the September 2005

83R5IFCD                    decision

1    term sheet recorded the parties' final agreement on this term.

2         I have said I am not considering the term sheet which

3    is Exhibit B of Korat's motion papers on this Rule 12(b)(6)

4    motion since it is not part of the complaint.  And, I am not

5    going to.

6         Let me drop a metaphorical footnote and say even if I

7    were to consider that exhibit, it does not help IFC since the

8    actual term sheet which, by the way, is entitled to "Draft Term

9    Sheet" despite the fact that IFC refers to it as the Final Term

10   Sheet that "Draft Term Sheet" the only term sheet I have, makes

11   it clear that its terms are not binding and are subject to

12   contingencies, approvals, and further negotiations.  And I am

13   reading from it which is Exhibit B to Korat's motion to dismiss

14   the complaint.  It says on the cover of it:

15        "Important disclaimer:  This term sheet is not a

16   complete description of the proposed ERPA apparently being

17   discussed by IFC and Korat and does not constitute an offer or

18   a commitment by IFC or Korat, and no party shall have any

19   liability hereunder.  It is intended to serve only as a basis

20   for discussion of the major terms that would apply to the

21   Emission Reduction Purchase Agreement.  IFC's authority to

22   enter into the ERPA is contingent on the approval of IFC's

23   management, approval of the Netherlands, and the execution of

24   final documentation."  And it goes on.  So, again, even if I

25   were to consider it, it is clear that that's not a document

83R5IFCD                    decision

1   that constitutes a contract.

2        In sum, the May to June 2005 e-mail exchange does not

3   constitute an agreement for sale of the carbon credits and I am

4   dismissing Count Two.  Now let's go on to Count Four.

5        In Count Four, IFC seeks to recover its expenses and

6   attorneys' fees in connection with negotiations pursuant to the

7   Letter of Intent arrived at the ERPA as well as its legal fees

8   and expenses of this litigation pursuant to the Letter of

9   Intent's indemnification clause.  Because the language of this

10  clause does not make it clear that Korat intended to indemnify

11  IFC for legal fees and the expenses of this litigation, IFC's

12  claim is without merit.

13       Under New York Law "words in a contract are to be

14  construed is to achieve the apparent purpose of the parties."

15  Hooper Associates Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487,

16  491 (1989).  With indemnity clauses, "the word should be

17  restrained to the particular occasion and particular object

18  which the parties had in view to avoid reading into them the

19  duty which the parties did not intend to assume."  Accordingly

20  "when a party is under no legal duty to indemnify, a contract

21  assuming that obligation must be strictly construed."  Those

22  quotes are from Hooper Associates Ltd. v. AGS Computers at 365.

23  In addition, "attorneys' fees are the ordinary incidents of

24  litigation" and Court should not infer a parties' intention to

25  pay attorneys' fees as damages "unless the intention to do so

83R5IFCD                    decision

1    is unmistakably clear in the language of the contract."  That's

2    from Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199

3    (2d Cir. 2003) (quoting Hooper Associates, 74 N.Y.2d at 492).

4         The indemnification clause in the Letter of Intent

5    provides that Korat will indemnify IFC and hold it harmless

6    against "losses, claims, damages or liabilities" to which it or

7    various of its representatives may become subject in connection

8    with any of their activities contemplated under this Letter of

9    Intent."  It also required Korat to reimburse any "expenses

10   including legal expenses" that IFC incurred "in connection

11   therewith or with the investigation or defense thereof."

12        This language does not disclose that the parties

13   intended to permit IFC to recover the expenses it incurred in

14   the course of their negotiations.  Most significantly, the

15   clause is addressed to "losses, claims, damages or

16   liabilities," none of which could plausibly encompass IFC's

17   expenses in negotiating the ERPA.  Additionally, there is

18   nothing in the clause to suggest that the reference to IFC's

19   "activities as contemplated under this Letter of Intent" should

20   be read so broadly as to include the parties' negotiations in

21   addition to the sale of purchase of carbon credits.  Construing

22   this language narrowly, I find no indication that it was

23   intended to permit IFC to recover negotiation expenses.

