# EXHIBIT B

**WHITE & CASE**LLP
Francis A. Vasquez, Jr. (FAV-1446)
Maria N. Lerner (Admission Pending)
Claire A. DeLelle (CAD-3527)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 626-3600
Facsimile: (202) 639-9355

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



INTERNATIONAL FINANCE CORPORATION,
not in its individual capacity, but solely as the
Trustee for the IFC-Netherlands Carbon Facility
2121 Pennsylvania Avenue, N.W.,
Washington, DC 20433,

        Plaintiff,

v.

KORAT WASTE TO ENERGY CO. LTD.
(a/k/a KHORAT WASTE TO ENERGY CO.)
571/11 Moo 3, Suranaree Industrial Zone,
Tambon NongBausala, Amphur Muang District,
Nakorn Ratchasima, 30000, Thailand,

        Defendant.

**07 CIV 5451**

Civil Case No.: _____

Judge: _____

**COMPLAINT**

Plaintiff International Finance Corporation ("IFC"), not in its individual capacity, but solely as the Trustee for the IFC-Netherlands Carbon Facility ("INCaF") and on behalf of the State of the Netherlands (acting through the Ministry of Housing, Spatial Planning and the Environment ("VROM")), and by and through its attorneys, White & Case LLP, alleges this Complaint against Defendant Korat Waste to Energy Co. Ltd. (also known as Khorat Waste to Energy Co.) ("Korat"), a corporation organized and existing under the laws of Thailand, as follows:

## NATURE OF THE ACTION

1.     This action arises from Korat's breach of the covenant of good faith and fair dealing implied in the Letter of Intent ("LoI") dated May 17, 2004, entered into between IFC, as Trustee for INCaF, and Korat, and Korat's breach of an agreement on price and quantity reached in June 2005.

2.     The purpose of the LoI was to negotiate the execution of an Emission Reduction Purchase Agreement ("ERPA").   The ERPA would govern the sale of certified emission reductions ("CERs"), commonly called "carbon credits," from Korat to the government of the Netherlands, on whose behalf IFC was negotiating with Korat.   CERs are greenhouse gas ("GHG") emission reductions that are created when a project (such as Korat's) reduces or avoids the emissions of GHGs, such as carbon dioxide or methane, relative to what would have been emitted under a 'business as usual' scenario.   The Kyoto Protocol, an international treaty committing the signatory nations to initiating steps to improve the quality of the earth's environment, permits the trading of CERs created by eligible projects to be used toward meeting national emission reduction targets.   Thus, the emerging, and rapidly growing, carbon credit market will become a key tool in meeting the objectives of the Kyoto Protocol.

3.     Because of IFC's ability to assess and manage long-term project and credit risk in emerging markets, IFC's objectives are to facilitate the development of a commercial carbon market by delivering financial products that achieve the value of carbon assets of developing country clients, and in its role as Trustee of INCaF, to assist the State of the Netherlands in meeting its commitment to mitigate climate change.

4.     Counsel for IFC drafted a proposed ERPA on the basis of a Term Sheet, which addressed all material terms, including price and quantity, upon which IFC and Korat had

reached agreement for the proposed ERPA. IFC sought on numerous occasions to finalize the language of the ERPA with Korat. To demonstrate its good faith in the negotiations, IFC was willing to increase the price Korat had agreed to accept, agree to advance certain of Korat's expenses to facilitate the continued negotiations, and agree to a number of additional concessions.

5.       During IFC's negotiations with Korat pursuant to the LoI, IFC incurred substantial fees and expenses.

6.       Despite having reached agreement as to all material terms of the proposed purchase, Korat delayed until it had secured the Thai government's approval and then purported to terminate the LoI by letter dated March 2, 2007. A true and complete copy of Korat's March 2, 2007, letter is attached as Exhibit A. Further, Korat has admitted that it was conducting negotiations with third-party purchasers prior to its attempted termination of the LoI, despite the LoI's exclusivity of dealings clause. A true and complete copy of an email from Ken Locklin (on behalf of Korat) to Peter Cook (of IFC), dated November 15, 2006, is attached as Exhibit B.

7.       Korat has breached the LoI, breached the covenant of good faith and fair dealing implied in the LoI, and breached its agreement to sell its CERs to INCaF. Accordingly, IFC seeks judgment compelling Korat to pay damages and lost expectancy damages for its breaches. IFC also seeks an order of indemnification of costs associated with the negotiations under the LoI, as well as the instant litigation.

