# EXHIBIT 7

83R5IFCD                      decision

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    INTERNATIONAL FINANCE
     CORPORATION,
4
                    Plaintiff,
5
                 v.                          07 Civ. 5451 (SHS)
6
     KORAT WASTE TO ENERGY CO.,
7    LTD.,

8                    Defendant.

9    ------------------------------x

10                                       March 27, 2008
                                         12:10 p.m.
11   Before:

12                   HON. SIDNEY H. STEIN,

13                                       District Judge

14                   APPEARANCES

15   WHITE & CASE, L.L.P.
          Attorneys for Plaintiff
16   BY:  FRANK A. VASQUEZ, JR.

17   WALLACE KING DOMIKE & REISKIN, P.L.L.C.
          Attorneys for Defendant
18   BY:  ANTHONY FRAZIER KING
          -and-
19   MORVILLO, ABRAMOWITZ, GRAND, IASON, ANELLO & BOHRER, P.C.
          Attorneys for Defendant
20   BY:  THOMAS M. KEANE

21

22

23

24

25

83R5IFCD                          decision

1                (Case called)

2                THE DEPUTY CLERK:  Counsel, please state your names

3     for the record.

4                MR. VASQUEZ:  Frank Vasquez of White & Case.  I'm here

5     for plaintiff IFC.

6                THE COURT:  Good morning, sir.

7                MR. VASQUEZ:  Good morning.

8                MR. KING:  Anthony King of Wallace, King for

9     defendant, Korat Waste Energy.

10               MR. KEANE:  And Thomas Keane of Morvillo, Abramowitz

11    also for Korat Waste Energy.

12               THE COURT:  Good morning.  Won't all of you please be

13    seated?

14               What I wanted to do this morning is three-fold:

15    First, to read into the record a decision granting in part and

16    denying in part Korat's motion to dismiss, and I will then

17    enter a minute order that simply says for the reasons set forth

18    on the record, the motion to dismiss is granted in part and

19    denied in part.  Then I wanted to see how I can assist the

20    parties and partially debrief a discovery dispute.  And, third,

21    I want to see if we can set up a track for attempting to

22    resolve it.

23               My decision is as follows:

24               Plaintiff IFC is an international organization

25    headquartered in Washington, D.C. and brings this action in its

83R5IFCD                      decision

1   capacity as trustee of the IFC Netherlands carbon facility,

2   which I will refer to as INCaF.

3           The action is brought against defendant Korat Waste

4   Energy Company limited, which I will refer to as Korat, that's

5   a corporation organized under the laws of Thailand.  On May 17,

6   2004, IFC and Korat executed a letter of intent which I will

7   also refer to as the LOI, documenting their intention to

8   negotiate Korat's sale of certified emission reductions, which

9   I will refer to either as CERs or by their common name, carbon

10  credits, to IFC.  In other words, the sale of the carbon

11  credits was going to be from Korat to IFC.  The parties never

12  finalized their negotiations and on March 2, 2007, Korat

13  exercised its option to terminate the letter of intent.  IFC

14  then commenced this action for breach of the implied covenant

15  of good faith and fair dealing, breach of contract, termination

16  payment due under the terms of the letter of intent and

17  reimbursement of various expenses incurred during negotiations

18  and in this litigation.

19          Korat has now moved, pursuant to Rule 12(b)(6), to

20  dismiss each of the four claims asserted in the complaint

21  except as to the claim for a termination payment as to which it

22  concedes liability.

23          As I will explain in this opinion, the allegations in

24  the complaint and the documents attached to the complaint as

25  exhibits do not support IFC's contention that the parties

83R5IFCD                    decision

1    reached agreement on all material terms for sale of the carbon

2    credits.  IFC has thus failed to state a claim for breach of

3    contract but it has sufficiently stated a claim for breach of

4    covenant of good faith and fair dealing implicit in the letter

5    of intent by alleging that Korat negotiated for sale of the

6    carbon credits in bad faith.

7            Finally, IFC's claim for negotiation expenses and

8    attorney's fees fails as a matter of law because the language

9    of the letter of intent's indemnification clause does not

10   contain an intention to permit recovery of those expenses.

11           In deciding a motion to dismiss, pursuant to Rule

12   12(b)(6) I am to consider the allegations in the complaint and

13   documents that are attached to the complaint as exhibits or are

14   incorporated in the complaint by reference and any document

15   upon which the complaint "solely relies and which is integral

16   to it."  Roth v. Jennings, 489 F.3d 499, 509, (2d Cir. 2007).

17   I accept the factual allegations, as I must, that are set forth

18   in the complaint, as true, and I must draw the inferences from

19   those allegations in the light most favorable to plaintiff.

20   However, if the complaint contains assertions regarding the

21   contents of the document that are contradicted by the document

22   itself, the document controls.  Roth v. Jennings, at 510 to

23   511.

24           Here the complaint has six exhibits, all of which I am

25   considering in deciding the motion to dismiss and, in addition,

5

83R5IFCD                            decision

1   IFC concedes that the letter of intent which Korat attaches to

2   the motion to dismiss is integral to the complaint and

3   appropriate to consider.  That concession, as I think is

4   appropriate, is in IFC's memorandum in opposition to the motion

5   at page 8.  Therefore, I will consider on this motion the

6   complaint, the six exhibits attached to the complaint and, on

7   consent, the letter of intent.

