# EXHIBIT 8



2121 PENNSYLVANIA AVE NW
WASHINGTON, DC  20433 USA
TELEPHONE: (202) 473-6684• FACSIMILE: (202) 974-4389

Letter of Intent

Confidential

May 17, 2004

Khorat Waste to Energy Company
Suite # 2504, 25th Flr., The Millennia Tower
62 Lang Suan Road
Lumpini, Pathumwan
Bangkok 10330, Thailand

Attention: David Donnelly, General Manager, KWTE Co

Ladies & Gentlemen:

### IFC-Netherlands Carbon Facility: Khorat Waste to Energy Project

In response to your expression of interest in selling Emission Reductions (as defined below) to International Finance Corporation ("IFC") in its capacity as the Trustee of the IFC-Netherlands Carbon Facility (the "Trustee") in connection with the Khorat Waste to Energy project we are pleased to enter into this letter agreement (the "Letter Agreement") which expresses both parties' intent to enter into an Emission Reduction Purchase Agreement ("ERPA"). This Letter Agreement is intended to set forth the basis on which the IFC-Netherlands Carbon Facility ("INCaF") and the Trustee will work with the Project Company (as defined below) in preparing and executing the purchase of Emission Reductions (as defined below) generated by the Project (as defined below).

1. The Project

We understand that the project, located in Khorat, Thailand, involves the construction, ownership, operation and financing of a methane recovery and waste to energy project to treat Sanguan Wongse Industries' (SWI's) wastewater and capture a minimum of 70,000 cubic meters of biogas daily for 10 years: (i) to be delivered to SWI as a substitute for its consumption of heavy fuel oil (HFO); and (ii) to be converted into electricity through combustion in biogas fueled electricity generator units which would generate approximately 19,100,000 kWh of electricity annually thereby displacing electricity currently purchased from the grid in Khorat, Thailand (the "Project"). It is envisaged that the owners of Khorat Waste to Energy Company (the "Project Company") will agree to sell and the Trustee will agree to purchase eligible greenhouse gas emission reductions as defined under the Kyoto Protocol including methane and carbon dioxide emission reductions ("Emission Reductions") to be generated or caused directly and/or indirectly by the operation of the Project per Paragraph 2 below unless otherwise agreed to in the ERPA.

2. INCaF Commitment

Nothing contained in this Letter Agreement will commit the Trustee to purchase Emission Reductions from the Project Company unless and until the Project Company and the Trustee have executed an ERPA and the terms and conditions of such ERPA are satisfied. Without prejudice to the

foregoing, at this preliminary stage and based upon the information made available to INCaF as of the date hereof and assuming (among other assumptions) the accuracy thereof, INCaF has the preliminary expectation to: (i) pay €3.00 per metric tonne of Emission Reductions; (ii) purchase not less than 2.0 million and not more than 2.25 million metric tonnes of Emission Reductions confirmed by validation for the period ending December 31, 2012 (the "Contract Volume") net of Emission Reductions payable as fees for adaptation and/or administration under the Clean Development Mechanism of the Kyoto Protocol ("CDM"); and (iii) purchase the Contract Volume based on an annual delivery schedule to be agreed.

3.  Project Requirements

The Project Company acknowledges that it has received information on INCaF's project processing cycle and understands both INCaF and Kyoto Protocol processing requirements (see Appendix A). In particular, the Project Company acknowledges that the Project will be required to comply with:

(i) UNFCCC, Kyoto Protocol and any national requirements for CDM projects (Article 12 of the Kyoto Protocol);

(ii) Project requirements of the State of the Netherlands, acting through the Ministry of Housing, Spatial Planning and the Environment ("VROM") which require that projects comply with certain sections of the OECD Guidelines for Multinational Enterprises (see Appendix B);

(iii) IFC's Environmental and Social Policies and Guidelines applicable to the Project (see http://www.ifc.org/enviro/EnvSoc/index.html); and

(iv) both IFC's and the Kyoto Protocol CDM disclosure requirements and public consultation requirements.