24        In addition, a termination clause, which is a separate

25   provision of the Letter of Intent from the current

83R5IFCD                    decision

1    indemnification provision, provides that Korat will provide IFC

2    with $100,000 for appraisal, due diligence and environmental

3    assessment and legal expenses if it terminates the agreement

4    after the start of due diligence.  The parties' inclusion of

5    this liquidated damage provision which was clearly intended to

6    compensate IFC for expenses incurred during the negotiation

7    process belies IFC's intention that the parties also intended a

8    separate indemnification clause to serve the same purpose.

9           In other words, I'm finding that in terms of "legal

10   expenses" that IFC is not entitled to its attorneys' fees

11   because in New York Law attorneys' fees are generally borne by

12   each party and it is only when the language unmistakably holds

13   otherwise that you find that the legal fees are being shifted

14   from one side to the other.  And in terms of legal fees, I just

15   don't find that.

16          In terms of the negotiation expenses here which

17   apparently they mean their hiring of experts and other expenses

18   associated with the negotiation, I am finding that the normal

19   rules governing contractual interpretation are that those

20   expenses were being handled in the termination clause and the

21   indemnification clause is designed to handle indemnification by

22   Korat of IFC for expenses incurred by IFC in connection with

23   third-party claims.  That's not what we are dealing with here.

24   So, the indemnification clause really is for third-party

25   claims.  The termination clause handles payment to IFC

83R5IFCD                       decision

1   including negotiation expenses.  So, it is all handled under

2   the contract and I'm not going to find -- I don't think I can

3   under the law -- that the indemnification clause covers legal

4   fees or negotiation expenses.

5          I refer to the <u>Oscar Gruss</u> case, that's quite

6   persuasive.  In that case the plaintiff sought his attorney's

7   fees on the basis of an indemnity clause saying that the

8   defendant would reimburse the plaintiff for any claims,

9   liabilities or damages resulting from the plaintiff's

10  contractual service.  And, it also provided that the defendant

11  would "reimburse the plaintiff promptly for any legal or other

12  expenses reasonably incurred by it in connection with

13  investigating, preparing to defend or defending any lawsuits,

14  investigations, claims or other proceedings arising in any

15  manner out of or in connection with the rendering of services

16  by the plaintiff hereunder (including, without limitation, in

17  connection with the enforcement of this agreement in the

18  indemnification obligation set forth herein)."  <u>Oscar Gruss</u> at

19  199.

20         The <u>Gruss</u> Court construed the first of these

21  provisions to reach only "claims, liabilities and damages"

22  arising from third-party claims.  It then read the second

23  provision -- notwithstanding that provision references to

24  expenses incurred "without limitation, in connection with

25  enforcement of this agreement" to also apply only to

83R5IFCD                    decision

1    third-party claims.  That's <u>Oscar Gruss</u> 200.

2         The Second Circuit explained that other provisions of

3    the indemnification clause such as pertaining to the

4    plaintiff's obligation to notify the defendant of any claims

5    for which it would seek indemnification and the defendant's

6    obligation to obtain the plaintiff's consent before settling

7    any suits made sense only if the indemnification clause were

8    limited to third-party claims.  Just as the Second Circuit

9    construed very similar language in <u>Oscar Gruss</u>, I read the

10   indemnification clause here to apply only to third-party

11   claims.

12        Now, I understand that this clause does not contain

13   the notice and consent provisions that, in the <u>Gruss</u> case,

14   weighed in favor of limiting the indemnification clause to

15   third-party claims.  But, on the other hand, the clause here

16   does not contain anything like the countervailing language in

17   <u>Oscar Gruss</u> that provided for indemnification "without

18   limitation in connection with enforcement of this agreement."

19        As I said, both because under <u>Gruss</u> it is not

20   unmistakeably clear that the parties intended the indemnity

21   clause to apply to these claims and because of the existence of

22   the separate termination clause, I am finding that the legal

23   fees are not recoverable and the contractual language does not

24   permit recovery of negotiations of the expenses either.

25        So, IFC's claims to recover expenses incurred during

83R5IFCD                    decision

1    the negotiations and attorneys' fees and legal expenses fails

2    as a matter of law.  And, lastly, as correct, concedes the

3    termination payments are due under the termination clause.

4          All right.  I think that handles the motion.  Let's go

5    off the record now.

6          (Discussion off record)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25