**PARTIES**

8.       Plaintiff IFC is an international organization within the meaning of the International Organizations Immunities Act, 22 U.S.C. § 288, *et seq.* ("IOIA"). IFC is headquartered in Washington D.C. and is a legally and financially independent member of the

World Bank Group. IFC's membership comprises 179 countries and its goals include the promotion of economic development by encouraging the growth of productive enterprise and efficient capital markets in its member countries. IFC is the largest multilateral source of loan and equity financing for private sector projects in the developing world.

9.     IFC is the Trustee of INCaF, and brings this action solely in that capacity and upon the instructions and consent of the State of the Netherlands, acting through VROM. IFC is the proper party to assert these claims, pursuant to Fed. R. Civ. P. 17(a).

10.     Defendant Korat, also known as Khorat Waste to Energy Co., is a corporation organized and existing under the laws of Thailand. Upon information and belief, Korat maintains a principal place of business at 571/11 Moo 3, Suranaree Industrial Zone, Tambon NongBausala, Amphur Muang District, Nakorn Ratchasima, 30000, Thailand, and maintains, or has maintained in the past, another office at Suite # 2504, 25th Flr., The Millennia Tower, 62 Lang Suan Road, Lumpini, Pathumwan, Bangkok 10330, Thailand.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to the International Finance Corporation Act ("the "IFCA"), 22 U.S.C. 282f; the IOIA, 22 U.S.C. § 288a; and 28 U.S.C. § 1331. The IFCA provides that any action at law or in equity to which IFC is a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of any such action. Additionally, the IOIA provides this Court with subject-matter jurisdiction in that this action is brought by IFC, an international organization within the meaning of 22 U.S.C. § 288, with the capacity to institute legal proceedings in federal court pursuant to 22 U.S.C. § 288a. Thus, federal-question

jurisdiction exists pursuant to 28 U.S.C. § 1331 as this action is deemed to arise under the laws of the United States.

12.      Jurisdiction over the person and venue is proper in this district pursuant to the parties' forum selection clause set forth in Paragraph 16 of the LoI. Pursuant to Paragraph 16, Korat irrevocably agreed that any legal action, suit, or proceeding arising out of or relating to the LoI may be brought in the courts of the United States of America located in the Southern District of New York.

## FACTS COMMON TO ALL COUNTS

13.      Korat's project, located in Khorat, Thailand, involves the construction, ownership, operation, and financing of a methane recovery and waste-to-energy project to treat wastewater and capture biogas for ten years, to be delivered as a substitute for consumption of heavy fuel oil, and to be converted into electricity through combustion (thereby displacing grid-supplied electricity).  The project is expected to generate methane and carbon dioxide emission reductions.

14.      In early 2002, EcoSecurities Group plc. ("EcoSecurities") informed IFC about the Korat project as a potential project for INCaF.  Upon information and belief, at that time EcoSecurities was acting as an advisor/consultant to Korat, and was to be reimbursed a commission upon successful sale of CERs from the Korat project.  IFC, acting solely as the Trustee of INCaF, subsequently began discussions with Korat about the possibility of purchasing the CERs expected to be generated by Korat's project.

15.      IFC and Korat executed the LoI, for the purpose of entering into an ERPA, on May 20, 2004. The LoI anticipates a sale from Korat to VROM on behalf of the Netherlands of no less than two million, and no more than two and a half million, CERs at a price of EUR 3 per

CER for the period ending December 31, 2012. The LoI contains an exclusivity clause at Paragraph 5, stating in relevant part that Korat "hereby agrees that INCaF's and the Trustee's rights to purchase Emission Reductions up to the Contract Volume and any additional Emission Reductions the Trustee may agree to purchase shall be prior to the rights of any other party to acquire Emission Reductions generated from [Korat's] Project."

16.     To understand Korat's conduct throughout the history of the LoI, two motivating factors must be noted. First, throughout the period of negotiations between Korat and IFC, the market price for CERs, while fluctuating some, has been steadily increasing.[1] Korat's willingness or unwillingness to proceed with memorializing the agreement it reached with IFC correlates to the robustness of the market for CERs. Indeed, Korat has acknowledged as much, stating in an email from G. Pete Smith (on behalf of Korat) dated May 27, 2005, that Korat's "shareholders are very aware of . . . the extraordinary move in the market prices subsequent to our LoI (according to our sales agents EcoSecurities), and the commercial unacceptability of the resulting situation." A true and complete copy of the email evidencing this discussion is attached as Exhibit C.