8       On the other hand, the complaint makes only fleeting

9   references to the document that's entitled "Draft Term Sheet"

10  that Korat also attaches to its motion to dismiss.  Fleeting

11  references are in paragraph 19 of the complaint.  Because they

12  do characterize them as just tangential references, the "Draft

13  Term Sheet" is not integral to the complaint and I'm not

14  considering it on this 12(b)(6) motion.  You will see even were

15  I to consider it, the outcome would still be the same.

16      The following facts were taken from the complaint and

17  the exhibits to the complaint and the letter of intent:

18      IFC is an independent member of the World Bank Group

19  with a membership of 179 countries and its goals include the

20  promotion of economic development by encouraging the growth of

21  productive enterprises and efficient capital markets in its

22  member countries.  And, it also serves as a trustee of INCaF.

23  Complaint, paragraphs 8 and 9.

24      Korat intends to build and operate a methane recovery

25  and waste energy facility in Khorat, Thailand.  For a period of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

83R5IFCD                        decision

1    10 years, this facility will treat wastewater and capture bio

2    gas which will be used in place of heavy fuel oil to generate

3    electricity.   The project is expected to generate carbon

4    credits which are credits created when a facility reduces the

5    amount of greenhouse gas emissions that otherwise would have

6    been produced.   Under the terms of the Kyoto protocol, an

7    international and environmental treaty, signatory nations may

8    trade carbon credits in order to meet national targets for

9    greenhouse gas emissions.   That's in the complaint at

10   paragraphs 2 and 13.

11            In early 2002, EcoSecurities Group PLC suggested

12   Korat's project to IFC as a source of carbon credits that the

13   Netherlands could use to meet its emissions targets.   At that

14   time, EcoSecurities was an advisor and consultant to Korat.

15   IFC subsequently entered into the negotiations with Korat in

16   its capacity as a trustee of INCaF and, on May 20th, 2004, IFC

17   and Korat executed the Letter of Intent in which they expressed

18   their intention to negotiate an Emission Reduction Purchase

19   Agreement -- I will also call that the ERPA -- governing the

20   sale of carbon credits.   That is the complaint at paragraphs 14

21   and 15 and the Letter of Intent dated May 17, 2004 at page 1.

22            The purpose of the Letter of Intent was to "set forth

23   the basis on which IFC will work with Korat in preparing and

24   executing purchase of" the carbon credits generated by Korat's

25   project.   The Letter of Intent stated INCaF's "preliminary

83R5IFCD                          decision

1    expectation" to pay three Euros per metric ton of carbon

2    credits and to purchase between 2 and 2.25 million metric tons

3    of carbon credits during the period ending December 31, 2012.

4    The Letter of Intent expressly stated, however, that IFC would

5    not be bound to purchase any carbon credits unless and until

6    IFC and Korat had executed an ERPA and the terms of that ERPA

7    had been satisfied.  All of those facts are taken from the

8    Letter of Intent in the complaint at paragraph 15.

9            The Letter of Intent contains the following relevant

10   provisions.  Paragraph 4 confers "preferential status" on IFC

11   by permitting Korat to enter into agreements with third-parties

12   for the sale of carbon credits only after it had first offered

13   them to IFC.  Paragraph 7(a)(i) permitted either party to

14   terminate the agreement on 15 days' notice, and paragraph 7(d)

15   provided that in the event that Korat was the party elected to

16   terminate, it would be required to pay IFC $25,000 for expenses

17   incurred before due diligence and an additional amount up to

18   $100,000 for IFC's appraisal, due diligence, and environmental

19   assessment and legal expenses.  Paragraph 7(g) provides that

20   Korat would be liable for an additional $300,000 payment if it

21   were to enter into an agreement for the sale of carbon credits

22   with a third-party within one year of electing to terminate the

23   agreement.  That's all from the Letter of Intent in the

24   complaint at paragraph 15.

25            Finally, paragraph 12 of the Letter of Intent labeled

83R5IFCD                    decision

1    "Indemnity" provided that Korat would hold IFC "harmless

2    against any losses, claims, damages or liabilities to which it

3    or its governors, directors, employees, agents, consultants or

4    legal counsel might become subject in connection with any of

5    their activities as contemplated under" the Letter of Intent,

6    and that Korat would reimburse IFC "for any expenses including

7    legal expenses" IFC incurred "in connection therewith or with

8    the investigation or in defense thereof" except in the case of

9    gross negligence or willful misconduct.

10          In a May 26, 2005 e-mail to IFC's Peter Cook, which is

11   approximately one year after the Letter of Intent was entered

12   into, Korat's Ken Lochlin proposed to sell IFC 1.5 million tons

13   of carbon credits at a price of 4.75 Euros per ton, subject to

14   a number of conditions regarding such issues as IFC's priority

15   right to purchase additional carbon credits; Korat's liability

16   for failure to deliver the full amount of carbon credits

17   requested or for selling IFC's carbon credits to third-parties;

18   and an extension of termination date in the event that Korat

19   failed to deliver all of the carbon credits promised.