4.  Scope of INCaF and Trustee's Work

INCaF and/or the Trustee may take any or all of the actions set forth in Schedule 1 and any other actions that they determine to be necessary for the specific purpose of concluding an ERPA with the Project Company (the "Services"). The Services to be performed by INCaF will be carried out by INCaF staff in the Environmental Finance Group of IFC's Environment and Social Development Department solely in their capacity as INCaF staff and/or by consultants commissioned by INCaF. IFC, in its capacity as Trustee for INCaF, will sign this Letter Agreement and the ERPA, if successfully negotiated. The Project Company will cooperate fully as necessary with INCaF and the Trustee in carrying out the Services and taking the other steps described in Schedule 1. INCaF and/or the Trustee will be authorized to take the steps described in Schedule 1(e) only after the approval in writing has been received by INCaF from the Project Company.

5.  INCaF's Preferential Status

The Project Company hereby agrees that INCaF's and the Trustee's rights to purchase Emission Reductions up to the Contract Volume and any additional Emission Reductions the Trustee may agree to purchase shall be prior to the rights of any other party to acquire Emission Reductions generated from the Project. Subject to the provisions of Paragraph 7 below, the Project Company may only enter into negotiations with third-party purchasers that are interested in buying Emission Reductions generated or caused directly and/or indirectly by the operation of the Project if the Emission Reductions have been offered to the Trustee and INCaF or the Trustee have not accepted the offer within 30 days or otherwise indicated that they are not interested in purchasing the additional Emission Reductions.

- 3 -

6. <u>Expenses</u>

   (a) <u>Project Company Expenses</u>

   As per Schedule 1 the Project Company will pay all expenses and fees related to the Baseline Study, the Monitoring Plan, and the validation of the Project as per Schedule 1, and all expenses and fees related to the registration with the Executive Board. The Project Company will pay any taxes, fees or other charges applied by the Government of Thailand to process CDM projects and/or to payments for Emission Reductions generated in the country and/or to transfers of Emission Reductions to foreign buyers.

   (b) <u>Trustee Expenses</u>

   The Trustee will cover the expenses for INCaF's appraisal and due diligence and IFC's Environment and Social Review as per Schedule 1(c) and for INCaF's legal counsel (collectively, "Appraisal Expenses").

   Subject to Paragraphs 7(d) and 7(e) below, the Trustee expects to recover all costs incurred by INCaF pursuant to this Paragraph 6 by amortizing them in the unit price paid for the Emission Reductions under the ERPA. The price paid is expected to be as provided in Paragraph 2.

7. <u>Termination</u>

   (a) Methods of Termination

   This Letter Agreement

   (i) may be terminated by the Project Company or the Trustee, with or without cause, by giving at least fifteen (15) days' prior written notice to the other party; and

   (ii) shall automatically terminate on the earlier of:
   (x) the execution of the ERPA, and
   (y) the date that is nine months after the Project is registered by the Executive Board in the event that the ERPA has not been executed by such date.

   If this Letter Agreement is terminated pursuant to Paragraph 7(a)(ii)(y) above, the parties acknowledge and agree that the Project Company shall have the obligation to reimburse the Trustee as provided in Paragraph 7(d) below.

   (b) <u>Consequences of Termination</u>

   Any such termination shall release the Project Company and INCaF and the Trustee from all of their respective obligations under this Letter Agreement, including any liabilities arising therefrom, except as provided in Paragraph 7.

   (c) <u>Survival of Provisions</u>

   In the event this Letter Agreement is terminated for any reason, the following provisions are hereby expressly agreed to survive termination and shall remain in full force and effect: Paragraph 7 (Termination), Paragraph 8 (Amounts Payable), Paragraph 9 (Sharing of Information), Paragraph 10 (INCaF's No Warranty), Paragraph 11 (Potential Conflict of Interest), Paragraph 12 (Indemnity), Paragraph 13 (INCaF Reports), and Paragraph 16 (Governing Law and Submission to Jurisdiction).