17.     Second, Korat's conduct strongly suggests that it used the LoI as a *de facto* put option agreement, allowing it to take advantage of what IFC offered while shopping for another buyer at the same time, for two purposes: (a) to protect itself against regulatory risks inherent in its project, and (b) to protect itself against the risk of price fluctuations in the market. Throughout the negotiations, there was a risk that the Thai government would not approve

---

[1] *See, e.g.*, State and Trends of the Carbon Market 2006, a report by the World Bank and the International Emissions Trading Association, found at http://carbonfinance.org/docs/StateoftheCarbonMarket2006.pdf; State and Trends of the Carbon Market 2005, a report by the World Bank and the International Emissions Trading Association, found at http://carbonfinance.org/docs/CarbonMarketStudy2005.pdf; State and Trends of the Carbon Market 2004, a report by the World Bank and the International Emissions Trading Association, found at http://carbonfinance.org/docs/CarbonMarketStudy2004.pdf.

Korat's project. Without the Thai government's approval, Korat would be unable to register its credits with the United Nations Framework Convention on Climate Change, and thus be unable to sell them in the carbon market. Korat's LoI with IFC, and the prospect of IFC as the purchaser of Korat's credits, gave Korat additional credibility and leverage with the Thai government – the Thai government, being a member of IFC, would think more favorably of Korat's project, be more likely to approve it, and approve of it more quickly. Korat's use of the LoI as a put option agreement to mitigate against this regulatory risk is evidenced by the fact that it terminated the LoI less than a month after the Thai government ultimately approved of the project. Having received its regulatory approvals, Korat no longer needed IFC to lend it credibility. Additionally, throughout the negotiations, Korat used the LoI as a "fall-back" option, ensuring that it would be able to sell its credits at a certain price if it could not find a more profitable venture with another purchaser. Korat's use of the LoI as a put option agreement to mitigate against the risk of market fluctuations is evidenced by the fact that it approached IFC on several occasions to induce IFC to increase the price it was willing to pay to reflect the market price, yet never moved forward to consummate the transaction after IFC agreed to those increases. Furthermore, Korat has admitted negotiating with other third-party purchasers during the life of the LoI, which violates the exclusivity provisions in the LoI.

18.    On May 26, 2005, Korat proposed certain terms in anticipation of an ERPA, including sale of one and one-half million CERs to IFC for a price of EUR 4.75. Korat also insisted that it would not accept financial liability for failure to deliver CERs in any given year. Korat stated that "[i]f these terms are broadly acceptable to IFC, we are now prepared to move quickly to finalize an updated Term Sheet which reflects them, and proceed with the completion of the balance of the purchase and sale documentation. Look forward to moving ahead

7

promptly." After further negotiations as to the quantity which would be sold to IFC, on June 10, 2005, IFC agreed with Korat on a price/quantity combination of EUR 4.75 for one and three-quarter million CERs and accepted Korat's other terms. A true and complete copy of the email chain evidencing these discussions and the June agreement is attached as Exhibit D.

19. On September 21, 2005, the final Term Sheet, which now reflected the new price and quantity combination for CERs that IFC and Korat had agreed to in June, was agreed upon as well. IFC hence proceeded with drafting the ERPA. The parties envisioned that the ERPA would be completed by the end of the year in accordance with the terms reflected in the Term Sheet. On October 13, 2005, IFC sent a draft ERPA to Korat that reflected the new price and quantity combination, as well as all other terms contained in the final Term Sheet.

20. Despite its June agreement and other representations, Korat began dragging its feet in completing the ERPA. Korat initially provided only very general comments and alleged "policy concerns" on the ERPA (e.g., it was too long, or had too many covenants), without providing specific feedback or language redrafting proposals. In response to IFC's request for additional comments, Korat provided a memorandum of "Guidelines for Redraft of [Korat]/IFC ERPA" ("Guidelines") on November 8, 2005. Korat's Guidelines continue to discuss Korat's "policy concerns," and call for additional terms not agreed to in the final Term Sheet that are above and beyond customary market terms for such agreements. Korat's Guidelines further demonstrate Korat's attempt to force IFC to assume all risks associated with its project, while it continued to keep its options open in the event that a better offer came along.