20          Lochlin stated "if these terms are broadly acceptable

21   to IFC, we are now prepared to move quickly to finalize an

22   updated term sheet which reflects them and proceed with the

23   completion of the balancing of the purchase and sale

24   documentation."   That is the complaint, paragraph 18, and the

25   e-mail from Lochlin to Cook dated May 26, 2005 which is Exhibit

83R5IFCD                          decision

1    D in the complaint.

2           On June 10, 2005, Lochlin again e-mailed IFC's Cook

3    and stated that he understood from communications between the

4    parties that "IFC would have an interest in an agreement to

5    purchase 1.75 million tons of Korat carbon credits at a price

6    of 4.25 Euros per ton from the 2006 vintage onward, on terms

7    otherwise in keeping with Korat's last proposal."  Lochlin

8    stated that "of course this is both a higher purchase price and

9    a lower proposed purchase price than we have previously

10   offered.  However, if you are in a position to confirm IFC's

11   interest in such an arrangement, subject to documentation,

12   etc., I will be happy to convey this to the rest of the board

13   on a call we have already scheduled over this weekend, and

14   hopefully revert to a formal response from our side on Monday."

15   That's the June 10, 2005 e-mail from Lochlin to Cook also part

16   of Exhibit D.

17          That same day, June 10, 2005, IFC's Cook responded in

18   an e-mail by stating, "I can confirm that IFC would agree to a

19   deal on those terms.  I look forward to hearing back from you

20   so we can finalize the terms."  Cook added that, "provided

21   Korat's board agrees, I would like to move forward quickly."

22   That's the June 10, 2005 Cook to Lochlin e-mail, also part of

23   Exhibit D.

24          Three and a half months later, on September 21, 2005,

25   according to the complaint, IFC and Korat agreed on a "Final

83R5IFCD                        decision

1    Term Sheet" reflecting the price and quantity combination

2    discussed in the May through June 2005 e-mail exchange.  IFC

3    then began drafting an ERPA which the parties envisioned would

4    be completed by the end of 2005.

5         October 13, 2005 IFC forwarded a draft ERPA to Korat

6    and, in response, Korat expressed what it referred to as

7    "policy concerns" including that the draft was too long and

8    contained too many covenants.  On November 8, 2005, after IFC

9    asked Korat to elaborate on these concerns, Korat provided a

10   memorandum entitled "guidelines for redraft of Korat IFC ERPA."

11   In this memorandum, Korat reiterated its concerns and requested

12   additional terms not in that term sheet.  All of this is from

13   the complaint at paragraphs 19 and 20.

14        IFC provided comments on Korat's memorandum the

15   following day, November 9, 2005 and Korat responded on November

16   15th informing IFC that it did not believe "sufficient

17   progress" had been made in resolving the parties' "very

18   material and fundamental differences and their positions."

19   Korat thereafter ignored IFC's attempts to discuss revising the

20   ERPA.  On December 13, 2005, IFC sent Korat an e-mail offering

21   to redraft the ERPA, and four days later Korat responded that

22   the new ERPA would have to be substantially different from the

23   original.  IFC thereafter retained English counsel, at what it

24   alleges was considerable expense, to undertake a review of the

25   ERPA.  It then sent Korat a revised version.  Korat never

83R5IFCD                     decision

1  responded to that draft.  Complaint, paragraphs 121, 23, 25.

2          In a July 14, 2006 e-mail, Korat's G. Pete Smith asked

3  IFC's Cook to consider paying a higher price for the carbon

4  credits explaining that "because Korat's board members consider

5  price to be the central issue, we would like to request from

6  you what price or price range IFC can now consider."  Smith

7  told Cook that although "IFC's might not be as high as current

8  commercial prices, there is willingness to consider a lower

9  price based on the financial strength by IFC relative to other

10 potential buyers."  Smith stated that "if the price issue can

11 be resolved, then we will discuss other details in the ERPA."

12         At an October 17, 2006 meeting, IFC proposed to pay

13 7.25 Euros per carbon credit to purchase an additional 250,000

14 carbon credits after 2012 at that same price.  It also offered

15 to help Korat obtain the Thai government's approval for the

16 project and to advance Korat's legal expenses which it would

17 recoup only if the ERPA were executed.  Complaint paragraphs 26

18 and 27 and e-mail from Smith to Cook dated July 14, 2006 which

19 is Exhibit E to the complaint.