- 4 -

(d) <u>Termination by Project Company</u>

Subject to the provisions of Paragraphs 7(f) and (g) below, if the Project Company terminates this Letter Agreement or otherwise fails to fulfill its obligations under this Letter Agreement such as to effectively terminate this Letter Agreement prior to concluding an ERPA with the Trustee then the Project Company agrees to reimburse the Trustee: $25,000 if the termination takes place before the due diligence has started; or up to an amount of $100,000 for Appraisal Expenses incurred (whether or not invoiced) in connection with the Services in addition to an amount of $25,000, if the termination takes place after the Project Concept Note ("PCN") has been approved by VROM as specified in Schedule 1 (b) and after the due diligence by the Trustee has commenced. The Trustee will commence due diligence at any time after the Project Company has requested in writing to the Trustee that the Trustee should commence such due diligence, which written request for commencement of due diligence shall be substantially in the form attached as Annex I.

(e) <u>Termination by Trustee</u>

If the Trustee terminates this Letter Agreement prior to the conclusion of an ERPA with the Project Company:

(i) if at any time it is determined that the Contract Volume is less than 1.2 million metric tonnes, or if the Project differs in a significant or material way from the Project proposed in the Project Concept Note (see Schedule 1 (b)), or as a result of the Project Company's failure to take any action or obtain any approval required pursuant to the terms of this Letter Agreement within a reasonable period of time, the termination will have the same consequences as a termination by the Project Company in 7(d) except for as provided in Paragraph 7(f)(iii) below; or

(ii) for all reasons other than those described in Paragraph 7(e)(i), the Project Company will have no liability.

(f) <u>Special Termination Events</u>

(i) In the event VROM does not grant its approval of the PCN within 60 days from the date INCaF transmits to VROM the PCN prepared by the Project Company as specified in Schedule 1(b), the Project Company has the right to terminate this Letter Agreement with no further obligation to the other party; <u>provided, however</u>, that if VROM has requested additional information in order to give its approval, such 60-day period shall be extended, but only by an additional 30 days unless the Project Company agrees in writing to a longer extension, in order to provide the parties and VROM reasonable time to obtain the approval.

(ii) In the event that VROM's PCN approval offers a price and range in volume which are lower than the price or range in volume, as applicable, in the price or volume range in Paragraph 2, then the Project Company may terminate this Letter Agreement within fifteen (15) days following receipt of the PCN approval and neither party shall have any further obligation to the other party.

(iii) If it is determined that the Government of Thailand has not been expediently issuing Letters of Approval ("LoAs") for projects and for this reason the Project does not receive its LoA by December 31, 2004, then the Trustee has the right

- 5 -

to terminate this Letter Agreement and INCaF will pay (and the reimbursement obligation of the Project Company set forth in Paragraph 7(d) shall not arise) for any and all of INCaF's expenses incurred in connection with INCaF's appraisal and due diligence and IFC's Environment and Social Review, as the case may be. If the LoA is subsequently issued, then if so requested by the Trustee, the Project Company agrees to enter into a replacement letter agreement on the same terms and conditions as this Letter Agreement, except that the Contract Volume and/or the definition of the Project shall be modified to reflect the attributes of the Project at the time the LoA is received. If the Project Company fails to enter into such replacement letter agreement with the Trustee, then it shall pay the Trustee the amount specified in Paragraph 7(d) plus $300,000.

(g)   Sale to Third Party

If (i) (a) the Project Company terminates this Letter Agreement or (b) this Letter Agreement automatically terminates pursuant to Paragraph 7(a)(ii)(y) and (ii) within one year of termination or the effective date of such termination of this Letter Agreement, as the case may be, the Project Company enters into an agreement or agreements with another buyer or buyers to sell Emission Reductions generated from or caused directly and/or indirectly by the Project or any configuration or reconfiguration of the Project, then the Project Company agrees to provide INCaF with a certified, true and complete copy of such agreement or agreements with such other buyer or buyers and to reimburse the Trustee the amount specified in Paragraph 7(d) plus $300,000.