21. IFC provided comments to Korat on its Guidelines on November 9, 2005 (the very next day), and suggested a meeting to discuss the proposed ERPA. Korat refused to meet, however, and instead sent an email to IFC on November 15, 2005, stating that it "[did] not

8

believe we have made sufficient progress working around the very material and fundamental difference in our positions . . . to justify further discussions at this time." In subsequent discussions, Korat continued to merely reiterate its general dissatisfaction with the then-existing draft of the ERPA, without providing additional specific feedback. Numerous attempts to follow up with Korat to discuss drafting of the ERPA were ignored.

22.     Tellingly, during this same time (the latter half of 2005), the price of carbon credits had risen, which gave Korat further incentive to avoid completing the ERPA under the agreed upon pricing terms.

23.     On December 13, 2005, IFC sent Korat an email offering to redraft the ERPA. IFC expressed frustration with the difficulty it faced communicating with Korat, and requested open lines of communication. IFC requested a response by December 15, 2005.

24.     On December 15, 2005, Korat requested additional time to respond, and on December 17, 2005, sent an email to IFC stating that any redrafted ERPA should be substantially different from the original. Korat additionally requested that IFC inform them if IFC "know[s] already that the commercial issues [Korat] raised . . . cannot be resolved or eliminated in a redrafted ERPA."

25.     In its efforts to consummate the transaction, IFC retained English counsel at considerable expense to undertake a review of the ERPA. IFC subsequently sent Korat a revised ERPA. Korat never provided comments on this revised draft.

26.     On July 14, 2006, Korat requested that IFC consider a further increase in the price it was willing to pay for the CERs, admitting that despite its prior agreement as to price and quantity and its alleged problems with the ERPA, it was really only interested in renegotiating the price. As Korat stated in an email from that date, its "Board members consider price to be

the central issue . . . If the price issue can be resolved, then we will discuss other details in the ERPA." In response to a query by IFC of what price levels Korat was seeking, Korat stated that it is "currently (in the last week) seeing unsolicited price offers of $15 for PS ["prior to start," or generated before registration] CERs, and $9-10 for 2007+ vintage CERs . . ." A true and complete copy of the emails evidencing this discussion are attached at Exhibits E and F.

27.    On September 23, 2006, Korat informed IFC that it did not wish to incur additional legal expenses in light of the recent coup in Thailand. In response, to demonstrate its good faith in seeking to consummate this transaction, IFC discussed the following revised terms during a meeting with Korat representatives on October 17, 2006: (a) a higher price for the CERs of EUR 7.25; (b) an advance by IFC of certain of Korat's legal expenses, which it would recoup only if the ERPA was executed; (c) an agreement to purchase an additional 250,000 CERs after 2012 at the same price of EUR 7.25 per CER; (d) assistance in obtaining approval from the Thai government; and (e) assistance with the sale of verified emission reductions if Korat's project was not registered in time to qualify for CERs generated prior to registration.

28.    On October 19, 2006, Korat informed IFC that "potential buyers have approached us or our Board members with indications of interest or CER purchase offers from time to time. . . We view these to be attractive offers . . ." In response, IFC send Korat an email on November 10, 2006, expressing a willingness to go forward with a new proposal despite the uncertainty of the political situation in Thailand. IFC further indicated that it believes "that the LoI of May 2004 does not give [Korat] the ability to treat IFC/INCaF as a put option and engage with us intermittently and continue to defer signing the ERPA to gauge how the market plays out." *See* Exhibit B.

29.    Despite repeated requests and deadlines, Korat never provided a substantive response to the enhanced terms described in the November 10, 2006, email. Instead by email dated November 15, 2006, from Ken Locklin (on behalf of Korat) to Peter Cook (of IFC), Korat stated that "at no point has it been our intention to 'play the market' in our discussions with IFC," yet freely admitted that it was negotiating with third parties — in violation of the LoI. *See* Exhibit B ("we also have *received and discussed* offers from third parties during that time . . .") (emphasis added).

30.    On or about February 8, 2007, the Thai government approved Korat's application that would allow it to register its project with the United Nations Framework Convention on Climate Change. Shortly thereafter, on March 2, 2007, Korat sent IFC a notice purportedly terminating the LoI as of March 17, 2007.