20         In an e-mail to IFC dated October 19th, 2006, two days

21 after this meeting, Korat's Lochlin took issue with IFC's

22 statement that Korat was "dragging its feet" in the

23 negotiations.  Lochlin stated that although other parties had

24 offered to pay Korat between $10 and $11.50 per carbon credit

25 which Korat described as "attractive" offers, "the

1  acceptability of the final determination will not be based

2  solely on the offered price levels or delivery tonnages but

3  will also be impacted by the specifics of the ERPA

4  documentation."  Lochlin explained that IFC's draft ERPA was

5  two or three times longer than the other ERPAs that IFC had

6  previously executed and that while he appreciated IFC's

7  willingness to address unintended potential problems, Korat

8  identified in the draft he remained concerned about how the

9  ERPA's terms "might impact Korat's future commercial

10  operations."  This is from the October 19th, 2006 e-mail from

11  Lochlin to Widge and Cook, Exhibit B to the complaint.

12          In an e-mail to Korat's Lochlin and Smith on November

13  10, 2006, Cook set forth what he described as "IFC's final good

14  faith attempt to deal with Korat's remaining concerns" which he

15  understood Korat would "discuss with its board and revert

16  promptly thereafter."  That's Exhibit B, it is the Cook to

17  Lochlin and Smith e-mail dated November 10, 2006.  Cook also

18  stated that "we note with interest your frank admissions

19  indicating that you have been discussing prices and terms for

20  the Korat carbon credits that are the subject of the binding

21  commercial terms in the IFC/Korat Letter of Intent.  We believe

22  that the Letter of Intent of May 2004 does not give Korat the

23  ability to treat IFC and INCaF as a put option and engage with

24  us intermittently and continue to defer signing the ERPA to

25  gauge how the market plays out."  Cook asked Korat to respond

83R5IFCD                               decision

1   to its terms by November 30, 2006.  That's all from the

2   November 10, 2006 e-mail.

3           In response, on November 15, 2006, Lochlin responded

4   to Cook's e-mail and stated, "at no point has it been our

5   intention to play the market in our discussions with IFC

6   consistent with the May 2004 LOI.  We have been negotiating in

7   good faith with IFC for two and a half years through multiple

8   negotiations."  Lochlin also noted that Korat's statements

9   regarding the offers it had received from third-parties was "a

10  further indication of our frank approach and our good faith

11  efforts to reach commercially and legally acceptable terms with

12  IFC pursuant to the LOI."  He promised that Korat would

13  complete its internal review of discussions with board members

14  promptly.  All of that is from the November 15, 2006 e-mail

15  which is Exhibit B.

16          On February 8, 2007, the Thai government approved

17  Korat's application to register its project with the United

18  Nations Framework Convention on Climate Change.  Without this

19  approval, Korat would have been unable to sell its carbon

20  credits on the carbon market.  That's complaint paragraph 17

21  and 30.

22          A month later, March 2nd, 2007, Korat sent IFC notice

23  that it was invoking its right to terminate the Letter of

24  Intent as of March 17, 2007, and in that notice Korat stated

25  that since the execution of the Letter of Intent, "the market

83R5IFCD                         decision

1    for CER and CER prices in particular have changed considerably.

2    Yet, the terms in the current draft ERPA provided by IFC still

3    fail to reflect market conditions for this type of transaction.

4    For these reasons, it has been concluded that it is not

5    worthwhile for Korat to continue to devote resources to the

6    negotiations." That's Exhibit A to the complaint.  Korat

7    acknowledged that its decision to terminate the agreement

8    triggered its obligation to make a termination payment pursuant

9    to paragraph 7(d) of the Letter of Intent and it requests that

10   an invoice of IFC's services.

11        On March 29, 2007, Korat registered its project with

12   the executive board of the U.N. Framework Convention on Climate

13   Change.  Complaint paragraph 33 and its supporting documents.

14        Korat identified both itself and EcoSecurities as

15   "project participants."  IFC alleges that EcoSecurities, which

16   had simply been Korat's advisor, had "accumulated a portfolio

17   of carbon credits on its own" and speculates that EcoSecurities

18   had purchased some of those credits from the Korat project.

19   Complaint, paragraph 33.

20        IFC asserts four causes of action in the complaint.

21   First, IFC alleges that Korat breached the covenant of good

22   faith and fair dealing, instinct in the May 20, 2004 Letter of

23   Intent by failing to negotiate good faith toward a final ERPA.

24   IFC alleges that Korat had no intention of executing a final

25   agreement and used the Letter of Intent as a "put option

83R5IFCD                    decision

1    agreement" or fallback to obtain leverage in the marketplace

2    while shopping for other buyers.  IFC also alleges that Korat

3    entered into the Letter of Intent because the credibility it

4    gained from a relationship of IFC would help persuade the Thai

5    government to approve the project.  Complaint, paragraph 16 and

6    41 and 42.

7            IFC also alleges that in the May through June 2005

8    e-mail exchange, IFC and Korat reached a binding agreement as

9    to all the material terms of its sale of the carbon credits.

10   Its second cause of action asserts that Korat's failure to

11   negotiate toward final ERPA constitutes a breach of the

12   contract which IFC finds in the May through June 2005 e-mails.

13   All right?

14           So, cause one is breach of the covenant of good faith

15   and fair dealing and cause of action two is breach of the

16   contract which is the May through June '05 e-mails.

17           The third cause of action is a claim that Korat is

18   liable for termination payment pursuant both to paragraph 7(d)

19   of the Letter of Intent because of its election to terminate

20   the agreement and, again, that's conceded by Korat, but it also

21   claims it is entitled to a payment pursuant to 7(g) because

22   Korat entered into an agreement with a third-party for the sale

23   of the carbon credits within one year of termination.

24   Complaint, paragraphs 52 to 54.

25           In the fourth cause of action, IFC seeks to recover

16

1    the fees and expenses it incurred in its negotiation with Korat

2    as well as attorneys' fees and costs incurred in the present

3    litigation pursuant to the Letter of Intent's indemnification

4    clause.   Complaint, 57 to 59.

5              This Court has federal subject matter jurisdiction

6    pursuant to 28 U.S.C. 1331.   Any action in which the IFC is a

7    party is deemed to arise under the laws of the United States

8    and there is original jurisdiction over such actions.   22

9    U.S.C. Section 282f.   This Court has personal jurisdiction over

10   Korat and venue here is proper pursuant to the Letter of

11   Intent's forum selection clause.

12             Dismissal is appropriate pursuant to Rule 12(b)(6)

13   only if the plaintiff has not pled "enough facts to state a

14   claim to reliefs that is plausible on its face."   Bell Atlantic

15   Corp. v. Twombly, 127 S. Ct. 1955 (2007).   A plaintiff's

16   factual allegations must be enough to raise a right to relief

17   above the speculative level."   Twombly at 1965.   As noted, when

18   reviewing motion to dismiss, the Court assumes the truth of all

19   facts asserted in the complaint and draws all reasonable

20   inferences from those facts in favor of the plaintiff.   See

21   Cleveland v. Caplaw Enterprises, 448 F.3d 518, 512, (2d Cir.

22   2006).