8.   Amounts Payable

Any amounts payable to the Trustee pursuant to this Letter Agreement shall be due and payable net of any taxes, withholdings or deductions whatsoever in U.S. Dollars in immediately available funds at such bank or banks, in such place or places as the Trustee or the payee may from time to time designate, to the Trustee within thirty (30) days of receipt by the Project Company of an invoice.

9.   Sharing of Information

The Project Company acknowledges that IFC and the Trustee have signed a confidentiality agreement with VROM whereby VROM has agreed to treat confidential information provided to it by INCaF or the Trustee with the same care as VROM normally exercises for its own information of a like character and to limit circulation of such information to persons within VROM who have a need to know such information. VROM has further agreed not to disclose any confidential information except to the extent necessary to meet requirements under applicable Dutch or European Union law and the requirements of the Kyoto Protocol. The Project Company agrees that IFC's, the Trustee's and INCaF's obligation to VROM is limited to obtaining its written agreement to these terms.

10.   INCaF's No Warranty

Neither INCaF nor the Trustee makes any representation or warranty as to the outcome of, or as to the accuracy or completeness of, any reports, documents, or analyses prepared, or caused to be prepared, by it in connection with the subject matter of this Letter Agreement. Neither INCaF nor the Trustee will be liable for any loss, cost, damage or liability that the Project Company or any other party might suffer or incur in connection with this Letter Agreement, the Services performed by INCaF or the Trustee hereunder, any transaction contemplated hereby or INCaF's or the Trustee's role in

connection therewith, except to the extent that such loss, cost, damage or liability resulted from INCaF's or the Trustee's gross negligence or willful misconduct. Any such claim will be limited to reasonably foreseeable losses arising directly from performance of such Services and will not include lost profits or consequential or punitive damages.

11.   Potential for Conflict of Interest

In the event that the Project Company enters into a mandate letter with an IFC investment department with the aim to obtain debt and/or equity financing for the Project, the Project Company will be expected to sign a letter acknowledging that the Project Company will be working with two separate teams within IFC (the investment department team representing IFC to process the debt and/or equity financing and the INCaF team to process the Emission Reduction purchase), and authorizing INCaF to obtain any necessary confidential information on the Project from the Project Company, from any department within the IFC and/or from other financial institutions or other entities that are involved in preparing or financing the Project and to share any confidential information developed or obtained by INCaF.

12.   Indemnity

The Project Company agrees to indemnify and hold IFC, INCaF and the Trustee harmless against any losses, claims, damages or liabilities to which the Trustee, IFC, its governors, directors, employees, agents, consultants or legal Counsel (each, an "Indemnified Party") may become subject in connection with any Indemnified Party's activities as contemplated under this Letter Agreement, and to reimburse IFC, INCaF and the Trustee for any expenses, including any legal expenses, incurred by IFC, INCaF or the Trustee in connection therewith or with the investigation or defense thereof; provided however that the Project Company shall not be liable in respect of any such loss, claim, damage or liability to the extent that such loss, cost, damage or liability resulted from such Indemnified Party's gross negligence or willful misconduct.

13.   INCaF Reports

All written material prepared by INCaF or the Trustee or in which INCaF or the Trustee assists in the preparation in connection with the Project, including, without limitation, this Letter Agreement and any ERPA whether or not they have been cleared and ratified by the Project Company, will be and will remain the property of INCaF or the Trustee. In all cases, the written material shall not be provided to any third party without INCaF's, the Trustee's and the Project Company's written consent, and then only if they include such disclaimers as INCaF and the Trustee shall specify with the exception of the PDD, which the Trustee acknowledges must be made public pursuant to Kyoto Protocol requirements. None of INCaF's, IFC's or the Trustee's names nor opinions shall be used in any advertisements, promotional material, or other written materials or in presentations or other oral representations to other potential lenders or investors or other written materials without the Trustee's prior written consent which will not be unreasonably withheld.

14.   Provision of Information

The Project Company shall provide, at its own cost and in a timely fashion, all relevant information and assistance reasonably requested by the Trustee, INCaF, its staff, consultants or legal counsel to carry out INCaF's and the Trustee's duties hereunder and shall grant access to INCaF, the Trustee and, upon request, VROM for such purpose, to all pertinent documents, facilities, premises, sites and personnel.