31.    Throughout the negotiations, IFC has acted in good faith, making concessions on multiple occasions in order to address Korat's concerns and to move the negotiations along. IFC twice agreed to adjust the price to reflect changes in the market, even though Korat was responsible for the delays in completing the ERPA; IFC agreed to aid Korat in obtaining approval from the Thai government; IFC agreed to advance Korat certain expenses to permit it to continue the negotiations, recognizing that it may not recoup those expenses if an ERPA was never reached; IFC assumed the risks related to possible under-delivery of CERs by Korat; IFC redrafted – at considerable expense – the first draft ERPA (which contained the terms that Korat and IFC had agreed to in principle in the final Term Sheet) at Korat's request, to address Korat's alleged "policy concerns"; and IFC continuously agreed to assume most if not all of the risks associated with Korat's project and the consummation of the proposed ERPA. Despite these

11

efforts, Korat did nothing but stall, hedge its bets, and attempt to extract additional price concessions from IFC.

32.    IFC responded to Korat's March 2, 2007, termination notice by letter on March 14, 2007, stating that the termination notice was invalid and requesting continued negotiations with Korat to complete the transaction in good faith.

33.    On or about March 29, 2007, Korat requested registration of its project with the Executive Board of the United Nations Framework Convention on Climate Change. The project must undergo a review during the period from April 19, 2007, through June 15, 2007, before being registered. The documents submitted by Korat name Korat and EcoSecurities as a Project Participants. Upon information and belief, EcoSecurities may have become a purchaser of carbon credits from the Korat project, rather than a mere consultant, advisor, or sales agent, and has accumulated a portfolio of carbon credits on its own.

34.    The parties had subsequent communications, but Korat refuses to meet with IFC to discuss this dispute prior to June 18, 2007, i.e., *after* the end of the registration review period. In the meantime, Korat also refuses to name IFC as an additional Project Participant in spite of IFC's request.

35.    As a direct and proximate result of Korat's acts and omissions, including Korat's breach of the LoI, breach of the June 2005 agreement, and breach of the covenant of good faith and fair dealing implied in the LoI, IFC has incurred substantial monetary damages.

36.    IFC has duly performed and fulfilled all its obligations under the LoI.

37.    All other conditions precedent to the enforcement of IFC's rights have been satisfied.

## CLAIMS FOR RELIEF

### Count One

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

38.    The allegations contained in paragraphs 1 through 37 above are incorporated herein by reference.

39.    Korat and IFC executed a valid and enforceable LoI on May 20, 2004.

40.    In reliance on the provisions of the LoI, and upon other representations and warranties of Korat, IFC negotiated in good faith with Korat to consummate the transaction contemplated by the LoI.

41.    The LoI required Korat to "provide, at its own cost and in a *timely fashion*, all relevant information and assistance reasonably requested" by IFC. LoI at ¶ 14 (emphasis added). Korat violated this provision of the LoI by repeatedly ignoring numerous attempts by IFC to obtain information, to obtain Korat's position on various proposals, and to move the negotiations along. Upon information and belief, Korat had no intention of executing an ERPA with IFC, and was instead using its negotiations, and purposely delaying and obstructing those negotiations, to obtain leverage in the marketplace. In effect, Korat was using the negotiations as a put option agreement, allowing it to take advantage of what IFC offered while shopping for another buyer at the same time.

42.    Despite having agreed in principle on all material terms in the final Term Sheet of September 21, 2005, Korat failed and refused, without legal cause or justification, to negotiate with IFC in good faith to complete the proposed ERPA. Korat failed to use its best efforts to achieve the goal of the LoI, which was the execution of an ERPA between Korat and IFC.

43. Korat also violated the exclusivity provision contained in Paragraph 5 of the LoI by conducting negotiations, to which it has admitted, with third party purchasers prior to the termination of the LoI. *See* Exhibit B. Korat was not entitled to negotiate with third parties until it presented additional terms which IFC rejected or failed to accept. Instead of proceeding in this manner, as outlined in the LoI, Korat breached the LoI by beginning negotiations with third party purchasers. LoI at ¶ 5.