23             The Letter of Intent specifies that New York Law

24   governs the interpretation of its terms.

25             All right, let's turn to the first claim for relief.

17

83R5IFCD                        decision

1    The first claim for relief is the breach of the implied

2    covenant of good faith and fair dealing.  I am finding that IFC

3    has stated a claim for breach of the applied covenant of good

4    faith and fair dealing.

5            Under New York Law, a covenant of good faith and fair

6    dealing in the course of contract performance is implicit in

7    all contracts.  <u>Dalton v. Educational Testing Service</u>, 87,

8    N.Y.2d 384,  389 (1995).  "Encompassed within the implied

9    obligation of each promisor are any promises which a reasonable

10   person in the position of the promisee would be justified in

11   understanding were included."  Among those implied obligations

12   is a pledge not to do anything that "will have the effect of

13   destroying or injuring the right of the other party to receive

14   the fruits of the contract."  No obligation may be implied,

15   however, that "would be inconsistent with other terms of the

16   contractual relationship."  Those are all quotes from <u>Dalton v.</u>

17   <u>Educational Testing Service</u> at 389.

18           Korat contends that IFC has failed to state a claim

19   for breach of this implied covenant because paragraph 7 of the

20   Letter of Intent permitted it to terminate their agreement on

21   15 days' notice.  In its view, an implied obligation to

22   continue negotiation would be inconsistent with this express

23   provision of the contract.

24           Korat's argument, however, mistakes the nature of

25   IFC's claim.  The complaint alleges that Korat breached the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

83R5IFCD                    decision

1   implied covenant of good faith and fair dealing with its

2   conduct during the negotiation of the ERPA.  The complaint 16

3   to 17 and 41 to 42.  It does not allege that Korat breached the

4   implied covenant of good faith and fair dealing by terminating

5   the LOI.  The issue before this Court is whether IFC has stated

6   a claim that Korat breached the implied covenant of good faith

7   and fair dealing by failing to negotiate in good faith.

8           Based on the allegations in the complaint and the

9   other documents I have said I am taking into account, that is

10  the exhibits and the LOI, I find that IFC has stated plausible

11  claim of breach of duty to negotiate good faith.  For example,

12  IFC alleges that between November and December of 2005 Korat

13  ignored IFC's attempts to discuss revisions to the Emission

14  Reduction Purchase Agreement and then responded only

15  reluctantly and not helpfully to IFC's December 13, 2005 offer

16  to redraft that document.  IFC also alleges that Korat totally

17  failed to respond to the revised draft ERPA it sent later that

18  month.  Complaint, paragraphs 23 and 25.

19          More significantly, IFC alleges that Korat kept IFC as

20  a fallback or "put option" while entertaining other offers.

21  This allegation is plausible which, again, is the Supreme Court

22  standard on 12(b)(6) motions for at least two reasons:  First,

23  Korat acknowledged it had received other offers it viewed as

24  "attractive," that's the October 19th, 2006 e-mail; and second,

25  IFC alleges that the market price of carbon credits had

83R5IFCD                    decision

1   increased significantly during the period of the parties'

2   negotiations which, if true, certainly provided Korat with an

3   incentive to hold out as long as possible in the negotiations.

4   Complaint paragraph 16.

5          IFC also alleges that Korat maintained negotiations

6   with IFC in order to use that relationship to help secure the

7   Thai government's approval for the project.  This claim is also

8   plausible.  IFC alleges that Korat terminated the agreement

9   after nearly three years of negotiations less than one month

10  after receiving the Thai government approval.  Complaint,

11  paragraph 30.

12         Finally, IFC alleges that EcoSecurities became a

13  purchaser of Korat's carbon credits rather than solely a

14  consultant.  According to the complaint, Korat disclosed

15  EcoSecurities' role as a "project participant" as opposed to an

16  advisor in its filing with the executive board of the U.N.

17  Framework Convention on Climate Change on March 29, 2007, less

18  than one month after Korat notified IFC that it was invoking

19  its right to terminate the Letter of Intent.  Complaint,

20  paragraphs 30 and 33.

21         Given how much time the parties spent attempting to

22  reach agreement on the sale of the CERs, it is unlikely

23  although certainly not inconceivable that Korat and ecosystems

24  could have reached agreement in less than one month.  Thus, it

25  is possible or at least plausible that Korat had been

83R5IFCD                    decision

1    negotiating with EcoSecurities while still bound by its

2    commitment under the terms of the Letter of Intent to negotiate

3    exclusively with IFC.  That, if true, would violate the Letter

4    of Intent's exclusivity clause and represent a breach of

5    Korat's duty to negotiate in good faith.

6            Therefore, I'm finding on Count One that IFC has

7    stated a plausible claim for breach of covenant of good faith

8    and fair dealing implicit in the Letter of Intent.  Count One,

9    therefore, remains, and I am denying the motion to the extent

10   it seeks dismissal of Count One.