15. <u>Trustee's Right to Assign</u>

The Trustee may assign, without the prior consent of the Project Company, all of its rights and obligations under this Letter Agreement to any IFC facility (other than INCaF) that agrees to enter into an ERPA with the Project Company as contemplated herein.

16. <u>Governing Law and Submission to Jurisdiction</u>

The terms of this Letter Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, United States of America. The Company irrevocably submits to the non-exclusive jurisdiction of the courts of the United States of America located in the Southern District of New York and irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Letter Agreement may be brought by INCaF or the Trustee in such court. The Company irrevocably waives, to the fullest extent permitted by law, any objection it may now or hereafter have to the laying of venue of any such legal action, suit or proceeding and any claim that such legal action, suit or proceeding has been brought in an inconvenient forum and agrees that a final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding upon it and may be enforced in any other courts in the jurisdiction of which it is or may be subject, by suit upon such judgment.

Please confirm your agreement with the above terms and conditions by executing and returning to us two of the enclosed copies of this Letter Agreement. This Letter Agreement will enter into force on the date of countersigning by the Project Company. In any event if this Letter Agreement is not executed and returned to INCaF before the close of business on May 21, 2004, then this Letter Agreement will not become effective and neither the Trustee nor INCaF will be bound by any of the terms and conditions stated herein.

Sincerely,

INTERNATIONAL FINANCE CORPORATION, in its capacity as Trustee for the IFC-Netherlands Carbon Facility

Date: _May 18, 2004_

By: _[signature]_
   Authorized Signature

Name: _LOUIS C. BOORSTIN_

We acknowledge receipt of this Letter Agreement and accept and agree to be bound by the terms set forth herein:

Khorat Waste to Energy Company,

Date: _May 20, 2004_

By: _[signature]_
   Authorized Signature

Name: _GRANVILLE SMITH_

- 8 -

Appendices (provided as attachments):

- A    Project Cycle
- B    OECD Guidelines (VROM Requirements)
- C    PCN Template
- D    VROM's Baseline Guidance
- E    Letter of Approval Template

SCHEDULE 1

SCOPE OF SERVICES AND PROJECT CYCLE

    (a)    <u>Preparation of Baseline Study</u>

The Project Company will commission and pay for a baseline study, which will be conducted in accordance with Kyoto Protocol requirements and interim guidance provided by VROM (see Appendix D) by an expert reasonably satisfactory to INCaF (the "Baseline Study"). The Project Company will also commission and pay for the development of an appropriate Methodology for the review and approval of the executive board of the CDM (the "Executive Board").

    (b)    <u>Preparation of the Project Concept Note</u>

The Project Company must prepare, at its own expense, a Project Concept Note ("PCN"), the template for which is attached in Appendix C. The PCN must contain or be supported by a preliminary baseline analysis to determine the 'without project' scenario, an estimate of the expected volume of Emission Reductions resulting from and/or caused directly and/or indirectly by the operation of the Project. INCaF and the Trustee will review the PCN and thereafter will transmit the PCN along with its observations and recommendations to VROM for its review and approval. VROM's approval of the PCN would constitute a conditional approval to purchase Emission Reductions from the Project subject to certain conditions being satisfied (such as, for example, the Project being validated and registered as a CDM project activity). The PCN approval will confirm certain preliminary material indicative terms which the parties expect at such time to be included in the Term Sheet including details on price, duration and volume and, if applicable, any options relating to the purchase of Emission Reductions beyond the maximum stated duration.

    (c)    <u>Preparation of Monitoring Plan</u>

If the baseline study indicates that Emission Reductions are likely to be eligible under the CDM and will be of a reasonable or significant amount, the Project Company will commission a monitoring plan for the Project to be prepared by consultants or experts reasonably satisfactory to both parties (the "Monitoring Plan").