44. In taking these actions, Korat breached the LoI's implied covenant of good faith and fair dealing.

45. As a direct and proximate result of the foregoing acts and omissions of Korat, IFC has incurred damages.

## Count Two

### (Breach of Contract)

46. The allegations contained in paragraphs 1 through 45 above are incorporated herein by reference.

47. Korat offered certain price and quantity terms for the sale of the CERs in May-June 2005. IFC accepted that offer.

48. Rather than proceeding forward with the execution of the agreement under the terms to which IFC had agreed, Korat improperly delayed execution of the full document and purported to terminate the LoI.

49. In taking these actions, Korat breached the LoI by refusing to complete the ERPA on the agreed upon terms.

50. As a direct and proximate result of the foregoing acts and omissions of Korat, IFC has incurred damages.

## Count Three

### (Claim in the Alternative for Termination Payments)

51.    The allegations contained in paragraphs 1 through 50 above are incorporated herein by reference.

52.    Paragraph 7, which survives termination of the LoI pursuant to Paragraph 7(c), of the LoI provides for certain penalties upon termination of the LoI.  In pertinent part, termination with or without cause by Korat triggers the penalties listed in Paragraph 7(d).  Additional penalties are provided under Paragraph 7(g) if Korat terminates the LoI and, within one year of the effective date of termination, enters into an agreement with another buyer to sell the Emission Reductions that were the subject of the LoI.

53.    Korat sent IFC a letter on March 2, 2007, indicating its intent to terminate the LoI on March 17, 2007.

54.    Korat has requested registration of its project with the United Nations Framework Convention on Climate Change, triggering a review period of April 19, 2007, through June 15, 2007, and has identified EcoSecurities as a Project Participant.  Upon information and belief, there is an agreement between Korat and EcoSecurities for the purchase of at least a portion of the CERs generated by the Korat project.

55.    Korat is obligated to pay IFC the penalties indicated in Paragraphs 7(d) and 7(g) of the LoI.

## Count Four

### (Indemnification)

56.    The allegations contained in paragraphs 1 through 55 above are incorporated herein by reference

57.    Paragraph 12 of the LoI, which survives termination of the LoI pursuant to Paragraph 7(c), requires Korat to indemnify IFC for "any losses, claims, damages or liabilities" to which IFC may become subject in connection with IFC's "activities as contemplated under this Letter Agreement." This indemnification clause requires Korat to reimburse IFC for any expenses, including legal expenses, incurred in connection with activities contemplated under the Letter Agreement "or with the investigation or defense thereof."

58.    As a result of Korat's actions, IFC has incurred substantial damages, fees and expenses, including but not limited to damages for Korat's failure to consummate its agreement, and legal expenses.

59.    Korat is obligated to pay the fees and expenses incurred by IFC in connection with the negotiations under the LoI, as well as fees and expenses incurred in this litigation, pursuant to Paragraph 12 of the LoI.

## PRAYER FOR RELIEF

WHEREFORE, International Finance Corporation, acting solely in its capacity as Trustee of the INCaF, respectfully requests that this Court enter judgment in its favor as follows:

### As to Count One

A.    Awarding IFC damages of not less than $360,000, or an amount to be proven at trial, and replacement costs for the CERs of not less than $18.3 million;

### As to Count Two

B.    Awarding IFC damages of not less than $360,000, or an amount to be proven at trial, and replacement costs for the CERs of not less than $18.3 million;

### As to Count Three

C.    Awarding IFC penalties of not less than $425,000 pursuant to Paragraphs 7(d) and 7(g) of the LoI;

### As to Count Four

D.    Awarding IFC damages, fees, and expenses of not less than $18.66 million, or an amount to be proven at trial, and all fees, costs, and expenses incurred in the course of this litigation;

### As to All Counts

E.    Awarding IFC pre-judgment and post-judgment interest on all monetary awards;

F.    Awarding such other and further relief as the Court may deem just and proper.


Dated: June 8, 2007                              Respectfully submitted,

                                                 WHITE & CASE LLP

                                                 _____
                                                 Francis A. Vasquez, Jr. (FAV-1446)
                                                 Maria N. Lerner (Admission Pending)
                                                 Claire A. DeLelle (CAD-3527)
                                                 701 Thirteenth Street, N.W.
                                                 Washington, D.C. 20005
                                                 Telephone: (202) 626-3600
                                                 Facsimile: (202) 639-9355

                                                 *Attorneys for Plaintiff*
                                                 *International Finance Corporation*

17