11           Now Count One remains, as I say, so the question then

12   is what type of damages may IFC seek under Count One?  And I am

13   finding that it can recover reliance damages on that claim but

14   it can't recover lost profits, that is, the cost of the carbon

15   credits.

16           IFC seeks to recover expectation damages on its claim

17   for breach of the implied covenant of good faith and fair

18   dealing.  It seeks "replacement costs for the CERs of not less

19   than $18.3 million."  That's the complaint at paragraph 16.

20   Under New York Law, however, a party that prevails on the claim

21   for breach of the implied covenant of good faith and fair

22   dealing is limited to reliance damages and it does not obtain

23   benefit of the contract that ultimately was not entered into.

24   In other words, on the breach of a covenant of good faith and

25   fair dealing, you don't receive the benefit of the contract

83R5IFCD                    decision

1    that was not entered into, that is, you don't receive what you

2    would have received under the ERPA.  The ERPA was never entered

3    into.  See Goodstein Construction Corp. v. City of New York, 80

4    N.Y.2d 366, 604 N.E.2d 1356, 590 N.Y.S.2d 425 (1992).

5         In that case, parties had entered into two

6    "designation agreements" as part of which they agreed to

7    cooperate in preparing a land disposition agreement called an

8    LDA which governed the plaintiff's purchase and development of

9    certain city-owned properties.  After plaintiff had incurred

10   substantial expenses negotiating with New York City and

11   preparing the land disposition agreement, the city

12   "de-designated" the plaintiff as the negotiator.  Plaintiff

13   sued for breach of contract based on the defendant's failure to

14   negotiate in good faith and sought not only its out-of-pocket

15   expenses but also the profits it expected to have received if

16   they had successfully negotiated the land disposition

17   agreement.  The New York Court of Appeals held that "both the

18   law and logic preclude such a recovery."

19        And the following, these quotes are all from 368, 369,

20   371 of Goodstein and this quote is from 373,

21        "Contract damages are ordinarily intended to give the

22   injured party the benefit of the bargain by awarding the sum of

23   money that will, to the extent possible, put that party in as

24   good a position as it would have been had the contract been

25   performed.  Here, the defendant's sole obligation under the

83R5IFCD                    decision

1    designation agreements was to negotiate in good faith.  The

2    defendant is neither bound to agree to an LDA nor to continue

3    the negotiating process.  To allow the profits that plaintiff

4    might have made under the prospective LDA as the damages for

5    breach of the exclusive negotiating agreement would be basing

6    damages not on the exclusive negotiating agreements but on the

7    prospective terms of a nonexistent contract which the defendant

8    was fully at liberty to reject.  It would, in effect, be

9    transforming an agreement to negotiate for a contract into a

10   contract itself."

11        Here, the Letter of Intent bound Korat to negotiate in

12   good faith toward an Emission Reduction Purchase Agreement.

13   IFC is in exactly the position of Goodstein and, just as in

14   that case, is attempting to "transform an agreement to

15   negotiate for a contract into a contract itself."

16        Thus, IFC's recovery on Count One -- which I repeat I

17   am allowing -- is going to be its reliance damages and not lost

18   profits.

19        Now let's turn to Count Two, that is, the claim for

20   breach of contract arising out of the May through June e-mail

21   exchange.

22        I'm finding that IFC has not alleged a formation of a

23   binding agreement and therefore I am granting the motion

24   dismissing Count Two.

25        IFC alleges that the parties reached agreement on all

83R5IFCD                    decision

1    material terms in the course of the May to June 2005 e-mail

2    exchange.  IFC calls that the June agreement.  Complaint,

3    paragraph 18.  Its argument is although that agreement was not

4    the formal ERPA that was contemplated in the Letter of Intent,

5    it was nonetheless a binding agreement since it involved a

6    meeting of the minds on all material terms save only the

7    subsequent execution of the more formal agreement embodying all

8    the terms that have been agreed on.

9            However, that e-mail exchange which, as I have said on

10   several occasions I am considering on this motion, it is

11   evident that the parties did not reach a meeting of the minds

12   on the two most crucial items, that is, price of the carbon

13   credits and quantity of the carbon credits.

14           E-mails disclose that on May 5, 2006, Lochlin of Korat

15   wrote to Cook of IFC with a proposal regarding a variety of

16   terms for the carbon credit sale including the price of 4.75

17   Euros and a quantity of 1.5 million tons.  On June 10, Lochlin

18   again e-mailed Cook stating that IFC would be willing to

19   purchase 1.75 million tons of carbon credits at a price of 4.25

20   Euros.  Lochlin, noting that these terms were different than

21   those he had earlier proposed, indicated "he would be happy to

22   convey IFC's offer to the rest of the Korat board."  In an

23   e-mail the same day, Cook confirmed IFC's willingness to agree

24   to a deal on those terms and stated that he "looked forward to

25   hearing back" from Lochlin in order for them to "finalize the

83R5IFCD                    decision

1    terms."

2           It is abundantly clear from this exchange that the

3    parties never agreed to a price and quantity combination.  What

4    is apparent is that Korat made an offer that contained price

5    terms and quantity terms, IFC counter-offered with different

6    price and quantity terms which Korat agreed to take under

7    advisement, and at no point in this exchange did Korat agree to

8    the counter-offer.  There was no meeting of the minds on price

9    and quantity and therefore the June agreement was not a binding

10   contract as a matter of law.  See Tractebel Energy Marketing v.