    (d)    <u>Project Design Document, Validation and Request for Registration</u>

The Project Company, in consultation with INCaF, will hire an Operational Entity ("OE") to validate the Emission Reduction component of the Project. INCaF will work with the Project Company to prepare and submit to the OE a Project Design Document ("PDD") (including a "Letter of Approval" from the Government of Thailand (see Appendix E) and a summary of how comments from stakeholders were solicited and taken into account) to be evaluated and validated by the OE against the requirements of the CDM.

Following validation by the OE, INCaF will assist the Project Company with its request that the OE submit to the Executive Board a request for registration of the Project in the form of a validation report including such supporting documents as the Executive Board may require or may otherwise be necessary or advisable. The Project Company shall be responsible for obtaining the registration with the Executive Board. In the event that the Executive Board is unable to accept the Project for timely registration, VROM may make a determination to proceed before formal registration of the Project by the Executive Board.

- 10 -

(e) <u>Appraisal and Due Diligence</u>

Promptly after the Project is registered by the Executive Board and written approval to proceed is received from the Project Company and no later than December 31, 2004, INCaF will carry out or commission an appraisal and due diligence at a level determined by INCaF. The scope and extent of the Environmental and Social Review and the appraisal and due diligence will depend on the information provided to INCaF by the Project Company and any other institutions participating in the financing of the Project that have carried out their own due diligence and are willing to share the information. For the appraisal, INCaF will also evaluate the technical, commercial, financial and legal soundness of the Project to ensure that INCaF is comfortable that the Project will perform as proposed or indicated by the Project Company. The appraisal should convince INCaF that, based on the information available, the Project is expected to perform and generate Emission Reductions as indicated in the PCN. In addition, INCaF will carry out and/or commission all or part of an Environmental and Social Review of the Project, including a field appraisal as necessary and desk review of the Project, as well as consultations with the Project Company, relevant governments, technical experts and stakeholders to ensure the Project complies with IFC's Environmental and Social Policies and Guidelines.

(f) <u>Emission Reduction Purchase Agreement Terms</u>

Once the Project has been validated and registered as per paragraph (d) above, INCaF will negotiate the terms of the ERPA, including price per metric tonne of Emission Reductions and duration of the agreement, with the Project Company and the parties will agree to a final term sheet (the "Term Sheet").

Once the Term Sheet is finally negotiated, INCaF will instruct its lawyers to prepare the ERPA. The ERPA will provide for the termination of this Letter Agreement and will govern the purchase of eligible Emission Reductions by the Trustee. The ERPA will require that the Project Company pay for services for verification and certification of the Emission Reductions to be purchased.

(g) <u>Verification and Certification</u>

The costs incurred relating to the initial verification (if applicable), verification, re-verification (if needed), certification, registration and issuance of Emission Reductions, renewal of the Baseline Study and monitoring of the Project, in each case, in accordance with the requirements of the Kyoto Protocol, will be paid directly by the Project Company.

**Annex 1**

Form of Request For Commencement of Due Diligence

IFC-Netherlands Carbon Facility
2121 Pennsylvania Ave NW
Washington, DC   20433 USA

Facsimile: (202) 974-4349
[Date]

Attention:  Mr. Vikram Widge

Subject:  Request for Commencement of Due Diligence

Dear Mr. Widge,

  Reference is hereby made to the Letter Agreement (the "Letter Agreement") dated [xxx] between Khorat Waste to Energy Company (the "Project Company") and International Finance Corporation in its capacity as the Trustee of the IFC-Netherlands Carbon Facility (the "Trustee"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Letter Agreement.

  Pursuant to Paragrah 7(d) of the Letter Agreement, the Project Company hereby formally requests the Trustee to commence due diligence of the Project. The Project Company acknowledges and agrees that this request will bind it to the provisions and potential liabilities applicable to a termination of the Letter Agreement after due diligence has commenced as set forth in Paragraph 7(d) of the Letter Agreement.

                   Sincerely,

Khorat Waste to Energy Company,

    Date: _____

    By: _____
       Authorized Signature

    Name: _____

    Title: _____