11   AEP Power Marketing, Inc., 487 F.3d 89, 95 (2d Cir. 2007).

12          IFC argues that the standard of review on a motion to

13   dismiss requires that the Court assume that the e-mail exchange

14   is only part of the correspondence between the parties.

15   Therefore, I must deny the motion to dismiss on Count Two.  I

16   do draw all permissible inferences from the allegations in the

17   light most favorable to plaintiff but the complaint is clear

18   that the e-mails attached as exhibits are the sole evidence of

19   the June agreement.

20          Paragraph 18 states that Korat proposed terms in the

21   May 26 e-mail and that "after further negotiations as to the

22   quantity which would be sold to IFC, on June 10, 2005, IFC

23   agreed with Korat on price quantity combination and accepted

24   Korat's other terms.  A true and complete copy of the e-mail

25   chain evidencing these discussions and the June agreement is

83R5IFCD                    decision

1    attached as Exhibit D."  That's Complaint paragraph 18.

2            So, the plaintiff itself is saying that the alleged

3    contract is contained solely within the e-mail exchanges that

4    make up Exhibit D.  It can't now allege in its motion papers

5    that there is more documents that constitute the contract.

6            Paragraph 19 of the complaint alleges the parties

7    subsequently executed a term sheet containing the price and

8    quantity terms agreed to in the June agreement.  IFC, however,

9    makes clear in its motion papers that the term sheet merely

10   reflected the agreement that it contends the parties reached in

11   the May to June 2005 e-mail exchange and is not itself the

12   contract IFC is seeking to enforce in this action.

13           Plaintiff's memorandum of law in opposition to

14   defendant's motion to dismiss at 18.  As previously noted, the

15   term sheet is not before the Court.  Given that the May to June

16   e-mail exchange does not evidence the formation of the binding

17   of a contract and that paragraph 18 of the complaint alleges

18   that the e-mails annexed as Exhibit D alone evidence the June

19   agreement, it is not permissible for the Court to infer from

20   paragraph 19 that the term sheet, regardless of what it

21   contained, recorded the parties' binding agreement on price and

22   quantity.  Moreover, such a reading is not plausible because

23   the allegations are that the parties continue to negotiate

24   regarding the price of the carbon credits as late as October

25   2006.  This belies IFC's contention that the September 2005

26

83R5IFCD                    decision

1    term sheet recorded the parties' final agreement on this term.

2             I have said I am not considering the term sheet which

3    is Exhibit B of Korat's motion papers on this Rule 12(b)(6)

4    motion since it is not part of the complaint.  And, I am not

5    going to.

6             Let me drop a metaphorical footnote and say even if I

7    were to consider that exhibit, it does not help IFC since the

8    actual term sheet which, by the way, is entitled to "Draft Term

9    Sheet" despite the fact that IFC refers to it as the Final Term

10   Sheet that "Draft Term Sheet" the only term sheet I have, makes

11   it clear that its terms are not binding and are subject to

12   contingencies, approvals, and further negotiations.  And I am

13   reading from it which is Exhibit B to Korat's motion to dismiss

14   the complaint.  It says on the cover of it:

15            "Important disclaimer:  This term sheet is not a

16   complete description of the proposed ERPA apparently being

17   discussed by IFC and Korat and does not constitute an offer or

18   a commitment by IFC or Korat, and no party shall have any

19   liability hereunder.  It is intended to serve only as a basis

20   for discussion of the major terms that would apply to the

21   Emission Reduction Purchase Agreement.  IFC's authority to

22   enter into the ERPA is contingent on the approval of IFC's

23   management, approval of the Netherlands, and the execution of

24   final documentation."  And it goes on.  So, again, even if I

25   were to consider it, it is clear that that's not a document

83R5IFCD                       decision

1    that constitutes a contract.

2        In sum, the May to June 2005 e-mail exchange does not

3    constitute an agreement for sale of the carbon credits and I am

4    dismissing Count Two.  Now let's go on to Count Four.

5        In Count Four, IFC seeks to recover its expenses and

6    attorneys' fees in connection with negotiations pursuant to the

7    Letter of Intent arrived at the ERPA as well as its legal fees

8    and expenses of this litigation pursuant to the Letter of

9    Intent's indemnification clause.  Because the language of this

10   clause does not make it clear that Korat intended to indemnify

11   IFC for legal fees and the expenses of this litigation, IFC's

12   claim is without merit.

13       Under New York Law "words in a contract are to be

14   construed is to achieve the apparent purpose of the parties."

15   Hooper Associates Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487,

16   491 (1989).  With indemnity clauses, "the word should be

17   restrained to the particular occasion and particular object

18   which the parties had in view to avoid reading into them the

19   duty which the parties did not intend to assume."  Accordingly

20   "when a party is under no legal duty to indemnify, a contract

21   assuming that obligation must be strictly construed."  Those

22   quotes are from Hooper Associates Ltd. v. AGS Computers at 365.

23   In addition, "attorneys' fees are the ordinary incidents of

24   litigation" and Court should not infer a parties' intention to

25   pay attorneys' fees as damages "unless the intention to do so

83R5IFCD                    decision

1   is unmistakably clear in the language of the contract."  That's

2   from <u>Oscar Gruss & Son, Inc. v. Hollander</u>, 337 F.3d 186, 199

3   (2d Cir. 2003) (quoting <u>Hooper Associates</u>, 74 N.Y.2d at 492).

4           The indemnification clause in the Letter of Intent

5   provides that Korat will indemnify IFC and hold it harmless

6   against "losses, claims, damages or liabilities" to which it or

7   various of its representatives may become subject in connection

8   with any of their activities contemplated under this Letter of

9   Intent."  It also required Korat to reimburse any "expenses

10  including legal expenses" that IFC incurred "in connection

11  therewith or with the investigation or defense thereof."

12          This language does not disclose that the parties

13  intended to permit IFC to recover the expenses it incurred in

14  the course of their negotiations.  Most significantly, the

15  clause is addressed to "losses, claims, damages or

16  liabilities," none of which could plausibly encompass IFC's

17  expenses in negotiating the ERPA.  Additionally, there is

18  nothing in the clause to suggest that the reference to IFC's

19  "activities as contemplated under this Letter of Intent" should

20  be read so broadly as to include the parties' negotiations in

21  addition to the sale of purchase of carbon credits.  Construing

22  this language narrowly, I find no indication that it was

23  intended to permit IFC to recover negotiation expenses.

24          In addition, a termination clause, which is a separate

25  provision of the Letter of Intent from the current

1  indemnification provision, provides that Korat will provide IFC

2  with $100,000 for appraisal, due diligence and environmental

3  assessment and legal expenses if it terminates the agreement

4  after the start of due diligence.  The parties' inclusion of

5  this liquidated damage provision which was clearly intended to

6  compensate IFC for expenses incurred during the negotiation

7  process belies IFC's intention that the parties also intended a

8  separate indemnification clause to serve the same purpose.

9        In other words, I'm finding that in terms of "legal

10  expenses" that IFC is not entitled to its attorneys' fees

11  because in New York Law attorneys' fees are generally borne by

12  each party and it is only when the language unmistakably holds

13  otherwise that you find that the legal fees are being shifted

14  from one side to the other.  And in terms of legal fees, I just

15  don't find that.

16        In terms of the negotiation expenses here which

17  apparently they mean their hiring of experts and other expenses

18  associated with the negotiation, I am finding that the normal

19  rules governing contractual interpretation are that those

20  expenses were being handled in the termination clause and the

21  indemnification clause is designed to handle indemnification by

22  Korat of IFC for expenses incurred by IFC in connection with

23  third-party claims.  That's not what we are dealing with here.

24  So, the indemnification clause really is for third-party

25  claims.  The termination clause handles payment to IFC

1   including negotiation expenses.  So, it is all handled under

2   the contract and I'm not going to find -- I don't think I can

3   under the law -- that the indemnification clause covers legal

4   fees or negotiation expenses.

5           I refer to the <u>Oscar Gruss</u> case, that's quite

6   persuasive.  In that case the plaintiff sought his attorney's

7   fees on the basis of an indemnity clause saying that the

8   defendant would reimburse the plaintiff for any claims,

9   liabilities or damages resulting from the plaintiff's

10  contractual service.  And, it also provided that the defendant

11  would "reimburse the plaintiff promptly for any legal or other

12  expenses reasonably incurred by it in connection with

13  investigating, preparing to defend or defending any lawsuits,

14  investigations, claims or other proceedings arising in any

15  manner out of or in connection with the rendering of services

16  by the plaintiff hereunder (including, without limitation, in

17  connection with the enforcement of this agreement in the

18  indemnification obligation set forth herein)." <u>Oscar Gruss</u> at

19  199.

20          The <u>Gruss</u> Court construed the first of these

21  provisions to reach only "claims, liabilities and damages"

22  arising from third-party claims.  It then read the second

23  provision -- notwithstanding that provision references to

24  expenses incurred "without limitation, in connection with

25  enforcement of this agreement" to also apply only to

83R5IFCD                              decision

1    third-party claims.  That's Oscar Gruss 200.

2            The Second Circuit explained that other provisions of

3    the indemnification clause such as pertaining to the

4    plaintiff's obligation to notify the defendant of any claims

5    for which it would seek indemnification and the defendant's

6    obligation to obtain the plaintiff's consent before settling

7    any suits made sense only if the indemnification clause were

8    limited to third-party claims.  Just as the Second Circuit

9    construed very similar language in Oscar Gruss, I read the

10   indemnification clause here to apply only to third-party

11   claims.

12           Now, I understand that this clause does not contain

13   the notice and consent provisions that, in the Gruss case,

14   weighed in favor of limiting the indemnification clause to

15   third-party claims.  But, on the other hand, the clause here

16   does not contain anything like the countervailing language in

17   Oscar Gruss that provided for indemnification "without

18   limitation in connection with enforcement of this agreement."

19           As I said, both because under Gruss it is not

20   unmistakeably clear that the parties intended the indemnity

21   clause to apply to these claims and because of the existence of

22   the separate termination clause, I am finding that the legal

23   fees are not recoverable and the contractual language does not

24   permit recovery of negotiations of the expenses either.

25           So, IFC's claims to recover expenses incurred during

83R5IFCD                              decision

1    the negotiations and attorneys' fees and legal expenses fails

2    as a matter of law.  And, lastly, as correct, concedes the

3    termination payments are due under the termination clause.

4              All right.  I think that handles the motion.  Let's go

5    off the record now.

6              (Discussion off record)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25